FILED
2014 Feb-27 PM 03:11
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT
# "1"

IN THE U.S. DISTRICT  COURT OF

NORTHERN DISTRICT OF ALABAMA

NORTHEASTERN DIVISION


CASE NUMBER:  5:12-CV-02119


DOUGLAS AGEE,

Plaintiff(s),

vs.

KONE, INC., CHUGACH WORLD SERVICES.,

Defendant(s).


DEPOSITION OF DOUGLAS AGEE


S T I P U L A T I O N

IT IS STIPULATED AND AGREED, by and
between the parties through their respective
counsel that the deposition of DOUGLAS AGEE may
be taken before Allison Miller, Commissioner,
at the law offices of Lloyd, Gray, Whitehead &
Monroe, 2501 20th Place, Suite 300,  Birmingham,
Alabama, on the 12th day of June, 2013,
commencing at or about 11:00 a.m.

40d7b3b5-0fcc-4a61-a2d6-807c6a734e4a

IT IS FURTHER STIPULATED AND AGREED that the reading of and signature to the deposition by the witness is waived, said deposition to have the same force and effect as if full compliance had been had with all laws and rules of court relating to taking of depositions.

IT IS FURTHER STIPULATED AND AGREED that it shall not be necessary that any objections be made by counsel to any questions, except as to form or leading questions, and that counsel for the parties may make objections and assign grounds at the time of the trial, or at the time said deposition is offered in evidence, or prior thereto.

IT IS FURTHER STIPULATED AND AGREED that notice of filing of the deposition by the Commissioner is waived.

In accordance with Rule 5(d) of The Alabama Rules of Civil Procedure, as Amended, effective May 15, 1988, I, Allison Miller, am hereby delivering to Bryan Grayson, Esq., the original transcript of the oral testimony taken

on the 12th day of June, 2013, along with exhibits.

Please be advised that this is the same and not retained by the Court Reporter, nor filed with the Court.

2

I N D E X

| EXAMINATION BY: | PAGE NO. |
|---|---|
| Mr. Grayson | 7 |
| Mr. Kendrick | 189 |

E X H I B I T S

| PLAINTIFF'S EXHIBIT NO.: | PAGE NO. |
|---|---|
| No. 1 Medical Record | 37 |
| No. 2 Operative Report | 41 |
| No. 3 Clinical Note | 43 |
| No. 4 Operative Report | 46 |
| No. 5 Clinical Note | 48 |
| No. 6 Clinical Note | 50 |
| No. 7 Operative Note | 54 |
| No. 8 MRI Record | 56 |
| No. 9 Document from Dr. Parker | 109 |
| No. 10 Results of CT Myleogram | 116 |
| No. 11 Clinical Note | 120 |
| No. 12 Record from Dr. Parker | 126 |
| No. 13 Letter from Dr. Parker | 134 |
| No. 14 Declaration from Dr. Parker | 136 |
| No. 15 Operative Report | 138 |
| No. 16 Physical Therapy Evaluation | 140 |

| | |
|---|---|
| No. 17 Discharge Form | 143 |
| No. 18 Clinical Note | 144 |
| No. 19 Clinical Note | 146 |
| No. 20 Office Note | 148 |
| No. 21 Lost Wage Form | 157 |
| No. 22 First Amended Complaint | 169 |
| No. 23 Initial Disclosure | 175 |
| No. 24 Initial Complaint | 178 |

40d7b3b5-0fcc-4a61-a2d6-807c6a734e4a

Page 6

APPEARANCES

APPEARING ON BEHALF OF THE PLAINTIFF(S):

David L. Middlemas, Esq.
1740 Oxmoor Road
#210
Birmingham, Alabama 35209

APPEARING ON BEHALF OF THE DEFENDANT(S):

Bryan Grayson, Esq.
Lloyd, Gray, Whitehead & Monroe, P.C.
2501 20th Place
Suite 300
Birmingham, Alabama 35223

Douglas Kendrick, Esq.
Swift, Currie, McGhee & Heirs
1355 Peachtree Street
Suite 300
Atlanta, Georgia 30309

Page 7

I, ALLISON MILLER, acting as Commissioner, certify that on this date as provided by Rule 30 of the Alabama Rules of Civil Procedure and the foregoing stipulation of counsel, there came before me DOUGLAS AGEE, witness in the above cause, for oral examination, whereupon the following proceedings were had:

THE COURT REPORTER: The usual stipulations okay?

MR. GRAYSON: That will be fine.

DOUGLAS AGEE,

being first duly sworn, was examined and testified as follows:

EXAMINATION BY MR. GRAYSON:

Q. Mr. Agee, we met a little while ago. My name is Bryan Grayson. I'm the attorney for one of the defendants in this case, Chugach World Services, Inc. Have you ever had to give a deposition before?
A. Yes.

Page 8

Q. So you know the routine. I'm going to ask you a bunch of questions today. The only thing I ask of you is if you don't understand any of the questions I ask, if you'll just ask me to rephrase it or repeat it, then I'll be happen to do so. If you answer a question, I'm going to assume you understood it; is that fair?
A. That's fair.
Q. And if you need a break at any point in time, go to the restroom or anything, just let me know.
Will you state your full name for the record, please?
A. Douglas Shepard Agee.
Q. What's your date of birth?
A. [redacted].
Q. And how many prior depositions have you given?
A. One.
Q. What type of case was that in?
A. It was a drug case. I was a young college student in Florida and I was a State's

Page 9

witness.
Q. Was it a criminal case?
A. Uh-huh (affirmative response).
Q. What's your current address?
A. [redacted]
Q. How long have you been at that address?
A. Eight years. 2005.
Q. Does anybody live there with you?
A. My wife and son.
Q. What's your wife's name?
A. [redacted] -- do you want the whole?
Q. Yeah, if you can.
A. [redacted].
Q. [redacted]
A. Uh-huh (affirmative response).
Q. Is your son, is he a minor still?
A. Yes.
Q. How old is he?
A. [redacted]
Q. And how long have you been married

40d7b3b5-0fcc-4a61-a2d6-807c6a734e4a

to your wife for?
A. 28 years.
Q. Other than your wife and son, do you have any other relatives that live in the Huntsville, Birmingham area?
A. No, sir.
Q. Any other relatives anywhere in North Alabama?
A. No, sir.
Q. Do you belong to any clubs or civic organizations in the Madison County area?
A. I belong to the Blue and Gray Rod and Gun Club.
Q. What was the second one you said?
A. It's the Blue and Gray Rod and Gun Club. It's a range.
Q. Any other clubs or civic organizations you belong to?
A. Army Aviation Association of America, VFW, Air Force Association and Boy Scouts of America.
Q. Do you belong to a church or any

other type of religious --
A. Yes, Christ Church of Monrovia, A Cumberland Presbyterian Church.
Q. Do you maintain any type of web page or blog?
A. I have Facebook and I have a Twitter account but don't use it.
Q. Do you use Facebook on a regular basis?
A. Yeah, I check it once a day, so I keep track with my sister.
Q. Do you ever post things on Facebook to keep relatives updated about how you're doing?
A. Yeah, I do that and I comment on the political events of the day.
Q. And do you know how long you've been using Facebook for?
A. I don't know. Probably, I don't know, four years.
Q. Where were you born?
A. Richmond, Virginia.
Q. What brought you to Alabama?

A. The U.S. Army.
Q. How long have you been in Alabama for?
A. 13 years consecutive. I was there -- I was at Rucker a number of times so -- my last assignment was there for five years and then eight years here.
Q. Where did you go to high school?
A. Venus High School.
Q. Where is that?
A. In Venus, Florida.
Q. Have you had any additional education since high school?
A. I have an Associate's degree from Manatee Junior College.
Q. Where is Manatee Junior College?
A. Bradenton, Florida and I was at the Venus campus.
Q. And other than that Associate's degree, have you had any other education since high school?
A. Oh, yeah. Army, I've been to Flight School, a maintenance officer's course,

instructor pilot's course, all my ATU training is the Department of Army Civilian.
Q. And all -- was all of that retired training as part of your service in the armed forces?
A. Uh-huh (affirmative response).
Q. Have you ever enrolled in any other types of degree programs?
A. I'm currently -- I'm working on my Bachelor's degree with Excelsior.
Q. I'm not familiar with Excelsior. What is it?
A. It's out of New York City in New York. It's -- you can do things on-line and they give you credit for the military. It used to be known as Regent's, I think.
Q. And do you have a major?
A. History.
Q. And do you have any type of minor?
A. No.
Q. Do you know when you expect to complete that degree?
A. I'm three classes short. It's

just time.
Q. Have you ever filed a lawsuit prior to this one?
A. No, sir.
Q. Have you ever been sued?
A. No, sir.
Q. Have you ever filed for bankruptcy?
A. No, sir.
Q. Have you done anything to prepare for your deposition today?
A. Just talked to Davis.
Q. Did you review any documents to get ready for your deposition?
A. No.
Q. Are you currently employed?
A. Yes, sir.
Q. Who do you currently work for?
A. The United States Army. Do you want the organization?
Q. Yes, please.
A. Close Combat Weapons Systems Project Office, PEO Missiles and Space.

Q. Is that program based on Redstone Arsenal?
A. Yes.
Q. And how long have you worked for the Close Combat Weapons Systems?
A. Since 2008.
Q. What were you doing immediately prior to when you started there?
A. I was working the internal tracking emission systems at the Redstone Arsenal as an international programming specialist.
Q. How many years total have you been working in some capacity on Redstone Arsenal?
A. Since 2005 when I retired from the Army.
Q. Do you currently take any medications that you believe would affect your memory or your ability to testify truthfully today?
A. No.
Q. And do you understand you're sworn to tell the truth in response to all questions

asked of you today?
A. Yes, sir.
Q. I want to take -- start out by going through some of your past medical history. There have been a bunch of medical records produced so far during the course of this litigation. And probably the easiest way to get started is, can you tell me when you first started experiencing any type of neck pain that caused you to go and see a physician for treatment?
A. Yes. 2003. I was at Fort Hood, Texas teaching 227s and long bow newest version and my neck started -- I lost feeling in my arms. So I flew back to Fort Rucker and self admitted. And that lead to my first two surgeries.
Q. You flew back to Fort --
A. Rucker, Alabama.
Q. Where is that? Where in Alabama is that located?
A. It's between Dothan and Ozark. Dothan, Ozark, Enterprise, Daleville.

Q. Did you go to the hospital on Fort Rucker for treatment?
A. Uh-huh (affirmative response).
Q. Do you know the name of that hospital?
A. It was Fort Rucker. It's not there any more.
Q. Do you recall whether there's a specific physician at the hospital that you saw?
A. I saw the flight surgeon who referred me to the orthopedic surgeon, and he took X-rays, myelogram -- not myelogram, but CT scans and referred me Dr. Barnard at Dothan. Southern Bone and Joint is who he worked for.
MR. KENDRICK: Say his name one more time.
A. Dr. Henry Barnard, B-A-R-N-A-R-D.
Q. So you were referred by a physician at Fort Rucker to Dr. Henry Barnard who you said worked at Southern Bone and Joint?

40d7b3b5-0fcc-4a61-a2d6-807c6a734e4a

A. Yes.
Q. And when you first went to Dr. Barnard, I assume, did he do some -- did he take an X-ray of your neck?
A. Yes.
Q. Did he do a myelogram?
A. He didn't do a myelogram. He did due diligence. It's like it was very apparent I had some problems and -- from a helicopter, so I had the first fusion.
Q. What was the diagnosis that Dr. Barnard made after he examined you?
A. It was -- I just had disc bulges.
Q. Was it one disc or multiple discs?
A. It was one. The second one he didn't think was necessary at the time and he was trying to be conservative in the approach because I had a year to get back in flight status. We had the first surgery. It went pretty good for about a month, and then we had to go in and -- go back in for the second one.
Q. All right. The first surgery you had, do you know what type of procedure that

was?
A. It was an interior fusion. They went through the front, put a sugar cube in between 6 and 7, I think it was. C6 and C7.
Q. So the disc bulge was at C6, C7?
A. Yes. I may be backward. You know, 5-6, 6-7, but it's been --
Q. Do you know the approximate date of that first surgery?
A. It was in -- it was the end of 2003, August, I think.
Q. And that surgery was performed -- was it performed by Dr. Barnard?
A. Uh-huh (affirmative response).
Q. And do you know where he performed that? Was it at a hospital?
A. Dothan Hospital.
Q. And is Southern Bone and Joint affiliated with Dothan Hospital?
A. Yeah, he had physician's rights there. He's kind of like -- yeah. He's a private practitioner.
Q. So Southern Bone and Joint, it's

its own private medical practice, but Dr. Barnard has access to facilities at Dothan Hospital?
A. Right. He has privileges at Dothan Hospital.
Q. And after that first surgery took place in late 2003, did you experience any pain relief?
A. Initially I did. And then the second surgery -- I ended up having the second surgery because the same problems pretty much manifested right away. So they took me back in, spent another month on the bed and went through recovery, got back in the cockpit in 11 months, 11 and a half months after that first surgery.
Q. After the first surgery, how long did you -- you said you initially had some pain relief. How long did that last for before the pain started coming back?
A. About two weeks. I mean, it was really quick. I can remember being back in about a month.

Q. And the second surgery was performed, was that about a month later or was it further down the road?
A. It was within a month after recovery. And I started having the same problems, so they did the second surgery. And then, you know, you woke up and you immediately feel no pain. I don't know if you've ever had one, but when they fix it, it's -- it's a good feeling to wake up. Other than feeling oozy, it's --
Q. And the second surgery, do you know whether that was the same procedure or was that a different procedure?
A. Same procedure, different disc. Same scar.
Q. And do you know which disc was involved in the second surgery?
A. I think it was 5 and 6.
Q. All right. So the first surgery that's in late 2003 you think was a fusion at C6, 7?
A. Uh-huh (affirmative response).

40d7b3b5-0fcc-4a61-a2d6-807c6a734e4a

Q. And then --
A. Then we had 5 and 6.
Q. And that C5, C6, is that still you think late 2003 or is that in 2004?
A. 2004.
MR. KENDRICK: I think he said the first one was August of 2003?
THE WITNESS: Yeah. I'm not sure of the month.
Q. All right. And you said you experienced immediate relief after the second surgery?
A. Uh-huh (affirmative response).
Q. Prior to the first surgery, did you experience some type of -- any type of trauma to the neck that brought on the pain?
A. 2,000 flight hours. I flew tactical helicopters.
Q. And did the physician ever tell you that he or she thought the neck problems you were experiencing were associated with the number of flight hours you had done?
A. Oh, yes, yes.

Q. Who told you that?
A. Colonel Barber. It's a normal -- that part of it is a normal effect of flying Apaches.
Q. And Colonel Barber, does he have any medical training?
A. He's the orthopedic -- he was, at the time, the orthopedic surgeon at Fort Rucker.
Q. Is he the one that referred you to Dr. Barnard?
A. Uh-huh (affirmative response).
Q. The -- prior to the second surgery when you started having pain again, was there any specific instigating event that brought on that pain?
A. No. Let me explain. The first surgery I had, I went home after the surgery and I was in bed for 30 days with a neck brace. The only time I got up was to go to the bathroom. That was the restriction I had. I got -- after that month was over, during that month of recovery, I started

feeling -- I didn't do anything but -- I was a vegetable and it started -- it started manifesting itself again. And so I went back in and talked to Dr. Barber and he referred me back to Dr. Barnard. It's kind of like -- what I went through is what Obamacare is going to be.
And I went into -- back to Dr. Barnard and we went back -- and he went back in the second time. I went back home and sat and laid in bed for another month. And it's changed. The procedures have changed now. But they took -- both of those were hip grafts as well. They took a bone from my body and that was more painful than the neck surgery.
Q. After that second surgery, did you eventually have the pain come back?
A. I had some -- I had some issues with my neck muscles. But I tell you, before I flew a helicopter, I was going to make sure I was feeling pretty good. And I got back in the cockpit and started flying, carrying students again, training them. And the Army

had held my -- I was supposed to have PCS'd and gone through and taken command. They had held that. And I was carrying students and started having some soreness. They gave me Motrin. The whole time I was flying I was taking Motrin. And eventually Colonel Barber called me in and told me I needed to retire.
Q. The time you were under the care of Dr. Barnard before the first and second surgeries, did he ever mention the possibility to you that you may have some sort of degenerative disc disease?
A. They called it degenerative disc disease. They did that, that's right. But they -- it was told to me it was caused from my flying. I used to -- I didn't just fly straight and level. I mean, I did -- I was a maintenance test pilot. I tried to balance the aircraft and flew at high vibration excursions.
Q. Did Dr. Barnard ever tell you whether it was -- you're likely to have additional neck problems in the future that

40d7b3b5-0fcc-4a61-a2d6-807c6a734e4a

Page 26

would recur?
A. Most orthopedic surgeons were -- most of them will tell you that once you started down the process you will end up having others, yes. I had no choice. It was not a decision I could make. The Army made it for me.
Q. At the time you had the first surgery and you had the second surgery, you had an understanding at that time that it was likely you may have additional neck problems in the future?
MR. MIDDLEMAS: Object to the form of the question. Go ahead.
A. Yeah. Because they tell you once you start, you sometimes have more.
Q. All right. You said that you started after the -- at some point after the second surgery you started experiencing some issues with your neck muscles?
A. That, and soreness.
Q. How long after the second surgery was that?

Page 27

A. When I started flying. About 5 months later.
Q. Is that still at some point 2004?
A. Yes. I knew for about six months.
Q. What were the problems that you were experiencing with your neck muscles?
A. Cramps and soreness, but I had -- I would just have -- I would be very, very sore and stiff because, you know, I'm wearing a helmet and running IPs.
Q. Was the pain confined to your neck or did it radiate down any other parts of your body?
A. Just neck. And it wasn't constant.
Q. When you started experiencing stiffness in your neck, issues with your neck muscles, did you see a physician about that?
A. I was under the care of Colonel Barber.
Q. He treated you himself or did he refer you to someone?
A. He also was a flight surgeon, so

Page 28

he treated me.
Q. What course of treatment did he recommend?
A. There's not much you can do. He just provided me with Motrin and tracked my progress. But as an aviator you see your flight surgeon once a year at the minimum and for every year you have your annual performance.
Q. And at the time Colonel Barber started treating you for the pain you were having in your neck and the issues with your neck muscles, did he make any sort of diagnosis as to what he thought was causing the issues at that point in time?
A. Just the surgeries.
Q. He thought the muscle pain you were experiencing was related to the surgeries?
A. Well, yeah. I mean, they go in through the -- you can see the scar right here (indicating). And, you know, it's hitting different nerves. It's --

Page 29

Q. So it was -- was it damaged --
A. This was a time at that point it was starting to get better. It was getting better, but the stiffness in the neck was just -- you know, it's going to be that way. We always analyzed it as a way -- as to my fitness for flight, which is a lot tighter than anything else.
Q. After -- at some point after the second surgery you started experiencing the issues with your neck muscles and you got treatment from Colonel Barber who you said prescribed you Motrin. Did he ever recommend any other course of treatment or did he just tell you to keep taking Motrin?
A. Anything else would ground me.
Q. So Motrin was your only option?
A. Yes. I had to get permission for aspirin. Any aviator does.
Q. And over time did the problems you were experiencing get worse?
A. They just basically stayed the same at that time.

40d7b3b5-0fcc-4a61-a2d6-807c6a734e4a

Page 30

Q. So you were having pain, but was it manageable at that point in time?
A. Yes.
Q. All right. And did you ever -- after that, did you ever start having major issues again that required another surgery?
A. Yes. I retired and came up to Fort -- we left Fort Rucker and I came -- and I went to Huntsville, got a job and I had to go through my VA physical. I went to the VA and I was surprised when I got my results because they said I had a partial fusion at 6 and 7. So I immediately got a referral to -- at the time it was Sports Med and Dr. Parker.
Dr. Parker examined me, did X-rays and said that my second fusion -- or my first fusion had died, it had not taken. Anyway, so they prescribed me Motrin, of course, and Motrin slows down bone growth. So I had to have 6 and 7 done again.
Q. All right. When you got to Redstone and had the VA physical done, I assume that was a prerequisite for the job you

Page 31

were taking?
A. It's a requirement for -- when you out process the Army you have to do a return physical, then they refer that. Then the VA does it and, you know, they're -- they do it so they can find out what disabilities you qualify for.
Q. And do you know what physician completed that physical?
A. I can't tell you for the life of me.
Q. And it was the -- was it the physician that performed the physical that told you you had a disc issue?
A. I got the results of -- I got a readout and it said partial fusion of 6 and 7. I was like, you've got to be kidding me. So I immediately went straight to it. You know, that means the fusion, the bone I have here is not whole.
Q. And you said you went Dr. Parker?
A. Uh-huh (affirmative response).
Q. Is that Larry Parker?

Page 32

A. Yes.
Q. And where was -- did you say he was working at the time?
A. Sports Med.
Q. Is that in --
A. In Huntsville. It's -- it's a group of doctors.
Q. And when you went to Dr. Parker, did he confirm what the VA physician had told you?
A. Right. He scheduled surgery. He scheduled surgery as soon as possible.
Q. And this would have been -- this was your third surgery?
A. Uh-huh (affirmative response), in 2005.
Q. And you said the issues -- the issue at that time was the prior surgery at C6-C7 hadn't taken?
A. Right.
Q. So it was your -- it was the first surgery that had been at C6-C7, correct?
A. Yeah.

Page 33

Q. And so Dr. Parker operated, was that sometime in 2005?
A. I think so. I mean, I've had a total of seven surgeries since 2003. They kind of merge together.
MR. KENDRICK: Can I clarify something real quick?
MR. GRAYSON: Absolutely.
MR. KENDRICK: Did the report from the VA acknowledge the C5-6 fusion?
THE WITNESS: Yes. It tells you it's a partial fusion at 6 and 7.
MR. KENDRICK: So it said that there was a partial fusion of 5 and 6?
THE WITNESS: Of 6 and 7. 5 and 6 were good.
MR. KENDRICK: Okay.
THE WITNESS: Do you understand what's being done in the neck? I can draw you a picture but --
MR. KENDRICK: Yeah. No, I think I've clarified it now. Thank you.
Q. So the time you saw the VA

40d7b3b5-0fcc-4a61-a2d6-807c6a734e4a

Page 34

physician for this physical, he told you there was a problem at C6?
A. He didn't tell me that. I had to wait three weeks for the results and that was fast.
Q. But at that time your understanding was the second surgery you had, which was at C5-C6, that surgery had taken, there weren't any problems there?
A. Yeah. When I went to the VA physical they said what have you had in your past and had everything tabbed, handed them the paperwork and I got the results of the physical after the fact. And he never -- he came in and examined me, looked at my X-rays in the typical military fashion.
Q. When you first started seeing Dr. Parker, did he express an opinion to you as to what he thought the cause of your neck issues was?
A. It was -- when I explained my history, I explained that I -- you know, what was -- what had caused it with me, everywhere

Page 35

they write they always say it's degenerative, but it's -- you know, when you take your -- I look at it this way, a helicopter hurt my first two and then you take away those cushions, eventually it's going to degradate some of them. The further ones, they carried more load. What I like about him is he's not in a hurry to cut.
Q. When you first started seeing Dr. Parker prior to the first surgery, did he tell you whether he thought you were likely to continue having neck problems over the course of your life?
A. He said I could. And I guess before any orthopedic surgeon or neurologist that works in that area will tell the same thing.
Q. And did Dr. Parker tell you you have degenerative disc disease?
A. He just said I had -- I had issues and he didn't tell me degenerative. He just said you have -- they were always focused on what's causing the problem. You can read his

Page 36

reports in there what he said.
Q. The third surgery took place, you said, in 2005. Would it have been late 2005?
A. I would say mid -- I had been here -- I can't tell you the actual dates. I'm sure you have it.
Q. And after that third surgery, did you have relief immediately following that surgery?
A. Yeah, it just -- I felt better as far as knowing it was solid. I had had some small tingling, but I expected that, but it went away. So, yeah, I had some improvement in this one, yeah.
Q. When you started working on Redstone in 2005, what was the job you were performing?
A. International Programs and I was a contractor, and I was highly familiar with the Hellfire Missile System. And I went all around the world building it for military sales cases and representing the discovery. I traveled a lot.

Page 37

Q. You traveled a lot to represent the U.S. government. When you were not traveling, what was the nature of your job there on Redstone? Did you have a -- was it a desk job?
A. A cube, desk cube. Working on PowerPoint presentations, meetings. The same thing as you do every day.
Q. So you had a computer for a good part of the day?
A. Uh-huh (affirmative response).
Q. All right. And how long did you have relief for after the third surgery before you started experiencing pain again?
A. I would say almost -- I think almost a year or so. We went in and I had some issues with my cramping. So I think the procedure -- we went in and had the plate that was in front of my neck removed.

(Defendant's Exhibit Number 1 was marked for identification, and the same is attached hereto.)

40d7b3b5-0fcc-4a61-a2d6-807c6a734e4a

Q. I'm handing you what I've marked as Exhibit 1.
A. He referred me directly. When I saw him, he referred me directly to Dr. Parker because I had had previous two fusions.
Q. You're referring to --
A. Calame Sammons.
Q. Calame Sammons is listed at the top of Exhibit 1.
A. Yeah. He referred me directly -- and I'm sorry I didn't say it, but he did refer me directly because he didn't want to do it.
Q. The document that's in front of you appears to be a record from --
A. This says 5 and 6. Go ahead.
Q. It appears to be a record from a cervical myelogram that was performed. Was this at the direction of Dr. Parker?
A. No, I think it was him.
Q. So this was before you were referred to Dr. Parker?

A. Uh-huh (affirmative response).
Q. And this document is dated October 11th, 2005. Do you believe, would this have been before your third surgery?
A. Yeah. Yes, I'm sorry.
Q. If you'll look at the second page of this document for me, there is a reference under findings. If you'll look at the third paragraph, it starts at C4.
A. Yeah.
Q. There's a reference to an inner body fusion at C5 to C6?
A. Uh-huh (affirmative response).
Q. And then there's also an indication at C6 to C7 that there are severe endplate degenerative changes?
A. Uh-huh (affirmative response).
Q. At that point in time --
A. That validated what the orthopedic surgeon at the VA had said, number 5 and 6 I had fused, 6 and 7 was bad and it had already been fused once.
Q. So your understanding, both from

what the VA doctor told you and -- you learned after you saw Dr. Sammons?
A. Yeah. I mean, I think it's him, I don't know. He immediately, as soon as we got all the records, he called my wife and I into the room and he said I'm going to refer you to Dr. Parker, he's the one that can do this. I never had a doctor look at me in the eye and tell me it was beyond him.
Q. And then under impression there's an indication, it says multi level disc disease.
A. Uh-huh (affirmative response).
Q. Did Dr. Sammons tell you that he believed you had multi level disc disease?
A. No. He just said, you know, we have to concentrate on C6 and 7. But I'll tell you, in most all the things, they're going to say multi level degenerative disc disease. And some of it, you know, could be caused -- the initial stuff was caused by the rotary wing. I don't know.

(Defendant's Exhibit Number 2 was marked for identification, and the same is attached hereto.)

Q. I'm handing you what I have marked as Exhibit 2. This is an operative report from Dr. Parker.
A. Okay. So it was January 6th.
Q. Would this be the operative report from your third surgery?
A. Yes.
Q. And under indications for procedure, it says you're experiencing untrackable neck pain at the time. It also makes a reference to right upper extremity pain?
A. Yeah, it radiates down the arm.
Q. So at the time of the third surgery, you were experiencing pain down your right arm?
A. Somewhat, yes.
Q. And was that something you previously experienced?

Page 42

A. Not as much as I had as it got worse. I haven't read everything for so long.
Q. Before your first surgery, did you have pain radiating down your arm?
A. Remember I told you I couldn't move them so --
Q. And so the procedure that was performed by Dr. Parker on January 6th, 2006, was it -- was it an anterior cervical discectomy and fusion?
A. Yeah.
Q. And my understanding is doctors commonly use the acronym ACDF. Have you heard that term?
A. Yes.
Q. And that was performed at C6-C7; is that correct?
A. Right. And he also did C7 and T1.
Q. All right. And after this third surgical procedure, were you able to go back to work?
A. Yes. I just recovered and went back to work. And he regulated it. We had --

Page 43

you know, he came in -- I came in, we talked and eventually he would let me do trips.
Q. So initially did he prevent you from traveling?
A. Uh-huh (affirmative response).
Q. After --
A. Initially.
Q. After the third surgery, did you start seeing Dr. Parker on a regular basis?
A. For follow-ups.
Q. What intervals did you typically see him at?
A. I think he was at three month intervals initially.
Q. At each appointment, would he typically do an X-ray to check how your neck was doing?
A. Uh-huh (affirmative response).

(Defendant's Exhibit Number 3 was marked for identification, and the same is attached hereto.)

Page 44

Q. I'm handing you what I've marked as Exhibit 3. This is a clinical note from Dr. Parker dated November 1, 2006. There's a diagnosis listed on here. It's got four different conditions it listed. Did Dr. Parker ever discuss any of those conditions with you?
A. Not in those terms. He would just say you're doing fine, you're getting better, how do you feel and, you know, just try and stay away from activities and -- because, honest to God, I never really saw these until I had to start finding them. All I had was a little code sheet that said come and see me again, you know.
Q. Did Dr. Parker ever talk to you about what cervical radiculitis is or whether you may have it?
A. No.
Q. Did he talk about degenerative disc disease with you?
A. He just said, you know, the same thing I've told you before. He would always

Page 45

say, you know, we're going to try not to -- you know, try and postpone this and do this.
Q. In this note dated November 1st, 2006, it says Mr. Agee presents today doing well, he's pleased with the results of his surgery. So as of November 2006, are you still experiencing pain relief from the third surgery?
A. I was doing okay. I mean, a matter of, you know, my good back then compared to my good today is different, but I was doing okay. You know, as he says, I was recovering fairly well.
Q. When's the next time you started experiencing serious neck pain?
A. That was 2000 -- probably -- I was in so much pain, I think it was muscle spasms, and I went to Dr. Parker and he said the only thing he can do is remove the plate and give me more room here (indicating) because I had a two fusion piece of metal in my neck covered by the fusions. I'm not sure on the date.
Q. All right. So eventually after

40d7b3b5-0fcc-4a61-a2d6-807c6a734e4a

the third surgery you started having these muscle spasms and Dr. Parker recommended removing the hardware that had been left from the prior surgeries?
A. Yes.
Q. And was it removed?
A. Uh-huh (affirmative response).
Q. And I assume that was a surgical procedure?
A. Uh-huh (affirmative response). Went in, opened me up and unscrewed six screws.
Q. And did that go smoothly or did you have any complications associated with it?
A. It went fairly well. The muscle cramps went away for quite a while.

(Defendant's Exhibit Number 4 was marked for identification, and the same is attached hereto.)

Q. I'm handing you what I've marked as Exhibit 4, which is an operative report

dated September 24, 2007.
A. Yes.
Q. It indicates procedure performed is removal of retained hardware, C6 to T1. Is this the surgery you're referring to?
A. Yes.
Q. And this was to address the neck spasms you had been having?
A. Uh-huh (affirmative response).
Q. Okay. And after this surgical procedure in September 2007, you said you experienced relief, but neck spasms, did they go away after that surgery?
A. Yeah, they got a lot better.
Q. And did you ever have -- did severe neck pain ever return? Did you have major problems after that?
A. I eventually did, yes. And I think it's probably the next one coming up.
Q. Well, what is your recollection of when --
A. Then I had problems with 4 and 5, and I went in and had surgery on 4 and 5. I

think it was 4 and 5. And that went fairly -- the surgery went well. I came out and I was recovering and I got an infection in the bone from that surgery. So I had to go back in within a couple of weeks and have it removed and they replaced it, the fusion. And I spent two months at home with an IV in my chest pumping antibiotics into my -- into me. That summarizes what some of that is. That was in 2007 and somewhat in '8.

(Defendant's Exhibit Number 5 was marked for identification, and the same is attached hereto.)

Q. I'll handing you what I've marked as Exhibit 5. This is a clinical note from Dr. Parker dated November 11th, 2008.
A. Yeah, that works.
Q. And it indicates in here that you had a new complaint of neck pain and bilateral shoulder pain at the time of this visit.
A. Uh-huh (affirmative response).

Q. And it appears that Dr. Parker recommended PT, which I assume is a reference to physical therapy as his course of treatment?
A. Right, and I did it and it didn't get better.
Q. And how long did you do physical therapy for?
A. I think it was -- it may have been ten weeks, eight or ten weeks.
Q. Was that the first time Dr. Parker had recommended you do physical therapy?
A. Uh-huh (affirmative response.)
Q. Do you recall who you completed that therapy with?
A. The Sports -- The Orthopedic Center in Madison.
Q. So it was someone in the same practice as Dr. Parker?
A. Yes. Within the same organization, yes.
Q. Let me ask you this: You testified earlier when you first started

40d7b3b5-0fcc-4a61-a2d6-807c6a734e4a

Page 50

seeing Dr. Parker he was with Sports Medicine?
A. He moved. He took his practice and went to POC.
Q. Do you know approximately when that happened?
A. No. I just know what when I called Dr. -- I called Sports Med for a follow-up and they said oh, he's moved to the POC and just moved everything with him.
Q. So you said you completed approximately ten weeks of physical therapy?
A. I'm not sure the exact, but, yeah, something like that.
Q. And that did not give you relief?
A. He doesn't usually -- he doesn't usually prescribe physical therapy to some extent, but with me it was why not, let's try it. We both agreed let's try this before we go in. I was all for that.

(Defendant's Exhibit Number 6 was marked for identification, and the same is

Page 51

attached hereto.)

Q. I'm handing you what I've marked as Exhibit 6, which is a clinical note from Dr. Parker dated February 17th, 2009. There's a reference in here to a large C4-5 disc herniation. Is that a diagnosis that Dr. Parker made?
A. Yes.
Q. And it appears, did Dr. Parker recommend another surgery to you?
A. Yes, right here at C4 and 5.
Q. And had you previously had a surgery at C4 to C5?
A. No.
Q. So this was a different disc than the three prior surgeries?
A. Yes.
Q. And this would have been your fourth surgery at that point in time that he was --
A. Fifth. Fourth was the plate removal. You understand why I'm kind of

Page 52

confused on some dates?
Q. I understand.
A. Okay.
Q. Just bare with me.
A. No, I understand this is what you need to do.
Q. So the first three surgeries we've talked about, were those all ACDF procedures?
A. Yes.
Q. And the fourth surgery was the hardware removal?
A. Yes.
Q. And then this fifth surgery that Dr. Parker is recommending in February of 2009, at that point in time he's recommending another ACDF?
A. Right.
Q. But at a different site than the three prior surgeries?
A. Uh-huh (affirmative response).
Q. And at that point in time that Dr. Parker was recommending this additional procedure, did he ever indicate to you why he

Page 53

thought you were experiencing disc problems at C4-C5?
A. The way it was explained to me and I've explained to you, is when you take all your cushion and you remove cushion and you put full bone on bone, eventually you put stress on other ones. I wasn't doing anything abnormal. I wasn't doing anything out of the ordinary.
Q. So is it the fact that you had all these prior surgeries --
A. Some of it.
Q. -- that was creating complications?
A. And if you look back through some of that stuff, there's other -- every time you have a myelogram or a CT scan, you're all over the place on some of them. It will pick up this, it will pick up that. And when I looked through some of these the first time I'm like I'm all -- you know, I definitely said I'm all screwed up. But then I asked Dr. Parker about it and he says, no, every time you have

FREEDOM COURT REPORTING
2015 3RD AVENUE NORTH BIRMINGHAM, AL 35203 1-877-373-3660

40d7b3b5-0fcc-4a61-a2d6-807c6a734e4a

Page 54

something it's a little different, but the glaring part, the disc, you know, has got worse. So that's why we had to redo it. But this is the one I went in and had done and I caught a bone infection.
Q. And the pain that you were experiencing in February 2009, was there any instigating event or trauma that brought on that pain or did it just come on seemingly randomly?
A. Just slowly came on.

(Defendant's Exhibit Number 7 was marked for identification, and the same is attached hereto.)

Q. I'm handing you what I've marked as Exhibit 7, which is an operative report dated March 2, 2009.
A. Uh-huh (affirmative response).
Q. This is the first --
A. First of the 4-5, yes.
Q. This record has a reference to

Page 55

Crestwood Medical Center at the top. Is that the hospital at which Dr. Parker sometimes performed procedures?
A. Yes, he's got rights at both Crestwood and Huntsville.
Q. And this surgery that's referenced on this document, your understanding that surgery took place on March 2nd, 2009?
A. Uh-huh (affirmative response).
Q. And the procedure that was performed at that time, was that an ACDF at C4 to 5?
A. Uh-huh (affirmative respone).
Q. And was it your understanding, was this the same procedure that Dr. Parker had previously performed, it was just at a different site?
A. Yes.
Q. Because at this point in time, you had a herniated disc at C4 to C5, correct?
A. Yes.
Q. And after this surgical procedure in March 2009, did you experience relief

Page 56

immediately following that surgery?
A. No.
Q. And I think you referenced a bone infection?
A. Uh-huh (affirmative response).
Q. Was that a complication from the surgery?
A. Yes. I had to go back in. It was right after my mother got to the house, after Saint Patrick's Day, March 17th. What day is that on? Anyway, the end of March, I think.

(Defendant's Exhibit Number 8 was marked for identification, and the same is attached hereto.)

Q. I'm handing you what I've marked as Exhibit 8, which is a record from an MRI that took place on March 16th, 2009. So this would have been shortly following the last surgery that we just talked about; is that right?
A. Yes.

Page 57

Q. And if you will look at the second page for me under impression, there's -- at C3 to 4 indicates that disc and bony changes combined result in moderately severe narrowing of the right neural foramen. Did Dr. Parker discuss that with you at the time?
A. No, he was on leave. This was recommended by his PA.
Q. And his PA, I've seen his name, is it Ron Filly?
A. What?
Q. Dr. Parker's PA, is that an individual named Ron Filly?
A. That doesn't sound familiar. But what happened was, I was having pain and I couldn't get in to see him and I said I need -- this needs -- I need help on the pain. So I went to Crestwood and this was -- they had set it up and I walked into the emergency room and I did it. And my mother died the next day. And then I went in -- I went in to have a -- when he got back off of leave, he came back and the next day I was moved to the front

40d7b3b5-0fcc-4a61-a2d6-807c6a734e4a

Page 58

and I had the -- the graft didn't take effect or whatever. This isn't something I normally see at Crestwood.

Q. Did the doctor that completed the MRI, did he or she discuss the results with you?

A. No.

Q. Did you eventually review the results with Dr. Parker?

A. Yeah, with the PA over the phone and then with Dr. Parker. I didn't see Dr. Parker, I think, until the day of the surgery.

Q. And the next surgery you had, was that to address the bone infection?

A. It was to address the -- well, I didn't -- whatever it was. Yes. I don't know what he called it, but --

Q. Do you know approximately when that surgery would have been?

A. Right after Saint Patrick's Day, within the week.

Q. So we're talking March 2009?

Page 59

A. Uh-huh (affirmative response).

Q. And after that surgery in March 2009, and that's also a surgery Dr. Parker performed?

A. Uh-huh (affirmative response).

Q. Is that a yes?

A. Yes. I'm sorry, yes, sir.

Q. Did you experience some relief after that neck surgery in March 2009?

A. Yes, the second one. Well, it took me quite a while, but eventually, once I got everything done, yeah. I was finally feeling better.

Q. And at that point in time, were you able to travel?

A. Once I got past -- you know, like I said, I spent two months at home. But once I got the PICC line pulled out, then yes, I was traveling. I was going all over the world.

Q. And when is the next time after that you started experiencing neck -- severe neck pain?

Page 60

A. Well, that was the elevator.

Q. And when you say the elevator, you're referencing the incident that's involved in this lawsuit?

A. Yes, sir, because that was the seventh surgery.

Q. And after the time of -- the sixth surgery, was that the one to address the bone infection?

A. No. Yes, yes, yes.

Q. After that sixth surgery, were you still seeing Dr. Parker on a regular basis?

A. On a reduced basis. It was reducing. If you notice the notes, he went from three to six months. I had seen him but I had seen him follow-up, you know, and it was going really well. And eventually he -- you know, it was like if you're willing to travel, go ahead, you're good to go. In fact, I don't see a reason to take an X-ray on the next visit because, you know, you're good. I'm only going to keep you on so I can continue to provide you your medication.

Page 61

Q. And after that sixth surgery, did you have an understanding from Dr. -- from your visits with Dr. Parker, had he indicated to you whether he thought you had -- there was a possibility you would have additional neck problems in the future?

A. He talked -- he would have discharged me if it hadn't been for some of my -- some of my medications.

Q. What medications were you taking at that point in time after the sixth surgery?

A. Mobic and I take a muscle relaxant.

Q. What is Mobic designed to treat?

A. Arthritis, pain, bone.

Q. Was that originally prescribed to you by Dr. Parker?

A. Yes.

Q. Was it was prescribed to address neck pain?

A. Bone pain, yeah, just ache.

Q. Did you say there was another medication you were also taking?

40d7b3b5-0fcc-4a61-a2d6-807c6a734e4a

Page 62

A. We tried -- we tried Neurontin and it didn't do anything. I quit taking it. And he's like, okay, we'll stop doing it. And that's a quick summary. And at that time I think I was only taking -- and I wasn't taking it every day. He prescribed those two for me so that I could -- if I was on an airplane ride, like to India, that's a long flight, long so you get stiff, and so I would take that. It was just for travel.
Q. So you were taking it on an as-needed basis?
A. As-needed basis. And we had a relationship, he knew I didn't -- I don't abuse. And that's why he kept me on, so when I traveled I could -- I was taking prescribed stuff.
Q. In 2009 -- or the sixth surgery we talked about, that was in late 2009; is that correct?
A. March sometime, yeah.
Q. After that sixth surgery in 2009, at that point in time were you working for the

Page 63

Close Combat Weapons Systems?
A. Uh-huh (affirmative response). While I was -- while I was home recovering from surgery, I was removed by the general basically to help set up a Close Combat Weapons International office.
Q. And when they moved you to that office, was that a promotion for you?
A. It was a lateral, but it was -- it was nice to be recognized and -- because we had gone from jams. We had gone from 200,000 in NF missile sales to 1.6 billion, which basically provided us missiles for the war.
Q. When you started working for Close Combat Weapons Systems, what building were you based out of on Redstone?
A. 4505.
Q. Had you previously worked in that building or were you in a different building?
A. I was in the PEO Headquarters Building, 5550.
Q. And the entire time you have worked for Close Combat Weapons Systems,

Page 64

you've been in building 4505 the entire time?
A. Yes.
Q. And when you started out with the Close Combat Weapons Systems, did you have a supervisor you reported to?
A. Yes.
Q. Who would that have been?
A. Christine Dedrick. She's the International Programs Director.
Q. Has your supervisor changed over time or is she still your supervisor?
A. I've changed.
Q. All right. When did your supervisor first change?
A. About a year -- right after I -- right before I came back from surgery 7, I was -- I moved to the -- I accepted or -- how should I say this? I got interviewed for a developmental assignment and I got selected for the program of assistant product director for Javelin.
Q. All right. So I want to make sure I've got all this right. When you first

Page 65

started in Close Combat Weapons Systems Program, what was your title?
A. I was an international programs assistant.
Q. And at that point in time you were reporting to Christine a Dedrick?
A. Uh-huh (affirmative response). And she was my supervisor day of the incident.
Q. And your job eventually -- you were still in the Close Combat Weapons Systems, but your job eventually changed to -- what was your new job title?
A. Assistant product director for Javelin, and still is.
Q. And when did you begin that position?
A. 2011.
Q. And also your supervisor changed with that move?
A. Uh-huh (affirmative response), Phil Skelton.
Q. How do you spell that last name?
A. S-K-E-L-T-O-N.

40d7b3b5-0fcc-4a61-a2d6-807c6a734e4a

Q. Does building 4505, does it -- is it exclusively devoted to the Close Combat Weapons Systems program or are there other government programs in that building?
A. It was a little bit left of MDA, Missile Defenses Agency. We couldn't go in their area. They have the second and third floor. Half of the second floor and all of the third floor.
Q. And is everyone that works in that building a government employee?
A. No.
Q. Are there contractor employees in there?
A. Yes.
Q. And the contractor employees that work in the building, are they doing work related to the Close Combat Weapons Systems?
A. Uh-huh (affirmative response). They have unique specialties that can't be found usually so --
Q. And do you know -- can you tell me the names of the contractors that have

employees in that building?
A. The ones I'm aware of, S3, Systems Studies and Simulation, SCIC, and that's it for us.
Q. So, best of your knowledge, everyone working in building 4505 either works -- is a government employee working for Close Combat Weapons Systems or they're a government employee working for the missile defense program?
A. Yes.
Q. Or if they're not a government employee, they're either with S3 or SCIC?
A. For us. I can't speak for MDA.
Q. So MDA may have some contractor employees, too?
A. Uh-huh (affirmative response).
Q. Approximately how many employees total work in building 4505?
A. I don't know. I just know our project office is 211.
Q. So it would be your people plus whatever missile defense has?

A. Yes, and whatever security has.
Q. So in total, is it fair to say there are hundreds of employees that work in the building but probably less than a thousand?
A. That's fine. I can only speak for what I know.
Q. When you started working in building 4505 where was your office located in that building?
A. You come up from the elevator or the stairwell and there's a foyer, go around the corner and it was in a converted conference room.
Q. What floor is that on?
A. The second floor.
Q. And has your office ever changed or are you still in that office?
A. It's changed twice since then. Same floor.
Q. So you've always been on the second floor?
A. Uh-huh (affirmative response). We

have second -- half the second floor and all of the first floor.
Q. At the time of the elevator incident involved in this lawsuit, where was your office located at that point in time?
A. The first one.
Q. It's still your first office?
A. Uh-huh (affirmative response).
Q. Which is located on the second floor. And do you know which side of the building it's on?
A. It's on the north side, the northeast corner.
Q. And does building 4505, does it have its own parking lot?
A. Uh-huh (affirmative response).
Q. Most -- is there an entrance by the parking lot?
A. Uh-huh (affirmative response).
Q. And is there an entrance by the parking lot? Is that where most of the employees would enter the building?
A. There's two. There's one on the

40d7b3b5-0fcc-4a61-a2d6-807c6a734e4a

north side and there's one on the east side.
Q. And is one of those a main entrance or are both entrances used about the same?
A. The one on the east -- on the east side is more often used by most folks. There's just -- we have designated parking in the front.
Q. So the east side entrance is the one close to the parking?
A. Right. As well, visitors come to the gate check there.
Q. Has that always been the entrance that you've used most often?
A. I've usually used the north entrance.
Q. Why is that?
A. Because I come to work at 5:30 in the morning, I get a good spot and I walk right in.
Q. When you first started working in the Close Combat Weapons Program under Christine Dedrick, what hours were you

required to work each week?
A. I worked a 40-hour week. I worked four 10s Monday through Thursday when I wasn't traveling.
Q. Did you have a set block of time on Monday through Thursday you were supposed to work?
A. 6:00 to 4:30.
Q. Did you have any flexibility as far as when you worked or that was your assigned block?
A. I had -- not unlike what you hear in the news, we have to get permission to do anything above our regular 40 hours, so I never -- did I work more than 40 hours a week, yes. Did I get paid for it, no. When I traveled, I got comp time, Federal comp time to use up in the air. So when you're traveling and you're going to -- anyway, yes. But it was only with the approval of the front office. Is that what you wanted to know?
Q. Yes. At the time you began working in building 4505 and you're still in

your first office in that building, I assume you could access the second floor using a stairwell or you could access it using one of the elevators in the building?
A. Yes.
Q. Were those your only two options?
A. There's a third elevator further down on the east side.
Q. Do you know in total how many elevators are in the building?
A. No, I just know those two. Because everywhere else in that building, in order to access to an elevator, I don't have access to it because that's a missile defense agency area.
Q. So you said you know of two elevators?
A. Uh-huh (affirmative response).
Q. I thought a second ago you referenced a third elevator?
A. No, the stairwell.
Q. Okay. And are the two elevators located in close proximity to each other or

are they on opposite sides of the building?
A. Same side of the building, about three hundred meters separating it. It's right on the end -- right on our side of the MDA wall, glass wall.
Q. And when you first began working in building 4505, to get to the second floor, did you typically take the stairs or did you typically take one of the elevators?
A. I would take the elevator. I have a rebuilt knee, so if I don't have to do stairs, I don't do it.
Q. So it's easier for you to take the elevator?
A. Yes.
Q. The two elevators in the building, do you know whether they have numbers associated with them or letters associated with them or directions associated with them?
A. It's always referred to when it's broken that they'll say the northeast elevator. Nobody uses the other third one because it's so far around the corner. The

40d7b3b5-0fcc-4a61-a2d6-807c6a734e4a

second one, excuse me.
Q. So is the northeast elevator the one that you would typically use?
A. Yes, sir.
Q. Is that the one that would be closest to the entrance where you entered the building?
A. Oh, yes.
Q. Is there a stairwell located near the northeast elevator?
A. It's right across the bottom first floor of the foyer.
Q. So it is close to where the elevator is?
A. Yes.
Q. Directly across from it?
A. Uh-huh (affirmative response).
Q. And so every morning when you got to work, you typically -- would you go directly to the elevator?
A. Yes.
Q. Take it up one floor and go to your office?

A. Uh-huh(affirmative response). Let's me out, I go to work.
Q. Were there ever days you decided to take the stairs?
A. No, not then.
Q. When you first started working in the building, the elevator, the northeast elevator you've referred to it as, can you tell just from observing that elevator whether it's in an -- is it an old elevator or newer unit?
A. The whole building is old, so it's an older elevator.
Q. And am I correct to assume you don't have any specialized training or knowledge relating to elevators?
A. You are correct.
Q. Do you know the difference between a hydraulic elevator and a traction elevator?
A. Not at all.
Q. And do you know one way or another whether the elevators in that building are hydraulic or traction elevators?

A. No, I do not know.
Q. Prior to the incident involved in this lawsuit, which I'm going to get to soon, were there ever days when the northeast elevator was out of service?
A. Uh-huh, yes.
Q. And on those days, did you have to take the stairs or would you go to the other elevator?
A. I took the stairs. That would be the only exception to your previous question.
Q. Prior to the incident involved in this lawsuit, had you ever experienced any problems with the northeast elevator?
A. Yes, most people wouldn't call, but most of the time we just got notified it was broken and not use it, use the stairs.
Q. But you said you had experienced problems with it on some occasion?
A. Yeah. I mean, you'd push a button and it wouldn't come or it would bounce a little bit.
Q. Is there days you go, you push the

button and the elevator never comes?
A. Uh-huh(affirmative response). So we would go and talk to Ben and Ben would call a work order in for it to be repaired.
Q. And what is Ben's last name?
A. Floyd.
Q. Is he the building manager?
A. Uh-huh, yes.
Q. Do you know who he's employed by?
A. The U.S. Army Close Combat Weapons.
Q. And is he the person who is responsible for reporting any problems with the elevators to someone so that they can come fix them?
A. Yes.
Q. So on days when the elevator didn't come, would you go report that to Ben Floyd?
A. One of us would. Somebody would report it or send him an e-mail.
Q. Other than issues with the elevator not coming when you pushed the

40d7b3b5-0fcc-4a61-a2d6-807c6a734e4a

button, did you ever experience any other problems with the northeast elevator prior to this incident?

A. Others have. And you -- just the bouncing, slight bouncing every so often.

Q. This was when you're riding in the elevator?

A. Uh-huh(affirmative response). But it would get fixed.

Q. When you say you experienced bouncing in the elevator, can you describe it for me, what it was like?

A. Well, you go up to the floor -- you come up a floor, you go down a floor and it would -- it would just bounce (indicating).

Q. Did it do that when you would get to a floor or when it would get to the bottom it would bounce?

A. All throughout.

Q. Do you know whether it happened when an elevator was going up or was it just when the elevator was going down?

A. I don't know.

Q. Was this a problem that was relatively frequent that you experienced on a regular basis?

A. Not all the time, no.

Q. But you had experienced it on a few occasions?

A. Yes.

Q. Was there ever anyone else on the elevator with you when you experienced bouncing?

A. Yes, Mike Cisco, other folks.

Q. Who is Mike Cisco?

A. He was my work partner. He and I worked -- we were the same position. He's retired now.

Q. When did he retire?

A. Two -- the year of the incident, after -- '10.

Q. Do you stay in touch with him?

A. All the time.

Q. Does he still live in the Huntsville area?

A. Yeah, he lives in Gurley. It also can be known as Owens Crossroads.

Q. All right. Other than Mike Cisco, is there anyone else you recall being in the elevator with you when you experienced bouncing?

A. Not that I recall, no.

Q. Can you give me your best judgment as to how many times you had experienced the elevator bouncing prior to the incident involved in this lawsuit?

A. Two or three times, just off the hip.

Q. On each occasion that the elevator bounced, did you report that to somebody?

A. We would go to Ben, yes, or Mike would.

Q. You said Mike Wood (sic)?

A. Or Mike would, yeah.

Q. Who is Mike Wood (sic)?

A. No. Or Mike would, Mike Cisco.

Q. Oh, I've got you. In the two or three times when you experienced the bouncing

prior to this incident, did you or Mike report that to Ben on every occasion?

A. I want to say yes. There's also another person you can talk to and that would be Sandy Kean who Ben works for.

Q. Is that a male or female?

A. Female.

Q. What is her position?

A. Admin, administration. She works under the business director.

Q. She's a government employee?

A. Uh-huh(affirmative response).

MR. KENDRICK: How do you spell her last name, K-I-N-G?

A. Kean, K-E-A-N.

Q. And is she still working?

A. Yes.

Q. And why would you report problems to her on some occasions rather than to Ben Floyd?

A. When you can't find Ben, you tell her. Or you let her know as you walk by, hey, you know.

40d7b3b5-0fcc-4a61-a2d6-807c6a734e4a

Q. Do you know whether Ben Floyd keeps any type of records related to when there are problems with the elevators?
A. No, I don't know.
Q. But is he typically -- is he the person responsible for calling maintenance to come fix a problem?
A. Uh-huh, yes.
Q. On the two or three occasions when you had experienced bouncing, did the problem get fixed on all those occasions?
A. Yeah. Usually there was a -- there would be a sign put on the elevator don't use, and then the sign would go away and it would be -- usually there would be an e-mail, hey, this is back in operation or it's not in operation.
Q. So the problem was always addressed when you reported that there was an issue?
A. Most often, yes.
Q. Well, was there ever an occasion in which you reported a problem with the

elevator that wasn't addressed?
A. Not to my knowledge.
Q. So when you would go to Ben, report the problem, he always followed through and made sure it got fixed?
A. Yeah.
Q. When you went to Ben and told him about an elevator problem, do you know who it was that he would typically contact about the problem?
A. I had no idea who was working on it.
Q. And do you have any understanding as to whether the individuals Ben Floyd would typically call to come service the elevator, do you have an understanding as to whether those were contract or government employees?
A. I had always assumed it was a government employee doing it, but I have since found out it's not.
Q. When did you find out it's not?
A. With workmen's comp.
Q. You found out when you saw

worker's comp benefits?
A. When I was discussing what happened with me at work and they said you understand that the elevator is not maintained by the U.S. Army. I said, no, I did not know that. They said you've got to do this. So that's when I met Davis.
Q. Other than the issues with the elevator not coming when you pushed the button and the occasional issue with it bouncing prior to the incident involved in this lawsuit, did you ever experience any other problems with the northeast elevator?
A. Not me directly, no. And I'd also say that when most of the time -- the times I would go to Ben, he would already have it on the work order or he was in the process. And I just got it, put a name on it -- he would put a sign on it.
Q. You said you personally hadn't experienced any other problems in the northeast elevator. Had you heard about other problems from other people?

A. Yeah, we would all talk about it, especially when it was broken.
Q. Well, were there ever any other problems you heard about, other than it not coming when someone pushed the button and other than the bouncing issues?
A. People would talk about it not stopping at the floor, you know, and the door would open and you would have to step up or step down into it.
Q. Who do you recall talking about issues of the elevator not stopping?
A. Just work order. I mean, I don't have specific names. But I think if you talk to Bill Ruda, who is the project manager there, he's the boss of all of us, he would be fully aware of some of those issues.
Q. So sitting here today, you can't tell me the name of anyone who ever told you about problems with the elevator not stopping at the correct floor or at the right place?
A. If you want a specific name, let me think back to that discussion. I can't

40d7b3b5-0fcc-4a61-a2d6-807c6a734e4a

really name her.

Q. So you recall somebody mentioning that to you at some point in time, but you don't recall who it was?

A. That's an accurate statement.

Q. Other than issues we've already talked about, any other problems you had ever heard about with the northeast elevator?

A. I think we've covered them.

Q. And, to your knowledge, talking about the time frame prior to this incident, was there ever an occasion on which there was a problem with the elevator and nobody came out to fix it?

A. Not to my knowledge.

Q. So whenever there's a problem --

A. It's posted.

Q. -- it was always taken care of, correct?

A. Yes. It would be up and would be in service, and then it would be out of service. I mean, it was just --

Q. And when a problem was reported,

were they always quick to take it out of service and to repair the problem?

MR. MIDDLEMAS: Object to the form of the question.

A. Yes.

Q. On the two or three occasions in which you said you had experienced bouncing in the elevator, do you recall what time of day those incidents occurred?

A. I think once in the morning and a couple of times -- the other two were during the day, the middle of the day.

Q. When you reported problems related to the elevator to Ben Floyd, did you always do that in person or did you ever do that through an e-mail?

A. E-mail and in person. The day of the incident we did notify -- Mike called him. I've called him. You know, it's just -- I want to make sure I'm correct here. We've called and we've gone by in person and seen him.

Q. And did you say that you had

notified him by e-mail before or you've never notified him by e-mail problems with the elevator?

A. I think I've e-mailed him before and in those cases he'd come back and get started on it.

Q. During the course of responding to discovery requests in this lawsuit, have you made an effort to look through your past e-mails to see if you ever sent any e-mails to Ben Floyd relating to the elevator?

A. No.

Q. And do you typically retain your work e-mails for a certain period of time?

A. I keep -- I have a sent file and I don't purge it very often so --

Q. So if you had at some point in time sent some e-mails to Ben Floyd about issues with the elevator, do you think you would still be able to go back and find those e-mails?

A. I could see. I don't know. I don't know.

Q. Tell me what happened on the date that you allege you were injured on the elevator.

A. I came to work right after about 5:30, walked in the front door, went to the elevator, pushed the button, walked in, leaned against the wall, pushed the 2 button. It lurched and, again, I was leaning against the wall and my head fell forward. It moved forward, went up. I mean, the elevator went up. Opened the door, I was in pain. I walked to my office. Mike was already there. I sat down. I said, I just got hurt in the elevator. He said what happened, I said the elevator lurched, my neck snapped, I'm feeling pain.

So we started notifying people. I went to the hospital on post, was seen, was referred to my surgeon and immediately started the paperwork for injury in the workplace. Christine was out of the office, so the deputy and the director, Steve Dirigo filled the paperwork out, notice of injury for workmen's

40d7b3b5-0fcc-4a61-a2d6-807c6a734e4a

Page 90

comp, and went from there.

Ben was notified. He got the team out. Somebody came out and worked on it. They said there wasn't anything wrong with it. But by that time, it was midday. Ben Ruda, knowing one of his folks was hurt on it, he went out there and said, what do you mean there's nothing wrong with it? He rode it and he said either you fix it or I'm going to find somebody else who will, this is not working correctly.

So they had to work on it again and it was out -- I don't know if it was fixed that day. They ordered a part, I think. That all happened that day.

Q. When Mike Cisco is working in the building, do you know whether he typically took the elevator each day or did he use the stairs?

A. He took the elevator.

Q. The same elevator as you?

A. Uh-huh(affirmative response). We sat in the same office, you know, usually got

Page 91

there about the same time.

Q. The date that you contend you were injured, do you know whether Mike Cisco had taken the elevator that morning?

A. I never asked him. I don't know.

Q. And he was the first -- was he the first person you talked to after this incident?

A. Yes. He was right around the corner in that office.

Q. Am I correct, there was no one on the elevator with you when it happened?

A. That's affirmative.

Q. He was the first person you saw when you got off the elevator?

A. Uh-huh(affirmative response).

Q. Is the office typically -- the building you work in, is it typically crowded at that time of day?

A. No.

Q. Are you one of the first ones who get to work usually?

A. I make the coffee.

Page 92

Q. Was Mike Cisco typically there at that hour also?

A. Yes. My job at that time entailed calling and conversing with countries in different time zones.

Q. Other than Mike Cisco, do you know whether on the date of your injury there was anyone else already at the office that day?

A. No, because I went from there to the -- pretty much to the hospital.

Q. And what was the date of this incident?

A. The 9th of June, I think, 2010. It's been three years and three days.

Q. Do you know one way or another whether you were the first person to use the elevator that day?

A. I do not know.

Q. Had you used that same elevator -- well, do you know what day of the week was June 9th?

A. I can't tell you.

Q. Do you know whether you had used

Page 93

the elevator the day before that?

A. More than likely, if it wasn't a Monday.

Q. And the last occasion in which you had used the elevator, were there any problems with it at that point in time?

A. No.

Q. It had worked fine?

A. Yes.

Q. And I assume, since the last time you used the elevator, had you heard about any problems with the elevator?

A. Since then?

Q. Yes.

A. Yes. Every time it comes up, I would usually send Davis an e-mail, hey, it's broke.

Q. I'm sorry, that was a bad question on my part. What I meant to ask is, assuming the last time you had used the elevator prior to this incident was the day before or whenever the last workday was, since that occasion that you rode the elevator down at

40d7b3b5-0fcc-4a61-a2d6-807c6a734e4a

the end of the day, had anyone told you about any problems with the elevator?
A. No. I was usually the last to leave, too.
Q. And you've already told me you don't have any training or specialized knowledge relating to elevators. Sitting here today, do you have a judgment as to why the elevator worked fine when you rode it down one day and then had an issue the next day?
MR. MIDDLEMAS: Object to the question.
A. I have no -- no.
Q. So you don't have any idea what caused the elevator to jerk, do you?
A. I just know the elevator jerked.
Q. The jerking sensation you experienced on the elevator, when did it happen? Like when you got on the elevator, was it after you pushed the button to go to your floor?
A. Yes.
Q. Had the doors closed yet?

A. Yes.
Q. Did the jerking happen when the elevator started to go up?
A. Yes. It went up, yeah.
Q. Did the elevator jerk upwards or did it ever drop downwards?
A. I just -- I was leaning against the wall. It jerked, it hurt me, you know. And as we got up to the top, when it got to the second floor, the door opened up, I got out of there. And I was in pain and I hadn't been in pain for a while.
Q. Well, what I'm trying to figure out, when you say the elevator jerked, which direction -- I assume by "jerk" you mean it moved suddenly?
A. It had to move up because my head went forward.
Q. So you think the elevator jerked upwards?
A. Yes.
Q. It didn't drop?
A. It jerked up and then it came

down, then moved up again.
Q. Approximately how large is the northeast elevator?
A. I don't know. Probably four of us could fit in it comfortably.
Q. So it's got enough room for four people, but it's not a huge elevator?
A. No.
Q. You said when the elevator jerked you fell forward?
A. My head did. I was leaning against the wall. I was tired. I hadn't gotten my first cup of coffee yet.
Q. Which wall of the elevator were you leaning against? Was it the back wall or one of the two side walls?
A. The right wall, because I had just pushed the button.
Q. If you get in the elevator, it's the wall on your right?
A. As I moved into the elevator, it's the left wall. Then I turned around, leaned against the wall, pushed the button. That was

the typical routine in the mornings.
Q. So once you get in the elevator and you're facing the door, it's the wall to your right, that's the one you were against?
A. Yes, Uh-huh.
Q. You said you were leaning against that wall?
A. Yes.
Q. And then when the elevator jerked, you fell forward?
A. My neck and my head went forward, yes.
Q. Did the rest of your body fall forward?
A. No, not really. I just -- because it was pretty straight. My head was leaning up against the wall.
Q. When your head fell forward, did it strike anything?
A. No.
Q. So you said your head fell forward and then you started experiencing a pain?
A. A new onset of pain.

Q. Was the pain similar to the pain you had felt before?
A. Yeah. I mean, I knew I had something wrong with my neck.
Q. And was it similar to the pain you had experienced before prior to some of your neck surgeries?
A. Yes.
Q. So when the elevator jerked, did any part of your body strike any part of the elevator?
A. No.
Q. And did you fall to the ground?
A. No. I didn't buckle, no.
Q. So your head jerked forward, but you kept your balance and didn't fall?
A. Yes.
Q. Did the elevator make any type of noise when it jerked?
A. Not that I -- no. I don't recall a huge noise, bang.
Q. And in the weeks leading up to this incident, had you had any problems with

the elevator in the preceding weeks?
A. I hadn't really been there. I had been flying. I had been overseas. I went to India, came back and turned around and went to Jordan, came back and then went to -- I had been three places, back to back trips.
Q. But before you left, before you started all of that travel?
A. I can't remember a specific day, no.
Q. Well, do you remember any time in the, say, three to four months preceding this incident, do you remember whether there had been any problems with the elevator during that time frame?
A. Yeah. Yes.
Q. And what problems were those?
A. I'm not privy to all of them because, like I said, I would come to work and it would be closed or it would be broken when I came back in after a meeting somewhere. I probably sent Davis five e-mails over the period of time since the accident where it's

been down, it gets repaired, gets back up. It's the same type of thing.
Q. And would you agree with me that an elevator is a piece of equipment that requires periodic maintenance?
MR. MIDDLEMAS: Object to the form of the question.
A. Yes.
Q. And I know you don't have any specialized knowledge or training when it comes to elevators, but even as a lay person you have an understanding that an elevator requires maintenance from time to time?
MR. MIDDLEMAS: Object to the form of the question.
A. Yes.
Q. When you got off the elevator after this jerking incident, you said Mike Cisco was the first person you saw. Do you remember precisely what it is you told Mike?
A. I said, Mike, I just -- something happened in the elevator, it jerked, my neck

hurts, I'm sitting down, I think I'm hurt. And that's paraphrasing. I can't tell you exactly what I said.
Q. And how did Mike respond to that?
A. Well, he wanted to make sure -- he just -- he just made sure I was -- it wasn't -- it wasn't getting any worse. And he said we've got to start the paperwork, you know, and you need to go to the hospital. I'm like, okay. So we started -- he started the process. I -- he walked me to my car, I drove to the hospital and walked in and told her I was in pain, and she asked me a few questions. I said -- I told her my history and she said I'm going to refer you to your surgeon for further stuff. And that's what we did. Of course, workmen's comp contacted me within two days or so.
Q. I didn't understand you. Did you say you drove yourself to the hospital?
A. Yes.
Q. Did anyone ride with you?
A. No.

40d7b3b5-0fcc-4a61-a2d6-807c6a734e4a

Q. Which hospital did you go to?
A. Redstone's emergency room.
Q. Is that Fox Army Health Center?
A. Yes, thank you.
Q. And do you know who the physician you saw at Fox was?
A. It was a red -- nurse practitioner. She's on the CA-16, it's on the paperwork.
Q. You don't know her name, though?
A. I can't recall it.
Q. And you said she referred you to your surgeon. Is that Dr. Parker you're referring to?
A. Yes.
Q. So did the nurse make any type of diagnosis of what was wrong with you?
A. I told her what was going on with me and I told her I've had some issues in the past, and she said I think I need to refer you to Dr. Parker, which I did that day. They got me in as soon as they could.
Q. So you saw Dr. Parker on June 9th?

A. Not that day. They got me in as soon as they could with his schedule.
Q. So after you went to Fox Army Health Center on the date of the incident and the nurse practitioner told you that you should probably see your surgeon, did you go home that day? Did you go back to work?
A. I went home. They sent me home for the day. And I was contacted -- I contacted Dr. Parker's office and they fit me in a couple of days later, I think. I don't know the specific time.
Q. Did you go back to work the next day following the incident?
A. I was off a couple of days, one or two days and I came back.
Q. Following this incident, did you ever communicate with Ben Floyd about the problem?
A. I asked him afterwards, you know, I said what did they ever find out, you know, just curiosity, and he said that they didn't find -- they said there wasn't anything wrong

with it. Mr. Ruda came in, rode it and said there was something wrong with it, called them back. And that's where I stopped. I said okay. And --
Q. Did you talk with Ben Floyd on the date of the incident?
A. I'm trying to remember. He wasn't there when I had the accident, so -- he wasn't in yet. So I guess Mike called him, Mike notified him of the accident. That's an assumption on my part. I don't know who contacted him.
Q. It's your understanding he was contacted on the day of the incident, but you don't know who contacted him?
A. I'm sure it was Mike or Steve Dirigo for workmen's comp for the injury, the accident.
MR. GRAYSON: Why don't we take a quick break?
(Short break.)
Q. Before we took a break we were talking about what all happened the day you

contend your injury on the elevator, which I understand was June 9th, 2010. You've already told me that the first person you saw after your injury was Mike Cisco. You reported the incident to him and then after you spoke with him, you went to the hospital. On the date of the incident, is there anyone else you worked with that you recall discussing what happened with?
A. That day, no. I mean, I left there and went home. I, you know, left the hospital and went home. I did come back and drop off, of course, the disposition, whatever. You probably have a copy of it, the thing that says referred to this physician.
Q. I'm sorry, what is that again?
A. The form they filled out in the emergency room. In order to take time off you have to be given direction, even dealing with these things.
Q. So is this like a work excuse form?
A. Uh-huh (affirmative response),

40d7b3b5-0fcc-4a61-a2d6-807c6a734e4a

like sick today.
Q. So when you left Fox Army you went directly home?
A. Yes.
Q. Were your wife or son there when you got home?
A. My wife was. She doesn't work. My son was in school that day.
Q. Did you tell her what happened?
A. Yeah.
Q. And after you discussed the incident with her, did you spend the rest of the day at home?
A. Uh-huh, yes.
Q. Anyone else you recall talking to on the day of the incident?
A. Mike on the phone. I think Steve Dirigo as he was trying to fill out forms.
THE COURT REPORTER: Did you say Gurgo?
THE WITNESS: Dirigo, D-I-R-I-G-O.
THE COURT REPORTER: Thank you.
Q. What is Steve Durigo's position?

A. At the time he was the SSMD branch chief, security systems management division branch chief for International. He was Christine's deputy.
Q. And what do you recall discussing with him on the date of the incident?
A. What happened -- real quick what happened and then that was it.
Q. Did he call you or did you call him?
A. I think he called me.
Q. So he called you and I guess he heard about the incident from someone?
A. He had been given the forms to fill out and wanted to know what was going on. Mike told me and he wanted to get my opinion, what I had done.
Q. And what forms was it that he wanted to get filled out?
A. It's the incident report. It's a form for workmen's comp. There's a -- I don't know the number of it. It's -- you fill it out, you submit it and -- it's a workplace

injury form.
Q. Is this a government form?
A. Uh-huh (affirmative response).
Q. Were you involved in filling out the form or did he fill it out for you?
A. They filled it out for me.
Q. So he called you on the day of the incident because he wanted all the information to put on this paperwork?
A. Yes.
Q. Were you ever provided with a copy of the form?
A. Yes, I have it somewhere. I have it in a folder somewhere at work. So does my office.
Q. Have you provided a copy of that form to your attorney in conjunction with this litigation?
A. I think so.
MR. MIDDLEMAS: If I haven't turned it over to you, I'll do it. Let me just check and see if I've got it. I don't think I've seen it in anything that's been

produced.
Q. You referenced at some point you had to do some worker's comp paperwork. Was that different than this form that Steve Dirigo completed?
A. It leads right into that. These are work -- if you're a Federal employee and you're injured on the job, you have to notify them. They have to adjudicate, you know, the whole bit.
Q. And did you personally complete any paperwork for worker's comp or did Steve Dirigo also complete that?
A. Steve did most of it. When I got back, I followed up and continued working with them.
Q. You said earlier you were not able to see Dr. Parker on the date of the incident. You said you weren't able to see him until his office was able to squeeze you in?
A. Yes, as I recall.
Q. Do you know the date on which you

40d7b3b5-0fcc-4a61-a2d6-807c6a734e4a

Page 110

were finally able to see him?
A. No, not off the top of my head. But I'm sure you have it here.
Q. Well, I'm not sure if this is it or not.

(Defendant's Exhibit Number 9 was marked for identification, and the same is attached hereto.)

Q. I'm handing you Exhibit 9, which is a document from Dr. Parker's office dated June 24th, 2010. Do you know whether June 24th, 2010, would that have been the first date --
A. I think that probably was the quickest day he could see me because of surgeries and everything else.
Q. So this was over two weeks after the incident, correct?
A. Yes.
Q. And that was the first occasion they could squeeze you in on?

Page 111

A. Uh-huh (affirmative response).
Q. Were you annoyed that it took them two weeks to get you in?
A. As annoyed as I could be. And that's wrong. That's his PA (indicating). That is his PA, I'm sorry. You asked me earlier.
Q. Did you call Dr. Parker's office on multiple occasions to try to make an appointment or you just called one time?
A. I called once, they told me they couldn't fit me in till -- but then I called back and asked them if they had -- well, I told them that if they had an opening, that I would make it, I didn't care what day it was, I didn't care what time it was, I would be there. Then, I think, if I'm not mistaken, this was earlier.
Q. In the week following this incident, did the pain over time, did it get worse, did it get better?
A. It did not go away.
Q. It was just constant?

Page 112

A. Just dull, aching. I knew I was hurt and I knew -- but I was interested to find out what was wrong, as anybody else was.
Q. Was the pain confined to your neck or were you experiencing pain anywhere else?
A. It was mostly my neck, some in my shoulders.
Q. Was it both shoulders or one in particular?
A. It usually manifests in the right.
Q. And you had experienced right shoulder pain previously before some of your other neck surgeries, right?
A. Yes.
Q. And so two weeks go by and eventually you go see Dr. Parker on June 24th. At that point in time that you went to see him, was the pain the same as it was immediately following the incident? Did it improve at all or get better at any point?
A. I think it was about the same. I knew I was hurt and I was afraid to do much of anything.

Page 113

Q. When you went to see Dr. Parker on June 24th, did you tell him what happened?
A. I told Filly, the PA.
Q. What did you tell him?
A. He saw me, not Dr. Parker. That was the way -- that's how I got into the office, was to see the PA.
Q. So Dr. Parker was not available on June 24th?
A. Right. That's why he had -- that's why you have his concurrency on the bottom. He had to concur that was a workmen's comp. They don't accept PA signatures.
Q. So the individual you saw on June 24th was Ron, I don't know how you pronounce the last name, is it Filly?
A. I don't know. I just talk to him as sir or doc.
Q. Had you ever seen him before and in Dr. Parker's absence?
A. No. Yes, he worked -- he did sutures and stuff. He goes in with Dr. Parker when they do the surgeries. He's his -- so

40d7b3b5-0fcc-4a61-a2d6-807c6a734e4a

he's assisted on some other -- on my previous surgeries.
Q. And on this form in front of you, the one we just marked, by Ron's name it says PA-C, which I think is some sort of physician's assistant degree?
A. Uh-huh (affirmative response).
Q. It's your understanding he's a physician's assistant, but he is not a medical doctor by training, correct?
A. I understand that. There's specific delineations, I guess.
Q. When Dr. Parker wasn't able to see you for two weeks, did you ever ask if anyone else in his practice could see you?
A. I wanted to see Dr. Parker and I knew -- and if it got any worse I would just go to the emergency room.
Q. All right. When you saw Ron Filly on June 24th, did he recommend a course of treatment to you at that time?
A. Well, he --
Q. Well, first, let me ask you: Did

he make a diagnosis as to what was wrong with your neck?
A. He wasn't sure and he recommended an MRI scan. That's -- you know, I've had friends -- I've had friends who have gone to doctors before and they immediately -- they see them, they do an X-ray and they go -- these guys, they do the MRI, they do due diligence and it's almost like -- I think the next one will be we'll have to do a myelogram, CT myelogram. And then after the myelogram, they make a decision whether or not to do the surgery, because I know they do soft tissue as well.
Q. When is the first occasion you saw Dr. Parker after the incident? Because you've already testified you didn't see him on June 24th, even though you went to his office. Do you know when you finally were able to see him?
A. The next trip I think -- the next visit I had, I had to get something from him for workmen's comp. And I walked in and he

got called in an emergency during my appointment. I'm not sure if it's this one or the next one. So I saw the PA again, I saw Ron again. We went forward, I think, with the myelogram and then I finally saw Dr. Parker. That's when he told me I had a fractured vertebrae.
Q. So the myelogram was something that was recommended by Ron Filly?
A. The CT -- MRI scan was recommended by Ron. And when -- I know that Ron talked to -- on the next visit, if it's there, he had talked to Dr. Parker and I think at that point -- at some point in here he recommends a CT myelogram, which may be that. Hopefully you'll never have one.
Q. I hope not.

(Defendant's Exhibit Number 10 was marked for identification, and the same is attached hereto.)

Q. I'm handing you what I've marked

as Exhibit 10 which I believe is a document summarizing the results of the CT myelogram. This document is dated -- it appears at the top to be dated July 23rd, 2010. Does that sound like the approximate date on when you would have had the myelogram done?
A. Uh-huh (affirmative response).
Q. And after that procedure was performed, was Dr. Parker able to give you a diagnosis?
A. Yes, he came in and told me I had -- he looked at everything and he said that I had a fractured C5.
Q. Was it the C4 to 5 site that was -- where there's a fracture?
A. It was the C5 site, C5 vertebrae on the -- I just know I had a fracture through it. Nothing but the disc was fractured.
Q. If you'll look for me under findings on the second page, where it says C4-5, in that paragraph there it says there's some narrowing of the spinal canal of moderate severity which appears similar to the prior

study. Did he tell you that this was similar to the problems you had previously experienced?

MR. MIDDLEMAS: Object to the form of the question.

A. No, and that's just -- I have -- it's the passage -- do you know what that is? It's the passages where the nerve endings comes out through -- okay. Just asking. And it's throughout all my things. I just have small openings. But he read this and he looked at the pictures and he told me I had a fractured vertebrae, which I think is pseudoarthosis. I could be wrong.

Q. And am I correct that you had fractured this same vertebrae before?

A. Never. I have never fractured a vertebrae.

Q. So the previous occasions --

A. All of the surgeries are discs.

Q. Okay. So your previous surgeries were discs, all involved discs between the vertebras?

A. Uh-huh (affirmative response).

Q. And your understanding, based on what Dr. Parker told you, was that you had a fractured C5 vertebrae?

A. Yes.

Q. At the fractured C5 vertebrae, do you know whether that was diagnosed with this myelogram or was that diagnosed with an X-ray?

A. It was this myelogram and him looking at it and --

Q. Looking at this document, I don't see where it makes a reference to a fractured C5 vertebrae. Is that something that Dr. Parker told you?

A. Uh-huh (affirmative response).

Q. And he told you that after this myelogram?

A. Uh-huh (affirmative response).

Q. Did he recommend a course of treatment at that point in time?

A. A posterior repair which involves two rods, four screws and turn buckles and cutting open all my muscles back here

(indicating).

Q. You said the procedure he recommended performing was a posterior one?

A. Uh-huh (affirmative response). I can show you the scar.

Q. Did he propose any other possible courses of treatment?

A. No.

Q. Did you see any other physicians to get a second opinion?

A. No. He's a good man.

(Defendant's Exhibit Number 11 was marked for identification, and the same is attached hereto.)

Q. I'm handing you what I've marked as Exhibit 11.

A. Yeah, that's a -- I'm sorry. I don't know.

Q. This document in front of you is a clinical note from Dr. Parker dated August 10th, 2010. And it looks like under plan, he

says here he recommends a supplemental posterior cervical fusion. This is when he was recommending surgery to you?

A. Yes.

Q. Above that in the HVI section, it says this study shows a significant crack or lytic lesion through his prior C4-5 fusion. Is that your understanding of what Dr. Parker's diagnosis was?

A. That means fracture.

Q. And you had previously had an ACDF at C4-C5, correct?

A. Uh-huh, yes.

Q. And that was the surgery you had at which point in time?

A. It was the last surgery. It was number 6.

Q. Number 6?

A. Which I didn't fully heal from.

Q. And was it your understanding that where the fusion had been there was now some sort of crack that needed to be repaired?

A. A fracture. It was more than just

40d7b3b5-0fcc-4a61-a2d6-807c6a734e4a

Page 122

-- I understood it was more than just a fusion.
Q. You keep using the term fracture. Is that a term that Dr. Parker used?
A. He called it either a pseudoarthrosis or whatever the heck it is, but he explained that it's a fracture. I have no disc. There's no disc there. The bone was broken.
Q. Do you know if this August -- I had asked you earlier when the first time you saw Dr. Parker following the incident was. Was it in August or do you know if you were able to see him in July?
A. I had not -- I had seen him for -- like I said, he was called away and I saw him for like a second. And he came to apologize. And then he read the myelogram and then came in and told me the bad news. Believe me, the last thing I wanted was another surgery. Absolutely last thing I ever have wanted.
Q. You testified earlier that you were -- I believe you said you were off work

Page 123

for a couple of days following the incident. After that did you go back to work?
A. I came back to work as we were working through all of this. And I had worked a few days, it depended on the day, and I had -- I had permission to work at my own pace, work whatever and I did. And some days I worked full, some days I didn't work.
Q. So you were working the hours you could?
A. What I could, yes, taking leave --
Q. And --
A. -- as I could.
Q. -- leading up to the next surgery you had, did your symptoms ever change over time or was it just constant neck pain?
A. Yes.
Q. And having shoulder pain?
A. Constant neck, just same pain. It never got better. You know, and if I -- if somebody -- if somebody -- if something like a big loud bang goes off, you know, and it sort of startles you, it hurt. It would hurt. I

Page 124

didn't do -- I did absolutely, absolutely nothing but what I had to do.
Q. Were you able to do most parts of your job in the weeks following this incident?
A. I couldn't travel. I had to cancel three trips, three meetings -- I think two or three meetings. I couldn't -- I cancelled a trip to Paris, a negotiation. I cancelled a trip -- a couple of other trips. Some other folks went in my place, but I wasn't able to do my job in that -- the full extent. I had finally -- I was back to full stride. I mean, I want you to understand that I was -- I was traveling internationally again and I wasn't -- I was pulling it all. I was doing everything and it was not having a bad effect on me whatsoever. I did back to back trips. I was in my stride. I was bringing in countries and --
Q. After Dr. -- leading up to your second surgery, did you continue to work in a regular work schedule or were you ever able to return full-time and work 40-hour weeks?

Page 125

A. You mean -- you said second surgery.
Q. Leading up to the next surgery --
A. This one?
Q. Yes, the one that Dr. Parker recommended, it looks like, on August 10th, 2010.
A. I had some full weeks and I had -- from the time I was -- from the injury, from June 9th to the time I came back off of sick leave, 45.5 days was total time taken here and there, because there were days I worked two hours. There were days I worked five, ten, eight, whatever. It just depended.
Q. So your understanding is you missed a total of 45.5 days of work?
A. Uh-huh (affirmative response).
Q. Did you keep records of dates you missed?
A. I have all my leave time, my timecards.
Q. So you have timecards that would show precisely which days you worked and how

40d7b3b5-0fcc-4a61-a2d6-807c6a734e4a

many hours you worked each day?
A. Yeah. Yes. And there's some weeks I worked almost full weeks. But remember, I wasn't traveling and I was doing minimal stuff. I wasn't -- I'm very fortunate to have a good command group.
Q. Have you provided those timecards to your attorney in conjunction with this litigation?
A. Yes. I had to go 240 hours in the hole and I had to take an advance to do it.

(Defendant's Exhibit Number 12 was marked for identification, and the same is attached hereto.)

Q. I'm handing you what I've marked as Exhibit 12, which is a record from Dr. Parker's office dated August 5th, 2010.
A. Uh-huh(affirmative response. This is the time when Dr. Parker came in and said I got called out.
Q. I'm looking at the section at the

bottom where it says plan and it says Mr. Agee's issue at this point in time is his workmen's comp, as this is currently under his primary insurance which is Tricare. Due to the fact this happened at work he needs it stated so that workmen's comp cover pay his medical expenses up to this point.
A. Uh-huh (affirmative response).
Q. Is that information that you conveyed to Dr. Parker?
A. I explained to him that as of right now -- there are two things going on at this point, was workmen's comp had said oh, it's an elevator, it happened on -- it's a third party and you have to prove you were hurt before we will pay -- we will put you on workmen's -- we will put you on workmen's comp and everything else. So I was working on two things. One, I was trying to get well. Two, I was trying to keep my name from being dragged through the mud for no pays on my medical bills. So understand, this is very important. They gave me a CA-16 which

authorizes care after an accident. What they didn't tell me was that it only covers the first $1,600 if your case had not been adjudicated.
So I went, following my doctor's guidance, and had myelograms and CAT scans and X-rays, and all the sudden the bills are no pay because the workmen's comp, Department of Labor, weren't paying the bills. So I had to take time off, again, and go around Huntsville and make good on all those bills. So it was kind of important for me to have this figured out as quick as possible so that the right billing process would happen and it would not reflect negatively upon my rating, because my rating affects my security clearance. Everything I do still -- you know, everything that happens to me affects that, and that's a requirement of employment. I want you to understand why I said that, you know.
Q. This document in front of you makes a reference also to your primary insurance being with Tricare.

A. Yes. I'm retired military.
Q. And that is insurance that's available to --
A. To me.
Q. -- to veterans?
A. To retired military. It's what they call it. But, yes. And I was injured on the job. It shouldn't have been them paying.
Q. Do you know whether the bills associated with your first few visits to Dr. Parker's office after this incident, were those submitted to Tricare?
A. They have been.
Q. Do you know whether Tricare paid -- agreed to pay those bills?
A. Yes. Because I went to Tricare and explained the situation and I said we have to cover this until I have adjudication. So I've done that. I've done everything I can possibly do to do it right.
Q. And did Tricare cover the expenses?
A. Yes.

40d7b3b5-0fcc-4a61-a2d6-807c6a734e4a

Q. Have you had an adjudication yet?
A. We've just received it.
Q. And this was an adjudication that took place in the -- with the Department of Labor?
A. Yes.
Q. And did you have an attorney that assisted you in that process?
A. Yes. I had to.
Q. And did you have a formal hearing you attended?
A. Not in person. Not formally in person. We've had multiple.
Q. Was there any type of telephonic hearing?
A. Once.
Q. When did that telephonic hearing take place?
MR. MIDDLEMAS: I don't want to testify. Go off.
(Off the record discussion.)
A. Yeah. But we had Telecon and we had it with the ombudsman. Because they have

made three errors in their judgments. And every time we had to appeal, we couldn't just -- I'm not whining. I don't want you to think I'm whining. They -- the facts spoke for themselves and we finally got a positive, so --
Q. And did you receive some sort of written adjudication from the Department of Labor that shows their findings?
A. Yes.
MR. MIDDLEMAS: Just recently.
A. Just recently.
Q. When you say recently, within the past week or --
A. I think two weeks.
Q. What's your understanding as to the Department of Labor's findings?
A. They agree that I was wounded -- excuse me, that I was hurt in the elevator accident and it occurred on the job, and I'm entitled to all entitlements that you would get under workmen's comp. And I am now eligible to procure -- to buy back my leave

and a few other options.
Q. And do you know whether the adjudication is retroactive? In other words, do you know whether the government is responsible for covering medical expenses you have incurred up until the date of the adjudication?
A. I am not sure how this works. That's why I have Davis. You might be able to answer.
MR. MIDDLEMAS: No.
Q. Let me maybe -- I need to ask this. All the medical treatment you've received since the date of this incident on the elevator, have you paid for anything out of pocket?
A. Yes, I have a supplemental, because unlike the promise made, I don't have full medical care. So I have a supplement as well and I have paid -- every year I have a certain amount of deductible that I have to pay. So, yes, I've had out-of-pocket expenses. I've had to pay my percentages for

the medication, you know, and they -- I have a better co-pay than most, but I still have things.
Q. And everything you had incurred up until the date of the adjudication, had all of those expenses been submitted to Tricare?
A. They've all been paid through Tricare and my supplemental.
Q. Going forward after the adjudication, is it your understanding that the government will be covering all expenses going forward?
A. As I understand the very short paragraph or so that they've provided, I think that they will go and they will back -- they will go back and retrofit -- or repay, but they're going to come after, I guess, through me through you. It all goes back to why we're here, it's a third party.
THE WITNESS: Is that succinct?
MR. MIDDLEMAS: Yes.
A. But I don't give up.
Q. Did Dr. Parker agree to help you

40d7b3b5-0fcc-4a61-a2d6-807c6a734e4a

in your worker's comp proceedings?
MR. MIDDLEMAS: Object to the form of the question.
A. He agreed that he would -- was what we needed was a letter telling them -- I said, I don't know what you're going to tell them, but I need something from you with your signature block.
Q. And did he agree to do that?
A. He agreed to write a synopsis of what happened, what it was, yes. It wasn't just to win workmen's comp. It was to display -- I don't like that question, the way you said that, but it wasn't that way.
Q. But you went to Dr. Parker and you asked him to write a letter about what happened because you needed that to submit to the Department of Labor?
A. Yes, that was a requirement levied on me by the Department of Labor. That's better.
Q. And Dr. Parker agreed to do that?
A. Yes.

(Defendant's Exhibit Number 13 was marked for identification, and the same is attached hereto.)

Q. I'm handing you what I've marked as Exhibit 13. Do you know, is this a copy of the letter that Dr. Parker prepared for you?
A. Uh-huh. Yes, I'm sorry.
Q. And do you know, after he prepared this letter, did you have the opportunity to review it?
A. Yes.
Q. And did you review it before it was submitted to -- it's addressed to a Gerald Halbert?
A. He's the workmen's comp person, yes.
Q. And when you reviewed the initial draft of the letter, did you request that any changes be made?
A. No, not that I know of. I don't recall. Why?

Q. I'm just asking.
MR. MIDDLEMAS: Just let him ask his questions.
THE WITNESS: Okay.
Q. So dr. Parker gave you a draft of this letter, you had the opportunity to review it?
A. He gave me a copy of the one he sent to Gerald.
Q. So you got it after it had already been sent?
A. After he sent it, yeah.
Q. Prior to this letter being sent, do you know if any attorney acting on your behalf had any discussions with Dr. Parker?
A. No, I don't think so, not with Dr. Parker, no.
Q. In the third paragraph of this letter there's a brief account of this elevator incident. Is it fair to say all of the information about the elevator incident contained in this letter would have been information that Dr. Parker got from you?

A. Oh, yeah.
Q. In other words, he doesn't have any personal knowledge regarding what happened on the elevator on June 9th, he only knows what you told him, correct?
A. That's affirmative.

(Defendant's Exhibit Number 14 was marked for identification, and the same is attached hereto.)

Q. I'm handing you what I'm marking as Exhibit 14, which is a declaration from Dr. Parker that was produced in this litigation. Do you know what purposes this document was prepared for?
A. Yes. Because under the workmen's comp they didn't agree that the letter that Dr. Parker had written, the first one, was sufficient. So we had to -- we were back in the appeals process. So we had to set it out a little bit better. So he wrote this one.
Q. So did you go back to Dr. Parker

40d7b3b5-0fcc-4a61-a2d6-807c6a734e4a

and ask him to prepare this?
A. I went back to him and I said we have this problem, we have an appeal, this is what they're saying and their decision. I gave him a copy of the decision.
Q. And do you know whether your attorney was involved in discussions with Dr. Parker at the time this declaration was prepared?
MR. MIDDLEMAS: Object to what -- well, go ahead. You can answer that.
A. I don't think he's talked to Dr. Parker yet.
Q. Do you know who prepared the initial draft of this declaration?
A. No.
Q. Well, do you believe it was Dr. Parker or do you believe it was someone else?
A. I believe it was Dr. Parker's office.

(Defendant's Exhibit Number 15 was

marked for identification, and the same is attached hereto.)

Q. All right. I'm handing you what I've marked as Exhibit 15, which is an operative report dated August 23, 2010. Is August 23rd the date you had your surgical procedure on?
A. Yes.
Q. The procedure that was performed was a posterior cervical fusion at C4-C5; is that your understanding?
A. Uh-huh, yes.
Q. And following, were there any complications associated with that surgery or did it go well?
A. It went well.
Q. And following that surgery, did you experience any pain relief?
A. It's better.
Q. Was it better immediately following the surgery?
A. Yeah, it was -- it was -- it

wasn't as bad. It's the most painful surgery I've had to date.
Q. The actual procedure was painful?
A. Uh-huh (affirmative response), and the recovery. This is a function of where to go. They cut all the neck muscles back here and the simple thing, it just -- you know, it just --
Q. I assume you were given anesthesia during the surgery?
A. Yes.
Q. When you say it's painful, are you referring to the recovery following the surgery?
A. The recovery, the physical therapy.
Q. After you completed -- after the surgery was performed, did Dr. Parker recommend an ongoing course of treatment of some sort?
A. I was sent to physical therapy. I had to rebuild my muscles.
Q. And did that begin immediately

following the surgery?
A. It was like a couple of weeks after. I can't remember the exact time, but it helped.

(Defendant's Exhibit Number 16 was marked for identification, and the same is attached hereto.)

Q. I'm handing you what I've marked as Exhibit 16, which is a physical therapy initial evaluation form. It is dated August 24, 2010. It appears you had at least an evaluation by a physical therapist on August 24th, is that your recollection?
A. This -- yes, from the Crestwood person.
Q. And that would have been the day following the surgery, correct?
A. Uh-huh (affirmative response).
Q. And did you begin physical therapy immediately after this evaluation?
A. No, I didn't do it with them. I

40d7b3b5-0fcc-4a61-a2d6-807c6a734e4a

did it with the TOC at Madison.
Q. You did it at The Orthopedic Center?
A. Yes.
Q. Do you know why, then, you had an evaluation at Crestwood?
A. No.
Q. Is Crestwood where your surgery was done?
A. Yes. This may have been a requirement based upon -- for my release.
Q. Once you started physical therapy at The Orthopedic Center, did you have a specific physical therapist assigned to you that you saw each time?
A. Most of the time, yes, I had a specific regimen that they were all familiar with.
Q. Who was that person?
A. I can't remember. I'm sorry, I can't remember.
Q. And how long did Dr. Parker recommend physical therapy for?

A. I think it was 10 or 12 weeks.
Q. And I believe you said earlier the purpose of physical therapy was to rebuild muscle strength?
A. Uh-huh (affirmative response).
Q. Did the physical therapy help with the pain?
A. No. It was just getting muscle strength. It helped a little, but it's still there. The problem was getting all the muscles and the nerves to fire.
Q. Following the surgery did Dr. Parker prescribe you any pain medications?
A. Yes, I take -- currently I take -- I take the muscle relaxant every night, I take Mobic. I take -- he has prescribed a compounding cream that's made in Birmingham. Oh, down here, I'm sorry. And it's got a couple of other things in it that my wife rubs in my neck every night. If I go two or three days without it, it's bad. It builds itself up.
Q. Anything else he prescribed?

A. This -- that's what I currently have is what I take. I take a couple other things for other reasons.
(Defendant's Exhibit 17 was marked for identification and copy of same is attached)
Q. I'm handing you what I've marked as Exhibit 17, which is a discharge form from Crestwood Medical Center. This is dated August 25, 2010. Is that your understanding of when you were discharged following your surgery?
A. Uh-huh (affirmative response).
Q. And after you were discharged, do you know how long it was before you were able to return to work?
A. It was a couple of weeks. You can -- approximately two or three weeks.
Q. And if I wanted to figure out exactly how long it was, would the best way to do that be to look at your timecards?
A. Uh-huh (affirmative response). I still take the Soma. I don't take the

Ambien. And then Percocet, I can't stand it. If I took the Percocet I wouldn't feel any pain, but I couldn't work.

(Defendant's Exhibit Number 18 was marked for identification, and the same is attached hereto.)

Q. I'm handing you what I've marked as Exhibit 18, which is a clinical note from Dr. Parker's office dated August 31st, 2010. In the HPI section it states -- he says, he states he has very minimal pain in his neck at this point. The numbness and tingling in his arm has completely resolved since the time of surgery. Is that information that you conveyed to Dr. Parker?
A. I conveyed it to Mr -- PA Jordan. And I was doing quite well. After eight days, I was doing quite well. We were very pleased with how I was coming.
Q. So as of August 31st, you were doing well, you had experienced a significant

40d7b3b5-0fcc-4a61-a2d6-807c6a734e4a

reduction in pain following the surgery; is that correct?

A. No. If you look at the plan, I have given him Lortab. You've got to remember, I don't know -- have you ever had medical surgeries like --

MR. MIDDLEMAS: Just go ahead and answer his question.

A. They -- when you get off -- you're still coming off -- anyway, I had higher levels of pain and every time I would come see him I'm -- it's coming down, but I'm still taking Lortabs every one to two -- six hours as needed for acute pain. So I'm doing better. The pain thread -- the pain is coming down, but it's still -- I'm managing my pain.

(Defendant's Exhibit Number 19 was marked for identification, and the same is attached hereto.)

Q. I'm handing you what I've marked as Exhibit 19, which is a clinical note from

Dr. Parker dated October 14th, 2010. And under -- and the plan section of this note indicates -- it says: Our plan is to start him back full-time at work in four weeks. I assume because Dr. Parker wanted you -- said you could go back full-time, that you were doing well and recovering successfully from the surgery; is that correct?

MR. MIDDLEMAS: Object to the form of the question.

A. No. I was pushing to go back to work because I was afraid of losing funds. But the other thing, it says our plans to start him back full-time to work in four weeks except we will limit him -- I couldn't do my long-term travel. I couldn't do any travel. I could only do for an additional eight weeks, for a total of eight weeks, such as overseas or cross country. Part-time work will be started in two weeks at four hours a day.

Q. And were you able to go back full-time except for the limitations the long distance travel within four weeks?

A. I started -- I started part-time work at two weeks and I went in a little bit less into that. I had worked at my -- I didn't meet every goal.

Q. Do you know when you were finally able to return full-time?

A. Just a little bit past that time limit. But, you know --

Q. In your best judgment, would it have been -- I mean late October, early November?

A. November, December time frame.

Q. Of 2010?

A. Uh-huh (affirmative response). This is where he recommended me for physical therapy. Did I answer your question?

Q. Yes.

A. Okay.

(Defendant's Exhibit Number 20 was marked for identification, and the same is attached hereto.)

Q. I'm handing you what I've marked as Exhibit 20, which is a note from Dr. Parker's office dated July 12, 2012. And this is, I believe, the last record that we've received from Dr. Parker's office. But as of this date Dr. Parker indicated overall you have very minimal complaints, you stated you're very happy with the outcome of the surgery; is that accurate information?

A. I'm as happy as I can be with what I've had done with me, you know, to the point. I mean, yeah. But I still go back to him as needed if I have anything.

Q. And has your pain continued to lessen over time?

A. It's stabilized. It's a constant. It's like my tinnitus, it's constantly there.

Q. The pain you currently experience, is it treated with medication?

A. Yes, to a point. And if I took the medication as prescribed, I could not do my job. You're supposed to take two muscle

40d7b3b5-0fcc-4a61-a2d6-807c6a734e4a

Page 150

relaxants a day and I can only take one at night.

Q. Other than medication, are you receiving any type of ongoing treatment at Dr. Parker's direction?

A. Only to come back and see him as needed. And I have a scheduled one every, year, other than my personal physician.

Q. And you're no longer doing any type of physical therapy, are you?

A. No. I just do it in my garage. I use bungees and stuff.

Q. Do you know when the last occasion you saw Dr. Parker was?

A. I want to say it would be the last time I saw him.

Q. This record right here?

A. Yeah, this is the last one. I don't see him socially.

Q. And as of your last meeting with him, did he want you to schedule a follow-up at some point in time?

A. They scheduled a follow-up. It's

Page 151

almost a year out. I can't tell you the date, but it's a follow-up. It's just go in there, no X-rays. Just make sure of the status.

Q. Will it be coming up sometime within the next month or so?

A. No. It's not on my calendar. I just check my -- I do a 90-day calendar.

Q. So you think you have an appointment scheduled with him, you just don't know when it is?

A. They call me a week beforehand. I have a calendar, I'm sure, like yours. Just --

Q. In your opinion, in the last year since you visited Dr. Parker on July 12th, 2012, have you had any setbacks as far as your neck goes?

A. I have a couple of times when I've tried to do something like I used to do and I can't do any more and I just sit in my hot tub. I have a hot tub I sit in almost every day.

Q. What activities did you used to do

Page 152

that you feel you can no longer do?

A. I can't work on my son's car. I can't go out and camp with scouts. I have a 16 year old boy I can't throw a ball with, I can't wrestle with him. It sucks when your son looks at you and goes sorry, dad, are you okay, just doing something simple. Or he comes up and takes a bag out of your hands because he doesn't want you carrying it. I don't hunt like I used to. When I do hunt, it's not the same. It's sitting in a shooting house. It's not like I used to do it. I don't water ski. I don't tube. I don't snow ski. I used to go to the range and shoot 5, 600 rounds a day. I go out there and just make sure that they're functional. I can't help out around the house to the extent I used to. Before the elevator incident my wife and I put in a brick patio out back of the house before our anniversary. I can't do that any more. I have two pallets of stone that I'm supposed to use -- I was going to use for our kitchen and I can't use it. I can't do it.

Page 153

There's a number of things. I have a 30x40 garage in back I can't use except to store stuff in now. I mean, it's just -- and there's personal things, too. I mean, I don't -- I just don't -- it's not the same. Anyway, you know, I'm very limited in where I look and -- you know.

Q. All the things you just told me about, are those activities you did on a regular basis prior to this last surgery?

A. Yes.

Q. Did you used to water ski on a regular basis?

A. Not water ski, but I would go behind the boat. What I'm saying is, I was in my stride, finally back, finally good after the second -- after the sixth surgery. I was traveling, I was doing things. I bought a car so my son and I could rebuild it. A number of things. I was still flexible. I didn't have the back and neck issues. I didn't have rods in my back. I feel everything when I step now. I feel cold. I feel weather.

40d7b3b5-0fcc-4a61-a2d6-807c6a734e4a

Page 154

Q. When you say you feel it, what do you mean?

A. I have a pretty good idea of the next day -- what the next day's weather is going to be, if there's a front moving through. Some people don't believe in it. I didn't until now.

Q. And you feel that in your neck or where do you feel it?

A. I feel it in my neck and I feel it in my knee, too. I know also that down the road my activity will be sharply decreased, at a fraction of the time it would have been. I know what I can do today. I know what I can't do today, but I don't know what's going to happen in five years.

Q. Is that your belief or has a physician told you that?

A. That's my belief.

Q. But Dr. Parker, the physician, has never told you you're going to have additional limitations in the future?

A. No.

Page 155

Q. Prior to your last surgery, is working on cars with your son something you did on a regular basis?

A. I was feeling good enough to do it.

Q. Well, had you ever done it?

A. Yeah. I bought a '73 Mustang.

Q. Is throwing a ball with your son something you did on a regular basis prior to the last surgery?

A. We had begun -- like I said, we had started doing things that we hadn't been able to do before. It was right there in that time frame where he needs a dad. I'm not a scout master because I can't go camping, I can't go hiking, but I can go and I sit on the committee. You know, I try to be part of it, but I can't do the things that I normally did.

Q. In your best judgment, when is the last time that you were able to throw a ball with your son?

A. I would say four -- he's a senior this year. So he was a sophomore the year

Page 156

before. I'm just saying there's quality of life issues that are decreasing.

Q. Which would have been what year?

A. The year -- the time between my sixth surgery and the time -- and -- when I was in the Army, I wasn't home.

Q. When is the last time you went hunting?

A. I went this season. But it's not hunting; it's sitting.

Q. So y'all are able to operate -- do you use -- typically use a rifle when you go hunting?

A. Yeah. It's a semi-automatic so it won't hurt. But I've made accommodations. I've made huge accommodations. I can't go out to Paint Rock Valley and hiking for three days, sit in a tree and get a 190 pound buck in the woods and walk them out and then go back and get the other part. I can't do that, so now I have to wait for them to come to me.

Q. So if I'm understanding you correctly, you're able to hunt now, but what

Page 157

you do now is different than what you might have previously done?

A. What I had to work up to, yes.

Q. When is the last time you went snow skiing?

A. A long time ago. I just haven't had the ability. But these are things I cannot do now.

Q. Did you have any intention to go snow skiing prior to your last surgery?

A. Yes. It's not much of a place, but you know where -- Mentone, the scouts are going to go, scouts go to Mentone and go skiing and I had considered doing it. I'm just trying to explain to you that some of these things that I used to do and I had thought I could possibly continue to do after I was finally feeling good, I can't do them. And believe me, I've tried some of it. I can't lay under the Mustang and pull wheels.

(Defendant's Exhibit Number 21 was marked for identification, and the same is

40d7b3b5-0fcc-4a61-a2d6-807c6a734e4a

attached hereto.)

Q. Has Dr. Parker given you any physical restrictions or limitations? Has he told you there are any activities you need to avoid?

A. He just basically told me to do what I felt would be -- what doesn't hurt. I mean, that's a common sense approach and I don't do it.

Q. So he's just told you to avoid activities that cause pain, he hasn't given you specific activities, don't do X, Y, or Z?

A. Right. He did tell me -- in fact, he did tell me one time don't go water skiing, don't go snow skiing or mountain climbing and he was trying to be funny.

Q. I'm handing you what I've marked as Exhibit 21. It's a document that was produced in discovery. It's a lost wages form. It appears to have been completed by Sandra Kean?

A. Yes.

Q. Would this have been in conjunction with your worker's compensation proceedings?

A. Yes, I think so.

Q. And the number of days absent from work that's shown on this form is 45.5 days. Is that number accurate?

A. Yes.

Q. I think earlier you gave me a different number that was --

A. I said 45.5 then.

Q. You did say that earlier, you're correct.

A. And there's a couple of half days.

Q. And did you calculate that number of days yourself or did your employer do that?

A. Well, we printed out the leave and the timecards, different codes and added them up.

Q. And the pay rate that's shown on this form, it says $46.49 per hour.

A. Uh-huh (affirmative response). It's more now. I've had some pay rates

increases. But that's my hourly wage.

Q. Was that your hourly wage in 2010?

A. Yes.

Q. At the time of this incident?

A. Uh-huh (affirmative response). And throughout the time of it.

Q. And the total lost wages calculation on this form, is that accurate to the best of your knowledge?

A. Yes. I mean, we calculated the 45.5 times 10 hours times 4649.

Q. And are there any additional lost wages you're seeking to recover in this lawsuit other than what's listed on this form?

A. That's -- no, not that I know of. No.

Q. To date, have you received any type of compensation for these lost wages from either your employer or through the course of these worker's compensation proceedings?

A. No. I used leave to pay my bills.

Q. Can you explain what you mean by that? You said you use leave to pay your

bills. I'm not sure I follow.

A. I have leave in the account. I have leave and I have sick time, sick leave. In order to be able to draw a paycheck while I was sick, since workmen's comp had not agreed, had not accepted the claim yet, I had to use my leave, and instead of being workmen's comp where they pay you 75 cents on the dollar. So I had to pay myself because I was hurting and I had to have money coming in. So I used my leave.

Q. So you had a bunch of paid leave that was saved up over time?

A. I accrued it, yes.

Q. And you were able to use that to make up for essentially the shortfall on pay from your employer when you were taking time off?

A. It paid my bills. But I have to explain that 240 hours of that 400 and approximately 50 hours was loaned to me, I went in the hole for and I had to pay it back every month by my accrual. It took me two

40d7b3b5-0fcc-4a61-a2d6-807c6a734e4a

years to pay it back. In those two years I was unable, unless I was to pay it back cash, I was unable to take job employments anywhere other than the U. S. government. I would have to move and play close to what, 240 hours times 46, that's what I would have to pay back, whatever I had to pay back. And then there was at least one instance where I did not take employment as a contractor for a substantial amount more money because I didn't have the money in the bank to pay it.

Q. During the course of the worker's compensation proceedings for the Department of Labor, are you seeking to get all that leave back?

A. Yes.

Q. And have you received any indication to date as to whether you're going to be able to get any of that leave back?

A. I have to buy it back.

Q. Will you explain to me what you mean by that?

A. Workmen's comp pays you -- when

you're sick -- you guys would know this, but the -- they pay you a lower rate per hour. In other words, if you get paid a thousand, including all your taxes, you get paid $740 because they -- it's not taxable. So when you use your leave and they haven't adjudicated and when you want to get that leave back, they don't give you dollar for dollar. You have to pay the additional amount that they paid you to pay tax on. So if I'm to buy that back right now, it's approximately -- I did a quick, it's like approximately $5,000 out of my pocket that I've got to pay to get that 450 hours back into my account. Because I -- my days -- I might have a 10 hour day. I get paid for 10 hours a day, four days a week. Did that help? I mean --

Q. Yes. Thank you. We talked earlier about your insurance through Tricare and you said in addition to that you have a supplement?

A. Uh-huh (affirmative response).

Q. Is that through another provider?

A. It's through MOL, Military Officer's Association. And that's my supplement. It pays whatever Tricare doesn't. So it allows me to go off in the economy, find a good surgeon and it pays -- as long as it's a Tricare authorized procedure, they pay whatever Tricare doesn't. And they paid --

MR. KENDRICK: You said that was the Military Officer --

THE WITNESS: MOA, Military Officer's Association.

MR. KENDRICK: Okay. That's good enough. Thanks.

Q. Since the time of this elevator incident, I know you've been seeking treatment from Dr. Parker who works at The Orthopedic Center and I believe you testified that your last surgery was at Crestwood Medical Center?

A. Yes, sir.

Q. Other than -- and you also testified that immediately following the incident that you went to Fox Army Health

Center?

A. Uh-huh (affirmative response).

Q. Other than the treatment you received at Fox Army Health Center, at The Orthopedic Center and Crestwood Medical Center, are there any other medical providers that have treated you for injuries you contend you sustained as a result of this incident on an elevator in June 2010?

A. No. Other than -- I want to make sure it's clear. Other than the Crestwood organization, the guys who -- the doctors who did the myelograms, CT scans, yeah. I just wanted to make sure.

Q. All the medical expenses you've incurred to date that you contend is related to this injury, have all the bills been paid?

A. Yes. I don't owe anything right now. I've paid everything.

Q. And do you know whether any of your medical providers have liens on any recovery you might have in this lawsuit?

A. No, no, but that's what I took

40d7b3b5-0fcc-4a61-a2d6-807c6a734e4a

care of. They were ready -- three places were ready to go to collection agencies because they weren't paying, so I -- I was serious, I went around and took care of it, you know, with my insurance, but it should not be that.

Q. When you say you took care of it, do you mean you paid out of pocket or you made arrangements for Tricare to pay?

A. I made arrangements for Tricare to pay with their expectation that they would be reimbursed eventually. And there's a form you fill out when you have potential litigation or something.

Q. To your knowledge, does Tricare have a lien on anything you might recover in this lawsuit?

A. No, to my knowledge.

MR. KENDRICK: David, do you know of any lien?

MR. MIDDLEMAS: Off the record just a second.

(Off the record discussion.)

Q. We just had an off-the-record

discussion. I had asked you earlier about any medical providers you've seen to treat you in relation to this injury you contend you sustained on the elevator. Do you recall any other medical providers you've not mentioned already today?

A. Yes. He didn't provide me, but he was working on behalf of worker's comp, and what he did was he did an X-ray. He reviewed the file that they provided him and asked me some questions and he gave his opinion. Didn't give me his opinion, he gave workmen's comp his opinion. And so a certain time after that, we got our decision in the affirmative. In fact, he supported Dr. Parker's claim, Dr. Parker's statements and causation.

Q. Do you know this physician's name?

A. He works at the Sports Med. Can I look at my calendar?

Q. Yes.

THE WITNESS: Was it a month ago or two months ago?

MR. MIDDLEMAS: I don't know.

About two months ago.

A. I don't think I can find it.

MR. MIDDLEMAS: I can get it to you. And I don't have a copy of any report issued. He never sent -- I didn't -- it was all done through comp. But I'll get the name for you.

MR. GRAYSON: Okay. Great.

A. I'm sorry. I thought I could find it really quick, but I don't want to sit here while you guys watch me.

Q. That's fine. If Davis can get it for us, that works.

A. We might be able to get it -- my wife is outside, so she might know it.

Q. So this doctor -- your understanding was this physician, was he paid by the Department of Labor for this evaluation?

A. It was -- the Department of Labor notified me on a phone call at 5:30 at night and -- anyway, and said this company from California would be coordinating my

appointment. I'm like, oh, crap, I'm going to go somewhere I don't know where. And so I got the letter and it said you will appear before doctor such and such. And it was like it's like Sports Med. But they paid it. I just walked in, showed my identification and an X-ray and that was it.

Q. So was an X-ray done?

A. They did an X-ray.

Q. Were any other types of tests or scans done?

A. No. He looked at my scars and he validated all of them.

Q. But he never reported any findings to you, he just reported them directly presumably to the Department of Labor?

A. No. He said, I've read the file, I've looked at your records and I -- and he said I don't -- I just have to make a report back to workmen's comp and you'll find out what the findings are. He couldn't believe that I was there for three years later.

40d7b3b5-0fcc-4a61-a2d6-807c6a734e4a

Page 170

(Defendant's Exhibit Number 22 was marked for identification, and the same is attached hereto.)

Q. I'm handing you what I've marked as Exhibit 22, which is a copy of the first amended complaint in this lawsuit. Do you know if you reviewed a copy of this document before it was filed?
A. Yes.
Q. If you'll look for me at paragraph number 52.
A. Yeah, I see you highlighted it.
Q. I'm sorry, I gave you the wrong copy. Take a look at that copy. It doesn't have my notes on it. If you'll look at paragraph number 52, there is a description of the incident on the elevator. It says the sudden lurching/jerking and/or sudden falling motion of the elevator caused Plaintiff's neck to react in a sudden snapping or jerking motion. I asked you to describe the incident earlier and I asked you if the elevator fell

Page 171

or dropped, and you said it did not fall. Did I understand your testimony correctly?
A. It didn't fall. It didn't free fall, but it lurched. I mean, it went up and down. I mean, it snapped my neck. I'm not trying to be --
Q. So the elevator jerked, but there was not -- it never fell downwards?
A. It didn't fall and then stop. I mean, there's a basement beneath me. It just -- it jerked enough to snap my head down.
Q. And in paragraph number 53 there is a reference to -- it says: Mr. Cisco ensured that a written report was made of the incident?
A. That's the form.
Q. What form are you referring to?
A. The one -- remember I told you about the paperwork you have to fill out? It's a form, the form that the workmen's comp claim, that's that.
Q. Okay. My understanding of your earlier testimony was that Steve Dirigo

Page 172

completed --
A. He completed it. He followed up -- he's the one that signs it. But Mike started it. He was a witness, the whole bit.
Q. So the written --
A. I'm not trying -- you know, I'm just saying.
Q. The written report that's referenced in paragraph number 53 of the complaint, is that the worker's compensation paperwork or --
A. It's the -- when you are injured on the job at the Department of Defense, there's a form you fill out. And immediately it gets sent. Because there's two things, line of duty determination, you know, whether or not it happened on the job or not. Okay. You're at work when you're supposed to be there and all that stuff. And the second thing is it goes forward to workmen's comp, because they have to report it. That's an incident.
Q. So it's a report to document that

Page 173

there was an on-the-job injury?
A. Yes. I should have just said that.
Q. Were you provided with a copy of that report?
A. This is the same -- yeah, yes. After the fact.
Q. Paragraph number 54 says the Plaintiff, after awaiting a few days to see if his pain would ease or improve, decided it was necessary to visit his doctor. Is that accurate?
A. It was more waiting a few days before seeing the surgeon because of scheduling. We should have put that in.
Q. And it was more than a few days before you finally saw a doctor, right?
MR. MIDDLEMAS: Object to the form of the question.
A. I saw -- it was a few days before I saw a surgeon, yes. But I did see a nurse practitioner the day of the injury.
Q. But it was several weeks after the

40d7b3b5-0fcc-4a61-a2d6-807c6a734e4a

Page 174

incident before you saw a doctor, correct?
A. For scheduling reasons, yes.
Q. When did you leave your position at the International Program's Office?
A. And become an assistant product director?
Q. Yes.
A. It was a year after selection, because we had to wait. So it was -- after I came back, I was working for a while and then I moved. I can't tell you the exact date.
Q. Would this have been in 2011?
A. '12.
Q. And I believe you told me earlier, was that a lateral move?
A. Yes, I took a lateral move. No increase in pay, just a lot more responsibility.
Q. And is that a move you wanted to make?
A. Well, yeah, I wanted to take the -- I wanted to do the developmental -- I originally wanted to do the developmental

Page 175

assignment the year before, but after everything is said and done, I knew I wouldn't be able to travel like I used to. I've stayed -- it's now been made permanent. It's a good thing, I mean, but I'm working in program management versus international.
Q. During the time you've worked on Redstone Arsenal, have you ever had any interactions with any employees of Chugach World Services, Inc.?
A. Maybe saying hi in the hallway. I say hi to everybody, but no, not directly. What you do with anybody you pass by working, but what's important in this, no*.
Q. And do you have an understanding sitting here today of what Chugach World Services, Inc's, role at Redstone Arsenal is?
A. All I know is they're a support contractor and they do maintenance.
Q. And do you have any knowledge -- do you know who any of the elevator mechanics employed by Chugach World Services are?
A. No, sir. When a guy comes in and

Page 176

does a work order, say, in my room, comes into my cube, I look and all I'm checking for is he's got proper tag that says security stuff. I just assume he's there for a reason.

(Defendant's Exhibit Number 23 was marked for identification, and the same is attached hereto.)

Q. I'm handing you what I've marked as Exhibit 23, which are the initial disclosures that your attorney served in this case. Do you know if you reviewed this document before?
A. I've seen it.
Q. And I think we've -- I want to ask you about some of these witnesses. I think we've covered a lot of them already today, but there are a few names on here I see that you haven't mentioned yet. There's an individual named Byron Lawing listed?
A. Yeah, he's the deputy -- he's Bill Ruda's deputy.

Page 177

Q. What knowledge do you believe he has related to this lawsuit?
A. He's fully aware because he's -- he's part of my chain of command.
Q. Have you ever talked to him about the incident that took place in the elevator?
A. Yes. Both he, Bill Ruda, I mean, they're my bosses. They're my overall bosses. So all I do is let them know, let him know over the three years what the status of things are as it applies to them, because they get asked. Rhonda Lambert, that's the name of the nurse practitioner.
Q. Was she the one that saw you at Fox Army Health center?
A. Yes, uh-huh. Thomas Tucker, he's my workmen's comp DOC and he's not my advocate.
Q. So your understanding is Thomas Tucker, is he employed by the Department of Labor?
A. Yes.
Q. Do you know, does he work in D.C.

40d7b3b5-0fcc-4a61-a2d6-807c6a734e4a

Page 178

or do you know where he works?
A. I called a Redstone number and he answered. I haven't talked to him in two years or a year and a half.
Q. So you think he's based on Redstone?
A. Uh-huh (affirmative response). Mr. Halbert, he's in Jacksonville.
MR. GRAYSON: Let's take a quick break. I'm almost done.
(Short break.)

(Defendant's Exhibit Number 24 was marked for identification, and the same is attached hereto.)

Q. I'm going to hand you what I've marked as Exhibit 24, which is a copy of the initial complaint that was filed in the lawsuit. We looked at the first amended complaint earlier. If you will, flip for me to page 6 which is where count one starts. And I want to ask you about this, because this

Page 179

is where all the claims against Chugach are set forth. In paragraph number -- and I guess I asked you about the first amended complaint, whether you had reviewed that and you felt you had. Do you know whether you've reviewed this initial complaint?
A. I reviewed it. I've seen it.
Q. In paragraph number 20 there's an allegation that Chugach World Services had a duty and responsibility to properly maintain the elevator. Sitting here today, can you tell me anything that you believe Chugach World Services failed to do to properly maintain this elevator?
MR. MIDDLEMAS: I'll object. I believe it calls for a legal conclusion.
A. Ask the question one more time.
Q. Yeah. Sitting here today, what is it that leads you to believe -- well, let me try one more time. Do you have any knowledge of anything Chugach World Services failed to do that it should have done to maintain this elevator you were in?

Page 180

A. I have no knowledge of that.
Q. You have no knowledge regarding any of the maintenance that Chugach World Services did on this elevator, do you?
A. No. Well, knowledge -- the second part of your question, any knowledge of --
Q. Any knowledge regarding the maintenance that Chugach World Services has done on this elevator at the office and you said you don't, correct?
A. Because at the time I didn't know it was Chugach, that's true.
Q. In count two there's an allegation that Chugach World Services had a duty to properly repair the elevator. Do you agree with me that in order to repair the elevator somebody first has to tell you that something is wrong with it?
MR. MIDDLEMAS: Object to the form of the question.
A. But they're the ones that work on it, so --
Q. So is it your contention -- well,

Page 181

on June 9th, 2010, the date this incident happened, do you have any knowledge of any problems that have been reported to Chugach World Services with this elevator that had not been fixed?
A. I have no knowledge of that.
Q. Count three, there's an allegation that Chugach World Services had a duty to properly inspect and monitor the elevator. Have you ever reviewed any portions of Chugach World Services' installation support services contract with the United States Government?
A. No.
Q. And you don't know whether that contract requires Chugach World Services to monitor elevators or not, do you?
MR. MIDDLEMAS: Object to the form of the question.
A. I would assume that they would inspect the work they've done.
Q. But that's an assumption on your part, correct?
A. Well, I'm sure it's a

40d7b3b5-0fcc-4a61-a2d6-807c6a734e4a

requirement. But you're right, it's an assumption on my part.

Q. In count four there's an allegation that Chugach World Services had a duty to warn Plaintiff of potential consequences of its failure to properly maintain, repair and inspect the elevator. What is it that you contend Chugach World Services should have warned you of?

A. What do you mean by -- I'm just reading this. Where does it -- that doesn't say that --

Q. Looking at paragraph 34.

A. Okay. Sorry. Sorry.

Q. No problem.

A. And you want me to -- what are you asking me?

Q. There's an allegation that Chugach World Services failed to warn you about potential consequences of its failure to maintain the elevator. What is it you contend Chugach World Services should have warned you about?

MR. MIDDLEMAS: Just quickly, I'll place an objection. That's why he hired an attorney to represent him in this matter.

A. Yeah, that's what I was going to say. I mean, I just -- I'll just go with that. That's why I hired an attorney, to cover this.

Q. Well, would you agree with me that Chugach World Services can't warn you of a problem with the elevator unless they're aware of a problem with the elevator?

MR. MIDDLEMAS: Object to the form of the question.

A. That's if they fixed it correctly the first time and the second time. But if they're aware of it, if there's a continual recurrence with the same problem, either they should take it out of service. And that would be an assumption on my part.

Q. Do you know who owns the elevator in building 4505?

A. I assume it was the United States Government, probably Department of the Army or

Department of Defense.

Q. And do you understand that because the elevator is government property, it can only be taken out of service or replaced with government authorization?

A. I understand that. But why would they make a decision under -- they would make a decision based upon data that would have been provided by the maintenance folks.

Q. Did you know -- and you don't know one way or another whether a request has ever been made to replace this elevator, do you?

A. I was informed we're moving buildings, I'm not going to tell you why, it would make you upset. But we're moving and when the gaining organization takes over the building, they're replacing the elevator. They're removing it and reinstalling a new elevator in that one.

Q. Today the elevator has not been replaced; is that your understanding?

A. That's affirmative. But I can tell you that I was told that they are

replacing the elevator.

Q. Who told you that?

A. I heard it from I think it was Byron Lawing.

Q. And you said he's Bill Ruda's deputy?

A. Uh-huh (affirmative response). And you can just ask Bill when you hear from him.

MR. KENDRICK: What's his name again? Byron?

THE WITNESS: Byron Lawing. He's in -- listed in here.

THE COURT REPORTER: And how do you spell his last name, Lawing?

THE WITNESS: L-A-W-I-N-G.

THE COURT REPORTER: Thank you.

Q. Have you used the northeast elevator since the day you were injured?

A. No, sir. No.

Q. Have you used the other elevator in the building since the day you were hurt?

A. Once or twice I have.

40d7b3b5-0fcc-4a61-a2d6-807c6a734e4a

Page 186

Q. Have you ever experienced -- well --
A. With no problems.
Q. If you will look for me at paragraph number 38 of the complaint, there's an allegation that Chugach World Services failed to properly train and supervise its employees concerning the appropriate maintenance, repair and inspection of elevators. What's your basis for that allegation?
A. Well, if the elevator was signed off and said it was good to go and it was put back into operation, and I walk in and use it and it works -- it doesn't work correctly, I assume that maybe somebody may have missed something. And if that's the case, one of the first things you look at is training.
Q. You told me earlier in the deposition, you don't know the names of any elevator mechanics employed by Chugach World Services, do you?
A. No.

Page 187

Q. And you don't have any knowledge regarding the training any of those elevator mechanics have been provided, do you?
A. No.
Q. And you don't know whether the problem with the elevator was caused by a maintenance problem, do you?
MR. MIDDLEMAS: Object to the form of the question.
A. No, I don't. But I didn't tell you, in my previous life, everything I did was dependent upon my training and if we have had a failure, it was the maintenance test pilot. So if we fault -- found fault or something happened, the first thing you do is we look at everything. You do a full balance, you look at it. And one of the first things we check is training, maintenance, inspection, QA.
Q. The problem with the elevator could have been caused by a latent defect in the design of the elevator, couldn't it?
MR. MIDDLEMAS: Object to the form.

Page 188

A. I'm not an engineer. I don't know.
Q. But it's possible that could have been the cause, isn't it?
MR. MIDDLEMAS: Same objection.
A. I guess you could say that.
Q. It's possible that there was a faulty part on the elevator that caused it to jerk, isn't it?
MR. MIDDLEMAS: Object to the form of the question.
A. You could assume that.
Q. And you don't have the expertise to make a determination as to what caused this elevator to jerk, do you?
A. No, I don't. I'm not the expert, but I am -- I am living with the results.
Q. Other than the people we've already discussed in your deposition today, is there anyone else you've discussed this lawsuit with?
A. My sister, my family. I have notified my chain of command, as I should,

Page 189

because -- as I said, Ruda, Byron Lawing, because they have to know where Doug is today. I'm here and not working.
Q. Have you talked to any people you work with about the possibility of testifying at the trial of this matter?
A. Yes, I've told Mike Cisco that since he was there the first morning and Bill Ruda. I haven't told everybody else on that list. I've just --
Q. Have Mike and Bill indicated to you whether they're willing to testify?
A. Yes. There's nothing to hide. I mean, there's nothing.
Q. Is everything you told me today truthful?
A. Yes.
Q. Do you have anything else you think you need to add in response to any of the questions I've asked you today?
A. No, sir.
MR. GRAYSON: That's all I have.
THE WITNESS: Thanks.

40d7b3b5-0fcc-4a61-a2d6-807c6a734e4a

Page 190

MR. GRAYSON: Thank you.
EXAMINATION BY MR. KENDRICK:
Q. I will try to be brief, Mr. Agee. I appreciate you answering the questions that we've had, or that counsel for Chugach has had. My name is Doug Kendrick. I represent Kone, Inc. We've had a chance to meet. And as you know, I've been sitting here with you throughout the process and I'm just going to try to go over some things that maybe I missed in the course of the questioning that Bryan had. It may sound like I'm trying to beat a dead horse. I promise you, at this hour, I don't mean to be. I'm just trying to get it clear so that I can fully understand what the testimony was and what your story is.
A. I appreciate that. Thanks.
Q. First of all, I'm kind of starting toward the end and I may work backwards, because I want to touch on some things that may be more fresh on our minds now than at the end of my questioning. But you were just asked a moment ago whether you knew the names

Page 191

of any technicians that worked on the elevators that were employed by Chugach. Do you recall that?
A. Yes, I recall the question.
Q. And you said you didn't know any of the names of any Chugach technicians, right?
A. That's correct.
Q. Do you know the names of any technicians whatsoever, whether they were employed by Chugach or otherwise?
A. No.
Q. You understand my client is Kone, Inc.?
A. Uh-huh (affirmative response).
Q. You don't know anybody from Kone, Inc. You never saw --
A. That's correct.
Q. -- or met anybody from Kone, Inc.?
A. That's correct.
Q. You were also asked about what your understanding of the maintenance responsibilities was at that time, who was

Page 192

responsible for maintaining the elevators. And I believe that you also said that you didn't know; is that fair?
A. I didn't know what the contract vehicle was, no. That's correct. I mean --
Q. Do you know now -- I thought at the end of your answer you may have said something, but it wasn't quite audible to me. Did you -- do you recall that statement when you answered that question and then I believe there was something else that you had added on about I didn't know at the time it was Chugach?
A. Right, I didn't know -- understand, Doug got hurt in the elevator, Doug was filling the proper paperwork out and hoping -- and going through the procedure, and Doug being me, and through the course of trying to do the right process that has brought us to here, but at no time was there ever an intent on my part to initially go off and do this. So I didn't do any -- I haven't gone through and asked who worked on it, what

Page 193

do you do, who was it, nothing.
Q. Sure. And a lot of that is your lawyer's job probably. I just want to make sure we're clear on what you knew. But as we sit here today, are you of the impression that one entity over another had responsibility for maintaining the elevators?
A. No.
Q. I want to go back to the incident itself, June 9th, 2010, and ask you some questions. You mentioned -- Bryan asked you the question what happened and you mentioned a sequence of events that you recall taking place. I want to kind of try to break them down. I'm not going to ask you to remember exactly what you said in what order and everything else, but I'm just going to kind of try to break it all down a little bit.
First of all, let's start the night before, the night of June 8th before going into work on the morning of June 9th. Do you recall what you had been doing?
A. No.

Page 194

Q. Do you know if you had just gotten back into town that day on June 8th or if it had been a day prior or how long -- because I know you had been traveling, right?
A. I had been traveling. I can't tell you the actual day. I can go back and find out. I just -- I worked -- I think I was in Huntsville the day before.
Q. Okay. And you would have gone to Redstone Arsenal that day and used the elevator, right?
A. More than likely, yes.
Q. So is it fair to say that within a week you had gotten -- within a week of getting back from one of these trips that you had the incident or would it be longer than that?
A. I think it was within a week or two.
Q. A week or two?
A. Uh-huh (affirmative response).
Q. And you mentioned they were back to back trips. Where did you go?

Page 195

A. I had done Jordan, I done UAE and then I had done India, all within about a month and a half's time. And two of them were back to back. I mean, I came back at four days and turned right around. And I was doing shows, trade shows and meetings and negotiations.
Q. Okay. And at that time when you were overseas and traveling, were you taking any of the pain medications that we've talked about today?
A. All I did was take -- I took the Soma for muscle relaxants.
Q. You didn't take any of the Neurontin or Percocet or Lortab?
A. No, no, I don't travel with that. I travel with Soma and Mobic.
Q. Okay.
A. And Mobic's not a -- I don't know what you call it.
Q. Narcotic?
A. Yes. It doesn't -- you know, Soma just makes you really, really sleepy.

Page 196

Q. And while we're on the topic, you mentioned family or a general physician that you have. What is his or her name?
A. She's -- I wasn't seeing her at the time of this. I can't pronounce her name. She's -- it's Rainbow Family Medicine. It's a Hungarian name. Petra -- I think it's Petra something. It's Doctor.
Q. Is she in communication with your other care in terms of your neck?
A. No. I've seen her for a physical and, you know, just typical --
Q. What I've got right now?
A. Yes, probably. Yes, a physical, blood sugar, that type of thing. Just -- they don't -- she knows my history, I've told her everything I have. They don't communicate.
Q. Ever an occasion where you're in severe pain and you don't have what you need medication-wise, you call her and say, hey, I can't get Dr. Parker, can you write me this?
A. No.
Q. Any of that?

Page 197

A. She wouldn't do it in the first place. But I don't do that.
Q. I'm not insinuating you do.
A. No. I know.
Q. So let's go back where I said we were originally going to go the morning of the incident. You drove to work, right?
A. Yes.
Q. You get out. Were you carrying a briefcase?
A. No. Just a bag of food, lunch.
Q. And it's dark outside that time of morning in June, right?
A. Uh-huh (affirmative response).
Q. 6:00 a.m.?
A. 5:30.
Q. When you approached the elevator, obviously you pushed the up button, right?
A. Yes.
Q. Are there any full floors below the level that you got on?
A. There's a basement. It takes you to the basement where the fallout shelters

40d7b3b5-0fcc-4a61-a2d6-807c6a734e4a

Page 198

are.
Q. So there's a button that you could push and go down?
A. Yes.
Q. When you pushed the up button, did the elevator come promptly?
A. It was already there.
Q. It was already there?
A. Yes.
Q. Was the door open?
A. No.
Q. No?
A. No.
Q. When the door opened, obviously you told us you walked on, you leaned your head over against --
A. Yeah, I walked in, turned to the left, leaned against the wall, the white wall -- the right wall as you look out and the panels there and pushed 2.
Q. So the panel is right in front of you, right?
A. Uh-huh (affirmative response).

Page 199

Q. And you're leaning against the wall and you push 2, like you said. Did you observe anything, hear anything, sense anything at all?
A. No, I don't. That's -- I mean -- I told him that I was a maintenance test pilot. I always listen because I love to know how things work. But I didn't hear anything unusual.
Q. Let's talk about first noise. Any sort of unusual noise that you heard at any point from the moment you pushed that button until the time that you stepped off the elevator, was there any unusual noise that you heard?
A. Not really. I mean, it just sounded like machinery, da, da, boom, boom, you know, and it was just-- that didn't feel good. And obviously I was checking my arms and doing my finger check because I was making sure it wasn't tingling.
Q. So what you're talking about are ordinary sounds you would hear made from

Page 200

machinery. There's no screams, there's no --
A. No.
Q. There's no -- by screams, I mean screeches of metal on metal?
A. No clutches, no nothing like that, no screeching, no grates, no.
Q. What about electrical components inside?
A. I didn't smell anything. No arcing, no flashing lights.
Q. No -- the lights didn't flicker, there was no electrical loss or anything?
A. Not that I saw. I didn't see any -- I mean, my head went down.
Q. And that gets me to -- there's been -- I found three adjectives to describe what kind of movement was made by the elevator when you were in it. You mentioned early on that you had previously on two, maybe three occasions felt the elevator bounce?
A. Uh-huh (affirmative response).
Q. That was a yes?
A. Yes. I'm sorry, yes.

Page 201

Q. And on those occasions obviously you weren't hurt, but you reported the issue, right?
A. Yes, I reported it.
Q. Later you -- you used the term lurched, I believe, or the doctor did in some of his reports maybe from you or otherwise, and there's also, I think you testified, that it jerked?
A. Yeah.
Q. So what I want to try to do is, is there a difference -- is there a distinction you can make between what you call bouncing and these other ways of describing it, lurching or jerking?
A. Have you ever walked in a -- well, let me see here. You know how your water bed, if you're walking on a water bed it kind of gives and comes up? It's generally -- but it does this (indicating). That would be light bouncing, you know.
Q. So whereas --
A. Like this (indicating).

Q. Whereas before it was moving up and down, it was doing so in such fashion that it wasn't abrupt starts and stops?
A. Right.
Q. So lurching would consist of the same up and down but abrupt starts and stops?
A. Yeah. Because I described my -- I described to Dr. Parker what happened and that's how he understood it. I didn't coach him.
Q. Oh, no, no. I'm -- we just try to get the best understanding of what you -- what your memory is.
A. Yeah, I understand.
Q. And the actual -- you're a helicopter pilot, you know about pitch and things like that, which I don't.
A. That's all right.
Q. But did the compartment, the elevator car, did it pitch to the left or right, forward or back?
A. Not that I saw. There was no change in azimuth (phonetic) or -- you know,

there's no change in the x-y axis that I could tell. It just (indicating) and it snapped me. That's a lurch or a bounce.
Q. When you got on the elevator, was there any -- did you notice anything that was, for example, the floor not being level or anything like that?
A. No. Not this time, no.
Q. Do you think you would have noticed if it wasn't?
A. I think so.
Q. Looking back, if you experienced something like you did, you would probably say, hey, I remember now when I stepped on that elevator it was --
A. Every elevator I climb into I think about it.
Q. So what I'm hearing is, up until the point that it went abruptly up and down, it was a typical elevator ride?
A. Not normal to me.
Q. And how long did the lurching or jerking last?

A. Maybe a second. I don't know. Long enough for me to realize that I had something happen to me.
Q. And your head, tell me again what direction your head went.
A. Down this way (indicating). I mean, I'm a big guy. I stay away from walls. I was like this far away from the wall (indicating) and that's why I didn't get hit in the head.
Q. All right. And how many floors does this building have?
A. Three. Three above, one down.
Q. And the elevator provides access to both your floor and the floor above it and the basement, right?
A. Uh-huh (affirmative response).
Q. And the first floor. Mike Cisco was there and he had gotten there a little bit before you?
A. We usually race to see who gets there first in the mornings.
Q. And this may be where I kind of

took a little siesta or something, because I have a feeling this was very clearly stated, but let me ask it again. He rode the elevator up to --
A. I assume he did, yes, sir.
Q. Did you ever ask him?
A. No. I never thought to.
Q. Okay. But you and Mike had ridden on the elevators before, right, together?
A. Uh-huh, yes.
Q. And he, too, had felt the bumping or the bouncing that you described, right?
A. Yes.
Q. And then when you went in and you talked to Mike, I think it was clear from what you said, you were in pain basically is what you told him?
A. Uh-huh (affirmative response).
Q. Anything else you can remember from the conversation with Mike?
A. Just -- I told him what had happened. You know, he started to process and make sure -- I think he was -- he went down to

see who was here, you know. It just -- it was so fluid, it happened so fast, we started doing everything. Mike -- I'm a new government employee in comparison to him. He was at 30 years. So I'm sitting there and I'm trying to figure out if my fingers are tingling or not and if I'm okay. And he's sitting there, you've got fill -- we've got to start the paperwork. We have to start this because it's important that you do this right and I didn't know how smart he was.

Q. As we've been sitting here today, how has your neck been?

A. It's bothering me.

Q. I'll try to let you go here.

A. All right.

Q. Is it -- is it manageable with over-the-counter medication?

A. No.

Q. You use the muscle relaxants, right?

A. Yes.

Q. The narcotics you don't use; is

that right?

A. I don't.

Q. So even if you're --

A. I've got to call in the next day if I do that. I don't do it. And we just threw them out because it's too much of a temptation.

Q. In between the time of the incident and the time that you saw Dr. Larry Parker, was there any incident or anything you can think of that may have caused additional trauma or separate trauma from the elevator?

A. No. I was very -- I was very careful what I did.

Q. What did you do during that period of time, just -- did you just stay in bed or you went to work a couple of days a week?

A. I worked a little bit, but, you know, I was going through the process of trying to be seen and find out what's wrong and -- and still try to work and work within -- and also have -- answer all workmen's comp questions and get everything in a timely

manner. And the only thing that added -- I could say that would have added to my injury was the stress of trying to do that and take care of myself and still make sure I have funds coming in every day.

Q. Have you talked to anybody that, whether before or after your incident, experienced the same type of lurching, jerking that you have described, those abrupt movements?

A. In the elevator -- in the same elevator in the same building?

Q. Yes.

A. Yes. I mean, if you walked in to anybody that works on the second floor and ask them if the elevator acts in a funny way sometimes, they'll all go, oh, yeah, it happens. I'm just saying, if you walked in and just grabbed 15 people on the floor.

Q. But I want to know, has anybody told you that they had the abrupt sort of action that --

A. I think it happened with Bill, I'm

assuming, because when -- the day of my injury when they came out and worked on it, and they said they can't find anything wrong, well, he got back on the elevator and rode the elevator and popped out and said this isn't right, fix it. If you guys can't fix it, we will find a contractor that will.

Q. All right. And --

A. And I don't know who he was talking to. And I was told -- that was -- Bill told me that once and Mike Cisco told me.

Q. So, number 1, did -- was Bill hurt? Did he have to get medical attention?

A. No, he's my size and he didn't.

Q. Did -- you said you didn't know who he was talking to as far as the techs?

A. I wasn't there, so I'd have to assume. I'm assuming so.

Q. And do you know if he went and got somebody else as he said --

A. They came back and then they put a part on order.

Q. The same techs?

40d7b3b5-0fcc-4a61-a2d6-807c6a734e4a

Page 210

A. The same team, same day, came back and looked at it further and put something on order and it was down for a while, I guess.
Q. And that was after he made the statements to them?
A. Yes.
Q. And they had originally said there's nothing wrong with it?
A. Uh-huh (affirmative response).
Q. So -- that's a yes?
A. Yes. I'm sorry.
Q. The way I'm hearing you say it, is he lit fire under them?
A. Yes, he did, as it was told to me.
Q. The written adjudication from the Department of Labor, are we going to get a copy?
MR. MIDDLEMAS: Yes, I'll get it.
A. You know what it says? It says we accept your claim. They tell you -- it takes six pages to tell you that they denied your claim, but they'll answer it in a paragraph.
Q. All right. And that's where I was

Page 211

going next, in terms of the denials. And I know you had a different, sounds like, appeal processes and things like that. The prior basis of dispute we talked about off the record was the causation -- medical causation. Do you understand that concept generally?
A. Generally, yes.
Q. I know you're not a lawyer. You don't know all the ins and outs. But your injury was caused by what took place on the elevator is your allegation, right?
A. Yes, sir.
Q. Were there any other bases for disputing your claim for the Department of Labor disputing your claim?
A. They weren't -- they didn't believe -- they didn't accept that at first it was on the elevator because of my prior surgeries, the same kind of questioning you went down. And the first time that they adjudicated it against me, I had 10 days left to respond and I was trying to get in to see

Page 212

Dr. Parker so he could write whatever he was willing to write on my behalf. They adjudicated. I came home with Dr. Parker's statement the day the adjudication order came in, 10 days early, 10 working days I still had, so that was strike one. So, then, it was all proven that my neck was good when I walked into the door and it was bad when I walked out. But we did it.
Q. I think I understand what you're saying.
A. It wasn't -- they said they knew I was hurt, okay? This is -- they said, yes, you were hurt, but we think it's because of your previous surgeries. It's like the one point that no one seemed to understand and the baseline here is, up until I herniated my disk, soft tissue, this was a fracture. This is a break in the bone.
Q. Did Mike Ruda provide any testimony or any written material to the department?
A. No.

Page 213

Q. Where do you get your prescriptions filled?
A. I get the Soma from Publix and I get everything else from the -- and I go through Dr. Parker for the compounding cream. I have to go through him every time when it's required for refill. And then everything else I go through Tricare. I do postal for my Mobic and a couple of other things I do.
Q. So you said Soma Publix, the compounding cream Dr. Parker?
A. Through a company down here, uh-huh (affirmative response).
Q. All right. And then Tricare is everything else?
A. Uh-huh (affirmative response). I went to -- it saves the government money, so I went that way.
Q. When we were talking about lost wages, you mentioned not only the figure that was calculated in this lost wages form, but also -- and at some point you mentioned that you have been offered other opportunities or

40d7b3b5-0fcc-4a61-a2d6-807c6a734e4a

Page 214

come across other opportunities that you couldn't accept because you would have had to, as I understood it, get your leave hours or -- or pay an amount equal to what those leave hours --

A. I owed Uncle Sam for 240 hours of sick leave that I accrue at four hours per pay period. So 240 hours times my pay rate is what I owed them. And I have since paid it off. It's been that long. But when I had that, one, you know, I had to check with -- I checked with Davis to make sure I could do it. Second, if I could afford it, because if I lost -- if I went back into the contracting world as a contractor, they make a lot more money, I don't make that much so I don't have that much in the bank to pay Delta. I had to pay the money back before I could get released. Unless the Army fired me, they would waive it, but I'm not going to get fired. I mean, so I had to turn down a job working with Apache Aviation working on simulation.

Page 215

Q. The manufacturer Apache?

A. No, working for BM Apache as a contractor, and I was going to go out and work all the simulation devices around the world for the U.S. Army and their customers and validate all the new software loads. And I turned that down once and they came back to me a year later and they offered it to me again. I had to turn it down again.

Q. And the sole reason was this paid leave issue?

A. Pretty much.

Q. Well, was there anything else?

A. That was it. I didn't have the money in the bank. I couldn't do it.

Q. And it was about $5,000 that you would have owed, right?

A. No, 220 at the time -- the first time it would be about -- at that point, if I would have paid some back, so let's just say it was 190 hours times 50, 10,000.

Q. Okay.

A. You know, I'm just -- that type of

Page 216

thing, for me I'm not going to go in the hole on. I was already -- you know, it was --

Q. And I understand it's one thing to not to have the cash flow at the time to do that. Did you ever consider an arrangement whereby you would pay it over time?

A. No.

Q. Why didn't you do that?

A. I didn't want to do it.

Q. Were those jobs -- I mean, how much more lucrative in terms of earning potential would they have been than the one you --

A. It's approximately $40,000 more a year.

Q. So you could have paid 10,000 to earn 40,000 more a year and you chose not to, I guess, because of the cash flow?

A. How do you pay Uncle Sam back on a buy-back basis unless it's a tax lien? It's really hard to do that. Hey, I promise I'm going to leave your employment, you're not going to be able to touch me. I didn't know

Page 217

how to do it. And I didn't want to go into credit card debt because I still --

Q. That's fine.

A. Yeah. It was hard. It was hard.

Q. I just want to make sure I understand. Were there any other --

A. And the other part was, I wasn't ready to travel.

Q. And you weren't ready to travel because of what, because of the injury?

A. I was still recovering. I couldn't go right to work and go (indicating).

Q. So then -- and the money really didn't even matter at that point, I guess?

A. Both of them mattered, but to a point. I don't -- these are my friends, people I used to work with and fly with and fire with, and I didn't want to yank them around. I said no because I had too much baggage.

Q. And any other similar opportunities that arose that you could identify?

40d7b3b5-0fcc-4a61-a2d6-807c6a734e4a

A. Nothing firm. I've had others come to me and ask me and I said, no, I can't move. Because the first thing I'm going to do is take care of my family.
Q. And when you say you can't move, you mean move your family?
A. I'm not going to move jobs. I'm not going to move jobs because I'm still stuck here.
Q. Okay. Going back in your post op, early few -- first few operations that you had degenerative -- I'm sorry, with the disc herniations or disc problems and the fusions, after you went through that period of recovery a handful of weeks, whatever it was, when you started feeling better, were you able to walk distances, say, I don't know, walk around the block?
A. Yes.
Q. Things like that?
A. Yes.
Q. Ordinary activities, were you able to do stuff like that?

A. The first two surgeries, since you're talking back to the beginning when I was in the Army, I was on a profile because you have to do physical training and you have to be able to make certain gates, and it took me a long -- I was on a permanent profile, okay, but I was able to do certain things. I did push-ups and I could do sit-ups. You know, I couldn't run because of the jarring.
Q. Did it ever -- did it ever compromise your ability to go up and downstairs, for example?
A. No. But I couldn't deploy. The Army made a decision that I couldn't deploy. I couldn't go wear a Kevlar. I couldn't go run around and be shot at. So they retired me to make room for a young guy.
Q. And what was your discharge status?
A. I was retired W4.
Q. And after you retired, the service you're talking about now is civilian, right?
A. Uh-huh (affirmative response).

Q. Let's see, I'm getting close to the end. And you've gone to work for a number of days since the incident in June 2010, right?
A. Uh-huh (affirmative response).
Q. Is that right?
A. Yes.
Q. And you continue, I guess, yet to use stairs, to get up and get down, right?
A. Uh-huh (affirmative response). I have good days and bad days.
Q. Right. What about the day that you had the incident and I think Mike walked you out to the car, did y'all go down the stairs?
A. Yeah.
Q. Did he have to help you or did you make it --
A. He just guarded me. We didn't know -- we didn't know what the extent was.
Q. How did you describe that pain again? Is it a constant aching pain or --
A. If you have a long day and you're

redoing a bunch of papers and you have that ache right here, you know, and it kind of goes to the migraine thing, I have that ache on both sides all the time.
Q. But immediately after the --
A. Oh, it was -- it was pain. Just pain.
Q. I can't remember if you said it was radiating down?
A. A little bit of radiation over here (indicating).
Q. Down the right arm?
A. A little bit.
Q. And what about down the leg?
A. No. It didn't affect my lower back.
Q. Anything else, as we've asked you these questions, that you can think of that you think we should know as -- well, as lawyers dealing with this case and the circumstances as you observed them on that elevator specifically?
A. No.

Q. Anything unusual that we haven't talked about?

A. No. Nothing more than -- no. We've discussed everything.

MR. KENDRICK: I think that's all I have.

MR. GRAYSON: I don't have any more questions. I've just got one thing I want to add on the record. There are a few documents that were referenced today here in the course of Mr. Agee's testimony that I don't think have been produced during the course of discovery and they are documents that I believe are responsive to our request for production. The items that I'm specifically referencing are, he said he may have some e-mails to Ben Floyd about elevator issues. He also referenced an on-the-job injury form that was completed after this incident occurred. He also talked about some timecards he has showing when he was present at work. And we're also interested in any -- the final adjudication from the Department of

Labor and any other correspondence or documents with the Department of Labor. And we do reserve the right, if necessary, to reopen his deposition just on the limited subject of any additional documents that are produced after the date of this deposition.

MR. MIDDLEMAS: Okay.

MR. KENDRICK: And any documents that have been proceeded prior to our involvement, we can handle that off the record, but I would at least make mention of it. And what -- the list of documents that he mentioned more obviously we want to take a look at as well.

MR. MIDDLEMAS: Got you.

MR. KENDRICK: I saw something else real quick. That's all. Thank you.

(Deposition concluded at 4:15 p.m.)

C E R T I F I C A T E

STATE OF ALABAMA
JEFFERSON COUNTY

I hereby certify that the above and foregoing deposition was taken down by me in stenotype, and the questions and answers thereto were reduced to typewriting under my supervision, and that the foregoing represents a true and correct transcript of the deposition given by said witness upon said hearing.

I further certify that I am neither of counsel nor kin to the parties to the action, nor am I in

any wise interested in the result of said cause.

/s/Allison L. Miller
ALLISON MILLER, CCR
CCR #57, Expires 9/30/2013
Commissioner for the
State of Alabama at Large
My Commission Expires: 9/30/13

40d7b3b5-0fcc-4a61-a2d6-807c6a734e4a

**A**

**ability** 15:19 157:7
219:11
**able** 42:20 59:15
88:20 109:17,19
109:20 110:1
114:13 115:19
117:9 122:14
124:3,11,22 132:9
144:15 147:21
148:6 155:13,20
156:11,23 161:4
161:15 162:19
168:14 175:3
216:23 218:16,22
219:5,7
**abnormal** 53:8
**abrupt** 202:3,6
208:9,21
**abruptly** 203:19
**absence** 113:20
**absent** 159:5
**absolutely** 33:8
122:21 124:1,1
**abuse** 62:15
**accept** 113:13
210:20 211:18
214:2
**accepted** 64:17
161:6
**access** 20:2 72:2,3
72:13,14 204:14
**accident** 99:23
104:8,10,18 128:1
131:20
**accommodations**
156:15,16
**account** 11:7
136:19 161:2
163:14
**accrual** 161:23
**accrue** 214:7
**accrued** 161:14
**accurate** 86:5
149:9 159:7 160:8
173:12
**ACDF** 42:13 52:8

52:16 55:11
121:11
**ache** 61:21 221:2,3
**aching** 112:1
220:22
**acknowledge** 33:10
**acronym** 42:13
**acting** 7:2 136:14
**action** 208:22
224:23
**activities** 44:11
151:23 153:9
158:5,12,13
218:22
**activity** 154:12
**acts** 208:16
**actual** 36:5 140:3
194:6 202:15
**acute** 146:14
**add** 189:19 222:9
**added** 159:18
192:11 208:1,2
**addition** 163:20
**additional** 12:12
25:23 26:11 52:22
61:5 147:17
154:21 160:12
163:9 207:11
223:5
**address** 9:4,8 47:7
58:15,16 60:8
61:19
**addressed** 82:19
83:1 135:15
**adjectives** 200:16
**adjudicate** 109:9
**adjudicated** 128:4
163:6 211:22
212:3
**adjudication**
129:18 130:1,3
131:8 132:3,7
133:5,10 210:15
212:4 222:23
**Admin** 81:9
**administration**
81:9

**admitted** 16:16
**advance** 126:11
**advised** 3:3
**advocate** 177:18
**affect** 15:18 221:15
**affiliated** 19:19
**affirmative** 9:3,18
13:6 17:3 19:14
21:23 22:13 23:12
31:22 32:15 37:11
39:1,13,17 40:13
43:5,18 46:7,10
47:9 48:23 49:13
52:20 54:20 55:9
55:13 56:5 59:1,5
63:2 65:7,20
66:19 67:17 68:23
69:8,16,19 72:18
74:17 91:13
105:23 108:3
111:1 114:7 117:7
119:1,15,18 120:4
125:17 127:8
137:6 140:4
141:20 143:5
144:13,22 148:14
159:22 160:5
163:22 165:2
167:14 178:7
184:22 185:7
191:15 194:21
197:14 198:23
200:21 204:17
205:18 210:9
213:13,16 219:23
220:5,10
**afford** 214:13
**afraid** 112:22
147:12
**Agee** 1:7,13,18 7:6
7:13,18 8:15 9:16
9:17 45:4 190:3
**Agee's** 127:2
222:11
**agencies** 166:2
**agency** 66:6 72:15
**ago** 7:19 72:19

157:6 167:21,22
168:1 190:23
**agree** 100:3 131:18
133:23 134:9
137:18 180:15
183:8
**agreed** 1:16 2:1,8
2:16 50:19 129:15
134:4,10,22 161:5
**ahead** 26:14 38:17
60:19 138:11
146:7
**air** 10:21 71:18
**aircraft** 25:19
**airplane** 62:7
**Alabama** 1:2,22
2:20 6:7,14 7:4
9:6 10:8 11:23
12:2 16:19,20
224:12 225:6
**allegation** 179:9
180:13 181:7
182:4,18 186:6,11
211:12
**allege** 89:2
**Allison** 1:19 2:21
7:2 225:3
**allows** 164:4
**Ambien** 145:1
**amended** 2:20 5:6
170:7 178:20
179:3
**America** 10:21,22
**amount** 132:21
162:10 163:9
214:4
**analyzed** 29:6
**and/or** 170:19
**anesthesia** 140:9
**anniversary** 152:20
**annoyed** 111:2,4
**annual** 28:8
**answer** 8:7 132:10
138:11 146:8
148:16 192:7
207:22 210:22
**answered** 178:3

192:10
**answering** 190:4
**answers** 224:17
**anterior** 42:9
**antibiotics** 48:8
**anybody** 9:10
112:3 175:13
191:16,19 208:6
208:15,20
**anyway** 30:17
56:11 71:19
146:10 153:5
168:22
**Apache** 214:22
215:1,2
**Apaches** 23:4
**apologize** 122:17
**apparent** 18:8
**appeal** 131:2 138:3
211:2
**appeals** 137:21
**appear** 169:3
**APPEARANCES**
6:2
**APPEARING** 6:3
6:9
**appears** 38:16,18
49:1 51:10 117:3
117:23 141:13
158:21
**applies** 177:11
**appointment** 43:15
111:10 116:2
151:9 169:1
**appreciate** 190:4
190:17
**approach** 18:17
158:9
**approached** 197:17
**appropriate** 186:8
**approval** 71:20
**approximate** 19:8
117:5
**approximately**
50:5,12 58:19
67:18 96:2 144:18
161:21 163:11,12

216:14
**arcing** 200:10
**area** 10:5,12 35:16 66:7 72:15 79:23
**arm** 41:17,20 42:4 145:15 221:12
**armed** 13:4
**arms** 16:15 199:19
**Army** 10:20 12:1 12:22 13:2 14:19 15:16 24:23 26:6 31:3 77:10 84:5 102:3 103:3 106:2 156:6 164:23 165:4 177:15 183:23 214:19 215:5 219:3,14
**arose** 217:22
**arrangement** 216:5
**arrangements** 166:8,9
**Arsenal** 15:2,11,14 175:8,17 194:10
**Arthritis** 61:15
**asked** 16:1 53:22 91:5 101:13 103:20 111:6,13 122:11 134:16 167:1,10 170:22 170:23 177:12 179:3 189:20 190:23 191:21 192:23 193:11 221:17
**asking** 118:9 136:1 182:17
**aspirin** 29:19
**assign** 2:13
**assigned** 71:11 142:14
**assignment** 12:6 64:19 175:1
**assistant** 64:20 65:4,13 114:6,9 174:5
**assisted** 114:1 130:8
**associated** 22:21 46:14 73:18,18,19 129:10 139:15
**Associate's** 12:14 12:19
**Association** 10:20 10:21 164:2,12
**assume** 8:7 18:3 30:23 46:8 49:2 72:1 75:14 93:10 95:15 140:9 147:5 176:4 181:19 183:22 186:16 188:12 205:5 209:18
**assumed** 83:18
**assuming** 93:19 209:1,18
**assumption** 104:11 181:21 182:2 183:19
**as-needed** 62:12,13
**Atlanta** 6:20
**attached** 37:23 41:3 43:22 46:20 48:14 51:1 54:15 56:15 110:9 116:21 120:15 126:15 135:4 137:10 139:2 141:8 144:6 145:7 146:20 148:22 158:1 170:3 176:8 178:15
**attended** 130:11
**attention** 209:13
**attorney** 7:20 108:17 126:8 130:7 136:14 138:7 176:12 183:3,6
**ATU** 13:1
**audible** 192:8
**August** 19:11 22:7 120:22 122:10,13 125:6 126:19 139:6,7 141:12,14 144:10 145:11,22
**authorization** 184:5
**authorized** 164:6
**authorizes** 128:1
**available** 113:8 129:3
**Aviation** 10:20 214:22
**aviator** 28:6 29:19
**avoid** 158:6,11
**awaiting** 173:9
**aware** 67:2 85:17 177:3 183:10,16
**axis** 203:1
**azimuth** 202:23
**a.m** 1:23 197:15

**B**

**B** 4:6
**Bachelor's** 13:10
**back** 16:15,18 18:18,21 20:12,14 20:20,22 24:3,5,8 24:9,9,10,17,21 42:20,23 45:10 48:4 53:15 56:8 57:22,23 64:16 82:16 85:23 88:5 88:20 96:15 99:4 99:5,6,6,21 100:1 103:7,13,16 104:3 105:12 109:15 111:13 119:23 123:2,3 124:12,17 124:17 125:10 131:23 133:15,16 133:18 137:20,23 138:2 140:6 147:4 147:6,11,14,21 149:12 150:6 152:19 153:2,16 153:21,22 156:20 161:22 162:1,2,7 162:7,15,19,20 163:7,10,14 169:20 174:10 186:14 193:9 194:2,6,15,22,23 195:4,4,4 197:5 202:21 203:12 209:4,21 210:1 214:14,18 215:7 215:20 216:19 218:10 219:2 221:16
**backward** 19:6
**backwards** 190:19
**bad** 39:21 93:18 122:19 124:16 140:1 143:21 212:8 220:11
**bag** 152:8 197:11
**baggage** 217:20
**balance** 25:18 98:16 187:16
**ball** 152:4 155:8,20
**bang** 98:21 123:22
**bank** 162:11 214:17 215:15
**bankruptcy** 14:8
**Barber** 23:2,5 24:4 25:6 27:20 28:10 29:12
**bare** 52:4
**Barnard** 17:14,19 17:21 18:3,12 19:13 20:2 23:11 24:5,8 25:9,21
**based** 15:1 63:16 119:2 142:11 178:5 184:8
**baseline** 212:17
**basement** 171:10 197:22,23 204:16
**bases** 211:14
**basically** 29:22 63:5,13 158:7 205:16
**basis** 11:9 43:9 60:12,13 62:12,13 79:4 153:10,13 155:3,9 186:10 211:4 216:20
**bathroom** 23:21
**beat** 190:12
**bed** 20:13 23:19 24:11 201:17,18 207:16
**began** 71:22 73:6
**beginning** 219:2
**begun** 155:11
**behalf** 6:3,9 136:15 167:8 212:2
**belief** 154:17,19
**believe** 15:18 39:3 117:1 122:19,23 138:17,18,20 143:2 149:4 154:6 157:19 164:18 169:21 174:14 177:1 179:12,16 179:19 192:2,10 201:6 211:18 222:14
**believed** 40:15
**belong** 10:10,13,19 10:23
**Ben** 77:3,3,18 80:16 81:2,5,19 81:21 82:1 83:3,7 83:14 84:16 87:14 88:11,18 90:2,5 103:18 104:5 222:17
**beneath** 171:10
**benefits** 84:1
**Ben's** 77:5
**best** 67:5 80:8 144:20 148:9 155:19 160:9 202:12
**Beth** 9:16,17
**better** 29:3,4 36:10 44:9 47:14 49:6 59:13 111:21 112:20 123:20 133:2 134:21 137:22 139:20,21 146:15 218:16
**beyond** 40:9

**big** 123:22 204:7
**bilateral** 48:21
**Bill** 85:15 176:22 177:7 185:5,8 189:8,11 208:23 209:11,12
**billing** 128:14
**billion** 63:12
**bills** 127:22 128:7,9 128:11 129:9,15 160:21 161:1,19 165:17
**Birmingham** 1:21 6:7,14 10:5 143:17
**birth** 8:16
**bit** 66:5 76:22 109:10 137:22 148:2,7 172:4 193:18 204:19 207:18 221:10,13
**block** 71:5,11 134:8 218:18
**blog** 11:5
**blood** 196:15
**Blue** 10:13,16
**BM** 215:2
**boat** 153:15
**body** 24:14 27:13 39:12 97:13 98:10
**bone** 17:15,22 19:18,23 24:14 30:19 31:19 48:3 53:6,6 54:5 56:3 58:15 60:8 61:15 61:21 122:8 212:19
**bony** 57:3
**boom** 199:17,17
**born** 11:21
**boss** 85:16
**bosses** 177:8,9
**bothering** 206:14
**bottom** 74:11 78:18 113:12 127:1
**bought** 153:18 155:7
**bounce** 76:21 78:15 78:19 200:20 203:3
**bounced** 80:15
**bouncing** 78:5,5,11 79:11 80:6,10,23 82:10 84:10 85:6 87:7 201:13,21 205:12
**bow** 16:13
**boy** 10:21 152:4
**brace** 23:20
**Bradenton** 12:17
**branch** 107:1,3
**break** 8:10 104:20 104:21,22 178:10 178:11 193:14,18 212:19
**brick** 152:19
**brief** 136:19 190:3
**briefcase** 197:10
**bringing** 124:18
**broke** 93:17
**broken** 73:21 76:17 85:2 99:20 122:9
**brought** 11:23 22:16 23:15 54:8 192:20
**Bryan** 2:22 6:10 7:19 190:11 193:11
**buck** 156:18
**buckle** 98:14
**buckles** 119:22
**building** 36:21 63:15,19,19,21 64:1 66:1,4,11,17 67:1,6,19 68:4,9 68:10 69:11,14,22 71:23 72:1,4,10 72:12 73:1,2,7,16 74:7 75:7,12,22 77:7 90:17 91:18 183:21 184:17 185:22 204:12 208:12
**buildings** 184:14
**builds** 143:21
**bulge** 19:5
**bulges** 18:13
**bumping** 205:11
**bunch** 8:2 16:5 161:12 221:1
**bungees** 150:12
**business** 81:10
**button** 76:20 77:1 78:1 84:9 85:5 89:6,7 94:20 96:18,23 197:18 198:2,5 199:12
**buy** 131:23 162:20 163:10
**buy-back** 216:20
**Byron** 176:21 185:4,11,12 189:1
**B-A-R-N-A-R-D** 17:19

**C**

**C** 224:10,10
**Calame** 38:8,9
**calculate** 159:15
**calculated** 160:10 213:21
**calculation** 160:8
**calendar** 151:6,7 151:12 167:19
**California** 168:23
**call** 76:15 77:3 83:15 107:9,9 111:8 129:7 151:11 168:21 195:20 196:20 201:13 207:4
**called** 25:7,13 40:5 50:8,8 58:18 87:18,19,21 104:2 104:9 107:11,12 108:7 111:10,11 111:12 116:1 122:5,16 126:22 178:2
**calling** 82:6 92:4
**calls** 179:16
**camp** 152:3
**camping** 155:15
**campus** 12:18
**canal** 117:22
**cancel** 124:6
**cancelled** 124:8,9
**capacity** 15:14
**car** 101:11 152:2 153:18 202:20 220:14
**card** 217:2
**care** 25:8 27:19 86:18 111:15,16 128:1 132:19 166:1,4,6 196:10 208:4 218:4
**careful** 207:14
**carried** 35:6
**carrying** 24:22 25:3 152:9 197:9
**cars** 155:2
**case** 1:5 7:21 8:21 8:22 9:2 128:3 176:13 186:17 221:20
**cases** 36:22 88:5
**cash** 162:2 216:4 216:18
**CAT** 128:6
**caught** 54:5
**causation** 167:16 211:5,6
**cause** 7:6 34:19 158:12 188:4 225:1
**caused** 16:10 25:15 34:23 40:21,21 94:15 170:20 187:6,20 188:8,14 207:11 211:11
**causing** 28:14 35:23
**CA-16** 102:8 127:23
**CCR** 225:3,4
**center** 49:17 55:1 102:3 103:4 142:3 142:13 144:9 164:18,19 165:1,4 165:5,6 177:15
**cents** 161:8
**certain** 88:14 132:21 167:13 219:5,7
**certify** 7:3 224:15 224:22
**cervical** 38:19 42:9 44:17 121:2 139:11
**chain** 177:4 188:23
**chance** 190:7
**change** 64:14 123:15 202:23 203:1
**changed** 24:12,12 64:10,12 65:11,18 68:17,19
**changes** 39:16 57:3 135:21
**check** 11:10 43:16 70:12 108:22 151:7 187:17 199:20 214:11
**checked** 214:12
**checking** 176:2 199:19
**chest** 48:7
**chief** 107:2,3
**choice** 26:5
**chose** 216:17
**Christ** 11:2
**Christine** 64:8 65:6 70:23 89:21
**Christine's** 107:4
**Chugach** 1:10 7:21 175:9,16,22 179:1 179:9,12,21 180:3 180:8,12,14 181:3 181:8,10,15 182:4 182:8,18,22 183:9 186:6,21 190:5 191:2,6,11 192:13
**church** 10:23 11:2 11:3

**circumstances** 221:21
**Cisco** 79:12,13 80:3 80:21 90:16 91:3 92:1,6 100:19 105:4 171:13 189:7 204:18 209:11
**City** 13:13
**civic** 10:11,18
**Civil** 2:20 7:4
**civilian** 13:2 219:22
**claim** 161:6 167:15 171:21 210:20,22 211:15,16
**claims** 179:1
**clarified** 33:22
**clarify** 33:6
**classes** 13:23
**clear** 165:11 190:15 193:4 205:15
**clearance** 128:16
**clearly** 205:2
**client** 191:13
**climb** 203:16
**climbing** 158:16
**clinical** 4:10,12,13 4:18 5:2,3 44:2 48:17 51:4 120:22 145:10 146:23
**close** 14:22 15:5 63:1,5,14,23 64:4 65:1,10 66:2,18 67:8 70:10,22 72:23 74:13 77:10 162:5 220:1
**closed** 94:23 99:20
**closest** 74:6
**Club** 10:14,17
**clubs** 10:10,18
**clutches** 200:5
**coach** 202:9
**cockpit** 20:14 24:22
**code** 44:14
**codes** 159:18
**coffee** 91:23 96:13
**cold** 153:23
**collection** 166:2
**college** 8:23 12:15 12:16
**Colonel** 23:2,5 25:6 27:19 28:10 29:12
**Combat** 14:22 15:5 63:1,5,15,23 64:4 65:1,10 66:2,18 67:8 70:22 77:10
**combined** 57:4
**come** 24:17 44:14 54:9 68:11 70:11 70:18 76:21 77:14 77:18 78:14 82:7 83:15 88:5 99:19 105:12 133:17 146:11 150:6 156:21 198:6 214:1 218:2
**comes** 77:1 93:15 100:11 118:9 152:8 175:23 176:1 201:19
**comfortably** 96:5
**coming** 20:20 47:19 77:23 84:9 85:5 145:21 146:10,12,15 151:4 161:10 208:5
**command** 25:2 126:6 177:4 188:23
**commencing** 1:23
**comment** 11:15
**Commission** 225:7
**Commissioner** 1:19 2:18 7:2 225:5
**committee** 155:17
**common** 158:9
**commonly** 42:13
**communicate** 103:18 196:17
**communication** 196:9
**comp** 71:17,17 83:22 84:1 90:1 101:17 104:17 107:21 109:3,12 113:13 115:23 127:3,6,13,17 128:8 131:22 134:1,12 135:17 137:18 161:5,7 162:23 167:8,13 168:6 169:20 171:20 172:20 177:17 207:22
**company** 168:22 213:12
**compared** 45:11
**comparison** 206:4
**compartment** 202:19
**compensation** 159:2 160:18,20 162:13 172:10
**complaint** 5:6,8 48:21 170:7 172:10 178:19,21 179:3,6 186:5
**complaints** 149:7
**complete** 13:22 109:11,13
**completed** 31:9 49:14 50:11 58:4 109:5 140:17 158:21 172:1,2 222:19
**completely** 145:15
**compliance** 2:5
**complication** 56:6
**complications** 46:14 53:14 139:15
**components** 200:7
**compounding** 143:17 213:5,11
**compromise** 219:11
**computer** 37:9
**concentrate** 40:17
**concept** 211:6
**concerning** 186:8
**concluded** 223:18
**conclusion** 179:16
**concur** 113:12
**concurrency** 113:11
**conditions** 44:5,7
**conference** 68:14
**confined** 27:11 112:4
**confirm** 32:9
**confused** 52:1
**conjunction** 108:17 126:8 159:2
**consecutive** 12:4
**consequences** 182:6,20
**conservative** 18:17
**consider** 216:5
**considered** 157:14
**consist** 202:5
**constant** 27:15 111:23 123:16,19 149:17 220:22
**constantly** 149:18
**contact** 83:9
**contacted** 101:17 103:9,10 104:12 104:14,15
**contained** 136:22
**contend** 91:2 105:1 165:7,16 167:3 182:8,21
**contention** 180:23
**continual** 183:16
**continue** 35:12 60:22 124:21 157:17 220:8
**continued** 109:15 149:14
**contract** 83:17 181:12,15 192:4
**contracting** 214:14
**contractor** 36:19 66:13,16 67:15 162:9 175:19 209:7 214:15 215:3
**contractors** 66:23
**conversation** 205:20
**conversing** 92:4
**converted** 68:13
**conveyed** 127:10 145:17,18
**coordinating** 168:23
**copy** 105:14 108:11 108:16 135:7 136:8 138:5 144:5 168:4 170:6,8,15 170:15 173:4 178:18 210:17
**corner** 68:13 69:13 73:23 91:10
**correct** 32:22 42:17 55:20 62:20 75:14 75:17 85:21 86:19 87:20 91:11 110:20 114:10 118:15 121:12 137:5 141:19 146:2 147:8 159:13 174:1 180:10 181:22 191:8,18,20 192:5 224:19
**correctly** 90:11 156:23 171:2 183:14 186:15
**correspondence** 223:1
**counsel** 1:18 2:10 2:12 7:5 190:5 224:22
**count** 178:22 180:13 181:7 182:3
**countries** 92:4 124:19
**country** 147:19

**County** 10:11 224:13
**couple** 48:5 87:11 103:11,15 123:1 124:9 141:2 143:19 144:2,17 151:18 159:14 207:17 213:9
**course** 12:23 13:1 16:6 28:2 29:14 30:18 35:12 49:3 88:7 101:17 105:13 114:20 119:19 140:19 160:19 162:12 190:11 192:18 222:11,13
**courses** 120:7
**court** 1:1 2:6 3:4,5 7:9 106:19,22 185:14,17
**cover** 127:6 129:18 129:21 183:7
**covered** 45:21 86:9 176:18
**covering** 132:5 133:11
**covers** 128:2
**co-pay** 133:2
**crack** 121:6,22
**cramping** 37:17
**cramps** 27:7 46:16
**crap** 169:1
**cream** 143:17 213:5,11
**creating** 53:13
**credit** 13:15 217:2
**Crestwood** 55:1,5 57:18 58:3 141:16 142:6,8 144:9 164:19 165:5,11
**criminal** 9:2
**cross** 147:19
**Crossroads** 80:2
**crowded** 91:18
**CT** 4:17 17:14 53:17 115:11
116:10,15 117:2 165:13
**cube** 19:3 37:6,6 176:2
**Cumberland** 11:3
**cup** 96:13
**curiosity** 103:22
**current** 9:4
**currently** 13:9 14:16,18 15:17 127:3 143:14 144:1 149:19
**Currie** 6:17
**cushion** 53:5,5
**cushions** 35:5
**customers** 215:5
**cut** 35:8 140:6
**cutting** 119:23
**C3** 57:2
**C4** 39:9 51:12,14 55:11,20 117:14
**C4-C5** 53:2 121:12 139:11
**C4-5** 51:6 117:21 121:7
**C5** 22:3 39:12 51:14 55:20 117:13,16,16 119:4,6,13
**C5-C6** 34:8
**C5-6** 33:10
**C6** 19:4,5 21:22 22:3 34:2 39:12 39:15 40:17 47:4
**C6-C7** 32:19,22 42:16
**C7** 19:4,5 39:15 42:18

**D**

**D** 4:2
**da** 199:17,17
**dad** 152:6 155:14
**Daleville** 16:23
**damaged** 29:1
**dark** 197:12
**data** 184:8
**date** 7:3 8:16 19:8 45:22 89:1 91:2 92:7,11 103:4 104:6 105:6 107:6 109:18,23 110:15 117:5 132:6,14 133:5 139:7 140:2 149:6 151:1 160:17 162:18 165:16 174:11 181:1 223:6
**dated** 39:2 44:3 45:3 47:1 48:18 51:5 54:19 110:12 117:3,4 120:22 126:19 139:6 141:12 144:9 145:11 147:1 149:3
**dates** 36:5 52:1 125:18
**David** 6:4 166:18
**Davis** 14:12 84:7 93:16 99:22 132:9 168:12 214:12
**day** 1:22 3:1 11:10 11:16 37:8,10 56:10,10 57:21,23 58:12,21 62:6 65:8 87:8,12,12 87:17 90:14,15,18 91:19 92:8,17,20 93:1,21 94:1,10 94:10 99:9 102:21 103:1,7,9,14 104:14,23 105:10 106:8,13,16 108:7 110:17 111:15 123:5 126:1 141:18 147:20 150:1 151:22 152:15 154:4 163:15,16 173:22 185:19,22 194:2,3 194:6,8,10 207:4 208:5 209:1 210:1 212:4 220:12,23
**days** 23:19 75:3 76:4,7,23 77:17 92:14 101:18 103:11,15,16 123:1,5,7,8 125:11,12,13,16 125:23 143:21 145:19 156:18 159:5,6,14,16 163:15,16 173:9 173:13,16,20 195:5 207:17 211:22 212:5,5 220:3,11,11
**day's** 154:4
**dead** 190:13
**dealing** 105:19 221:20
**debt** 217:2
**December** 148:12
**decided** 75:3 173:10
**decision** 26:6 115:12 138:4,5 167:14 184:7,8 219:14
**declaration** 4:21 137:13 138:8,15
**decreased** 154:12
**decreasing** 156:2
**Dedrick** 64:8 65:6 70:23
**deductible** 132:21
**defect** 187:20
**defendants** 7:20
**Defendant's** 37:21 41:1 43:20 46:18 48:12 50:22 54:13 56:13 110:7 116:19 120:13 126:13 135:2 137:8 138:23 141:6 144:4 145:5 146:18 148:20 157:22 170:1 176:6 178:13
**Defendant(s)** 1:11
6:9
**defense** 67:10,23 72:14 172:13 184:1
**Defenses** 66:6
**definitely** 53:21
**degenerative** 25:12 25:13 35:1,19,21 39:16 40:19 44:20 218:12
**degradate** 35:5
**degree** 12:14,20 13:8,10,22 114:6
**delineations** 114:12
**delivering** 2:22
**Delta** 214:17
**denials** 211:1
**denied** 210:21
**department** 13:2 128:8 130:4 131:8 131:17 134:18,20 162:13 168:18,20 169:16 172:13 177:20 183:23 184:1 210:16 211:15 212:22 222:23 223:2
**depended** 123:5 125:14
**dependent** 187:12
**deploy** 219:13,14
**deposition** 1:13,18 2:3,4,14,17 7:22 14:11,14 186:20 188:19 223:4,6,18 224:16,20
**depositions** 2:7 8:18
**deputy** 89:21 107:4 176:22,23 185:6
**describe** 78:11 170:22 200:16 220:21
**described** 202:7,8 205:12 208:9
**describing** 201:14
**description** 170:17

**design** 187:21
**designated** 70:7
**designed** 61:14
**desk** 37:5,6
**determination** 172:16 188:14
**developmental** 64:19 174:22,23
**devices** 215:4
**devoted** 66:2
**diagnosed** 119:7,8
**diagnosis** 18:11 28:14 44:4 51:7 102:17 115:1 117:10 121:9
**died** 30:17 57:20
**difference** 75:18 201:12
**different** 21:14,15 28:23 44:5 45:11 51:16 52:18 54:1 55:17 63:19 92:5 109:4 157:1 159:10,18 211:2
**diligence** 18:8 115:9
**direction** 38:20 95:15 105:19 150:5 204:5
**directions** 73:19
**directly** 38:4,5,11 38:13 74:16,20 84:14 106:3 169:15 175:12
**director** 64:9,20 65:13 81:10 89:22 174:6
**Dirigo** 89:22 104:17 106:18,21 109:5,13 171:23
**disabilities** 31:6
**disc** 18:13,14 19:5 21:15,17 25:12,13 31:14 35:19 40:11 40:15,19 44:21 51:6,16 53:1 54:2 55:20 57:3 117:18 122:8,8 218:12,13
**discectomy** 42:10
**discharge** 5:1 144:8 219:18
**discharged** 61:8 144:11,14
**Disclosure** 5:7
**disclosures** 176:12
**discovery** 36:22 88:8 158:20 222:13
**discs** 18:14 118:20 118:22,22
**discuss** 44:6 57:6 58:5
**discussed** 106:11 188:19,20 222:4
**discussing** 84:2 105:8 107:5
**discussion** 85:23 130:21 166:22 167:1
**discussions** 136:15 138:7
**disease** 25:12,14 35:19 40:12,15,20 44:21
**disk** 212:18
**display** 134:12
**disposition** 105:13
**dispute** 211:4
**disputing** 211:15 211:16
**distance** 147:23
**distances** 218:17
**distinction** 201:12
**DISTRICT** 1:1,2
**division** 1:3 107:2
**doc** 113:18 177:17
**doctor** 40:1,8 58:4 114:10 168:16 169:4 173:11,17 174:1 196:8 201:6
**doctors** 32:7 42:12 115:6 165:12
**doctor's** 128:5
**document** 4:16 38:15 39:2,7 55:7 110:12 117:1,3 119:11 120:21 128:21 137:16 158:19 170:8 172:23 176:14
**documents** 14:13 222:10,13 223:2,5 223:8,12
**doing** 11:14 15:7 43:17 44:9 45:4,9 45:12 53:7,8 62:3 66:17 83:19 124:16 126:4 145:19,20,23 146:14 147:7 150:9 152:7 153:18 155:12 157:14 193:22 195:5 199:20 202:2 206:3
**dollar** 161:8 163:8 163:8
**door** 85:8 89:5,11 95:10 97:3 198:10 198:14 212:8
**doors** 94:23
**Dothan** 16:22,23 17:15 19:17,19 20:2,5
**Doug** 189:2 190:6 192:15,16,18
**Douglas** 1:7,13,18 6:16 7:6,13 8:15
**downstairs** 219:12
**downwards** 95:6 171:8
**dr** 4:16,19,20,21 17:14,19,21 18:3 18:12 19:13 20:2 23:11 24:4,5,8 25:9,21 30:14,15 31:21 32:8 33:1 34:18 35:10,18 38:5,20,23 40:2,7 40:14 41:7 42:8 43:9 44:3,6,16 45:18 46:2 48:18 49:1,11,19 50:1,8 51:5,8,10 52:14 52:22 53:22 55:2 55:15 57:5,12 58:9,11,12 59:3 60:12 61:2,3,17 102:13,21,23 103:10 109:18 110:12 111:8 112:16 113:1,5,8 113:20,22 114:13 114:16 115:16 116:5,13 117:9 119:3,14 120:22 121:9 122:4,12 124:20 125:5 126:19,21 127:10 129:11 133:23 134:15,22 135:8 136:5,15,17,23 137:14,19,23 138:8,13,18,20 140:18 142:22 143:13 145:11,17 147:1,5 149:3,5,6 150:5,14 151:15 154:20 158:3 164:17 167:15,16 196:21 202:8 207:9 212:1,3 213:5,11
**draft** 135:20 136:5 138:15
**dragged** 127:21
**draw** 33:19 161:4
**Drive** 9:5
**drop** 95:6,22 105:13
**dropped** 171:1
**drove** 101:11,20 197:7
**drug** 8:22
**due** 18:8 115:8 127:4
**dull** 112:1
**duly** 7:14
**Durigo's** 106:23
**duty** 172:16 179:10 180:14 181:8 182:5
**D-I-R-I-G-O** 106:21
**D.C** 177:23

**E**

**E** 4:2,6 224:10,10
**earlier** 49:23 109:17 111:7,18 122:11,22 143:2 159:9,12 163:19 167:1 170:23 171:23 174:14 178:21 186:19
**early** 148:10 200:18 212:5 218:11
**earn** 216:17
**earning** 216:11
**ease** 173:10
**easier** 73:13
**easiest** 16:7
**east** 70:1,5,5,9 72:8
**economy** 164:5
**education** 12:13,20
**effect** 2:4 23:3 58:1 124:17
**effective** 2:21
**effort** 88:9
**eight** 9:9 12:7 49:10 125:14 145:19 147:17,18
**either** 67:6,13 90:9 122:5 160:19 183:17
**electrical** 200:7,12
**elevator** 60:1,2 68:11 69:3 72:7 72:13,20 73:10,14 73:22 74:2,10,14 74:20 75:7,8,9,10 75:13,19,19 76:5 76:9,14 77:1,17 77:23 78:2,7,11

78:22,23 79:10 80:5,10,14 82:13 83:1,8,15 84:4,9 84:13,22 85:12,20 86:8,13 87:8,14 88:3,11,19 89:3,6 89:10,14,15 90:18 90:20,21 91:4,12 91:15 92:17,19 93:1,5,11,12,20 93:23 94:2,9,15 94:16,18,19 95:3 95:5,14,19 96:3,7 96:9,14,19,21 97:2,9 98:9,11,18 99:1,14 100:4,12 100:17,23 105:1 127:14 131:19 132:15 136:20,21 137:4 152:18 164:15 165:9 167:4 170:18,20 170:23 171:7 175:21 177:6 179:11,14,23 180:4,9,15,16 181:4,9 182:7,21 183:10,11,20 184:3,12,17,19,20 185:1,19,21 186:12,21 187:2,6 187:19,21 188:8 188:15 192:15 194:11 197:17 198:6 199:14 200:17,20 202:20 203:4,15,16,20 204:14 205:3 207:12 208:11,12 208:16 209:4,4 211:12,19 221:22 222:17
**elevators** 72:4,10 72:17,22 73:9,16 75:16,22,23 77:14 82:3 94:7 100:11 181:16 186:10 191:2 192:1 193:7 205:9
**eligible** 131:23
**emergency** 57:19 102:2 105:18 114:18 116:1
**emission** 15:10
**employed** 14:16 77:9 175:22 177:20 186:21 191:2,11
**employee** 66:11 67:7,9,13 81:11 83:19 109:7 206:4
**employees** 66:13 66:16 67:1,16,18 68:3 69:22 83:17 175:9 186:8
**employer** 159:16 160:19 161:17
**employment** 128:19 162:9 216:22
**employments** 162:3
**ended** 20:10
**endings** 118:8
**endplate** 39:16
**engineer** 188:1
**enrolled** 13:7
**ensured** 171:14
**entailed** 92:3
**enter** 69:22
**entered** 74:6
**Enterprise** 16:23
**entire** 63:22 64:1
**entitled** 131:21
**entitlements** 131:21
**entity** 193:6
**entrance** 69:17,20 70:3,9,13,16 74:6
**entrances** 70:3
**equal** 214:4
**equipment** 100:4
**errors** 131:1
**especially** 85:2
**Esq** 2:22 6:4,10,16
**essentially** 161:16
**evaluation** 4:23 141:12,14,22 142:6 168:19
**event** 23:15 54:8
**events** 11:16 193:13
**eventually** 24:17 25:6 35:5 43:2 45:23 47:18 53:6 58:8 59:11 60:17 65:9,11 112:16 166:11
**everybody** 175:12 189:9
**evidence** 2:14
**exact** 50:13 141:3 174:11
**exactly** 101:3 144:20 193:16
**examination** 4:3 7:7,17 190:2
**examined** 7:14 18:12 30:15 34:15
**example** 203:6 219:12
**Excelsior** 13:10,11
**exception** 76:11
**exclusively** 66:2
**excursions** 25:20
**excuse** 74:1 105:21 131:19
**Exhibit** 4:7 37:21 38:3,10 41:1,6 43:20 44:2 46:18 46:23 48:12,17 50:22 51:4 54:13 54:18 56:13,18 110:7,11 116:19 117:1 120:13,18 126:13,18 135:2,7 137:8,13 138:23 139:5 141:6,11 144:4,8 145:5,10 146:18,23 148:20 149:2 157:22 158:19 170:1,6 176:6,11 178:13 178:18
**exhibits** 3:2
**expect** 13:21
**expectation** 166:10
**expected** 36:12
**expenses** 127:7 129:22 132:5,23 133:6,11 165:15
**experience** 20:7 22:15 55:23 59:8 78:1 84:12 139:19 149:19
**experienced** 22:11 41:23 47:12 76:13 76:18 78:10 79:3 79:6,10 80:5,9,23 82:10 84:21 87:7 94:18 98:6 112:11 118:3 145:23 186:1 203:12 208:8
**experiencing** 16:9 22:21 26:19 27:6 27:16 28:18 29:10 29:21 37:14 41:13 41:19 45:7,15 53:1 54:7 59:22 97:22 112:5
**expert** 188:16
**expertise** 188:13
**Expires** 225:4,7
**explain** 23:17 157:15 160:22 161:20 162:21
**explained** 34:21,22 53:3,4 122:7 127:11 129:17
**express** 34:18
**extent** 50:18 124:12 152:17 220:20
**extremity** 41:15
**eye** 40:8
**e-mail** 77:21 82:16 87:16,17 88:1,2 93:16
**e-mailed** 88:4
**e-mails** 88:10,10,14 88:18,21 99:22 222:17

**F**

**F** 224:10
**Facebook** 11:6,8,13 11:18
**facilities** 20:2
**facing** 97:3
**fact** 34:14 53:10 60:19 127:5 158:14 167:15 173:7
**facts** 131:4
**failed** 179:13,21 182:19 186:7
**failure** 182:6,20 187:13
**fair** 8:8,9 68:2 136:20 192:3 194:13
**fairly** 45:13 46:15 48:1
**fall** 97:13 98:13,16 171:1,3,4,9
**falling** 170:19
**fallout** 197:23
**familiar** 13:11 36:19 57:14 142:17
**family** 188:22 196:2,6 218:4,6
**far** 16:6 36:11 71:10 73:23 151:16 204:8 209:16
**fashion** 34:16 202:2
**fast** 34:5 206:2
**fault** 187:14,14
**faulty** 188:8
**February** 51:5 52:14 54:7
**Federal** 71:17

109:7
**feel** 21:8 44:10 145:2 152:1 153:22,23,23 154:1,8,9,10,10 199:18
**feeling** 16:14 21:10 21:11 24:1,21 59:13 89:15 155:4 157:18 205:2 218:16
**fell** 89:9 96:10 97:10,18,21 170:23 171:8
**felt** 36:10 98:2 158:8 179:4 200:20 205:11
**female** 81:6,7
**fifth** 51:22 52:13
**figure** 95:13 144:19 206:6 213:20
**figured** 128:12
**file** 88:15 167:10 169:17
**filed** 3:5 14:2,7 170:9 178:19
**filing** 2:17
**fill** 106:18 107:15 107:22 108:5 166:12 171:19 172:14 206:8
**filled** 89:22 105:17 107:19 108:6 213:2
**filling** 108:4 192:16
**Filly** 57:10,13 113:3,16 114:19 116:9
**final** 222:23
**finally** 59:12 110:1 115:19 116:5 124:12 131:5 148:5 153:16,16 157:18 173:17
**find** 31:6 81:21 83:21 88:20 90:9 103:21,23 112:3 164:5 168:2,9 169:20 194:7 207:20 209:3,6
**finding** 44:13
**findings** 39:8 117:20 131:9,17 169:14,21
**fine** 7:11 44:9 68:6 93:8 94:9 168:12 217:3
**finger** 199:20
**fingers** 206:6
**fire** 143:11 210:13 217:18
**fired** 214:19,21
**firm** 218:1
**first** 5:6 7:14 16:9 16:16 18:2,10,19 18:22 19:9 20:6 20:16,17 21:20 22:7,14 23:17 25:9 26:8 30:16 32:21 34:17 35:4 35:9,10 42:3 49:11,23 52:7 53:20 54:21,22 64:14,23 69:2,6,7 70:21 72:1 73:6 74:11 75:6 91:6,7 91:14,21 92:16 96:13 100:19 105:3 110:14,22 114:23 115:15 122:11 128:3 129:10 137:19 170:6 178:20 179:3 180:17 183:15 186:18 187:15,17 189:8 190:18 193:19 197:1 199:10 204:18,22 211:18 211:21 215:18 218:3,11 219:1
**fit** 96:5 103:10 111:12
**fitness** 29:7
**five** 12:6 99:22 125:13 154:16
**fix** 21:9 77:15 82:7 86:14 90:9 209:5 209:6
**fixed** 78:9 82:11 83:5 90:13 181:5 183:14
**flashing** 200:10
**flew** 16:15,18 22:17 24:20 25:19
**flexibility** 71:9
**flexible** 153:20
**flicker** 200:11
**flight** 12:23 17:11 18:18 22:17,22 27:23 28:7 29:7 62:8
**flip** 178:21
**floor** 66:8,8,9 68:15 68:16,20,22 69:1 69:2,10 72:2 73:7 74:12,22 78:13,14 78:14,18 85:8,21 94:21 95:10 203:6 204:15,15,18 208:15,19
**floors** 197:20 204:11
**Florida** 8:23 12:11 12:17
**flow** 216:4,18
**Floyd** 77:6,19 81:20 82:1 83:14 87:14 88:11,18 103:18 104:5 222:17
**fluid** 206:2
**fly** 25:16 217:17
**flying** 23:3 24:22 25:5,16 27:1 99:3
**focused** 35:22
**folder** 108:14
**folks** 70:6 79:12 90:6 124:10 184:9
**follow** 161:1
**followed** 83:4 109:15 172:2
**following** 7:7 36:8 56:1,20 103:14,17 111:19 112:19 122:12 123:1 124:4 128:5 139:14,18,22 140:13 141:1,19 143:12 144:11 146:1 164:22
**follows** 7:15
**follow-up** 50:9 60:16 150:21,23 151:2
**follow-ups** 43:10
**food** 197:11
**foramen** 57:5
**force** 2:4 10:21
**forces** 13:5
**foregoing** 7:5 224:15,19
**form** 2:11 5:1,5 26:13 87:3 100:6 100:14 105:17,22 107:21 108:1,2,5 108:12,17 109:4 114:3 118:4 134:2 141:12 144:8 147:9 158:21 159:6,21 160:8,14 166:11 171:16,17 171:20,20 172:14 173:18 180:19 181:17 183:12 187:8,23 188:10 213:21 222:19
**formal** 130:10
**formally** 130:12
**forms** 106:18 107:14,18
**Fort** 16:12,15,18 17:1,6,21 23:8 30:8,8
**forth** 179:2
**fortunate** 126:5
**forward** 89:9,10 95:18 96:10 97:10 97:11,14,18,21 98:15 116:4 133:9 133:12 172:20 202:21
**found** 66:21 83:20 83:23 187:14 200:16
**four** 11:20 44:4 71:3 96:4,6 99:12 119:22 147:4,14 147:20,23 155:22 163:16 182:3 195:4 214:7
**fourth** 51:20,22 52:10
**Fox** 102:3,6 103:3 106:2 164:23 165:4 177:15
**foyer** 68:12 74:12
**fraction** 154:13
**fracture** 117:15,17 121:10,23 122:3,7 212:18
**fractured** 116:6 117:13,18 118:13 118:16,17 119:4,6 119:12
**frame** 86:11 99:15 148:12 155:14
**free** 171:3
**frequent** 79:3
**fresh** 190:21
**friends** 115:5,5 217:16
**front** 19:3 37:19 38:15 57:23 70:8 71:20 89:5 114:3 120:21 128:21 154:5 198:21
**full** 2:5 8:13 53:6 123:8 124:11,12 125:8 126:3 132:19 147:21 187:16 197:20
**fully** 85:17 121:19 177:3 190:15
**full-time** 124:23

147:4,6,14 148:6
**function** 140:5
**functional** 152:16
**funds** 147:12 208:5
**funny** 158:17
208:16
**further** 2:1,8,16
21:3 35:6 72:7
101:16 210:2
224:22
**fused** 39:21,22
**fusion** 18:10 19:2
21:21 30:12,16,17
31:16,19 33:10,12
33:14 39:12 42:10
45:21 48:6 121:2
121:7,21 122:2
139:11
**fusions** 38:6 45:22
218:13
**future** 25:23 26:12
61:6 154:22

**G**

**gaining** 184:16
**garage** 150:11
153:2
**gate** 70:12
**gates** 219:5
**general** 63:4 196:2
**generally** 201:19
211:7,8
**Georgia** 6:20
**Gerald** 135:15
136:9
**getting** 29:3 44:9
101:7 143:8,10
194:15 220:1
**give** 7:22 13:15
45:19 50:15 80:8
117:9 133:22
163:8 167:12
**given** 8:19 105:19
107:14 140:9
146:4 158:3,12
224:20
**gives** 201:19

**glaring** 54:2
**glass** 73:5
**go** 8:11 12:8 16:10
17:1 18:21,21
23:20 26:14 28:20
30:10 38:17 42:20
46:13 47:13 48:4
50:20 56:8 60:19
60:19 66:6 68:12
74:19,22 75:2
76:8,23 77:3,18
78:13,14 80:16
82:14 83:3 84:16
88:20 94:20 95:3
101:9 102:1 103:6
103:7,13 111:22
112:15,16 114:18
115:7 123:2
126:10 128:10
130:20 133:15,16
137:23 138:11
139:16 140:6
143:20 146:7
147:6,11,21
149:12 151:2
152:3,14,15
153:14 155:15,16
155:16 156:12,16
156:19 157:9,13
157:13,13 158:15
158:16 164:4
166:2 169:2 183:5
186:13 190:10
192:21 193:9
194:6,23 197:5,6
198:3 206:15
208:17 213:4,6,8
215:3 216:1 217:1
217:12,12 219:11
219:15,15 220:14
**goal** 148:4
**God** 44:12
**goes** 113:22 123:22
133:18 151:17
152:6 172:20
221:2
**going** 8:2,7 16:4

24:6,20 29:5 35:5
40:6,19 45:1
59:19 60:17,22
71:19 76:3 78:22
78:23 90:9 101:15
102:18 107:15
127:12 133:9,12
133:17 134:6
152:22 154:5,15
154:21 157:13
162:18 169:1
178:17 183:4
184:14 190:9
192:17 193:15,17
193:21 197:6
207:19 210:16
211:1 214:20
215:3 216:1,22,23
218:3,7,8,10
**good** 18:20 21:10
24:21 33:16 37:9
45:10,11 60:19,21
70:19 120:11
126:6 128:11
153:16 154:3
155:4 157:18
164:5,13 175:4
186:13 199:19
212:7 220:11
**gotten** 96:13 194:1
194:14 204:19
**government** 37:2
66:4,11 67:7,9,12
81:11 83:17,19
108:2 132:4
133:11 162:4
181:12 183:23
184:3,5 206:4
213:17
**grabbed** 208:19
**graft** 58:1
**grafts** 24:13
**grates** 200:6
**Gray** 1:20 6:11
10:13,16
**Grayson** 2:22 4:4
6:10 7:11,17,19

33:8 104:19 168:8
178:9 189:22
190:1 222:7
**Great** 168:8
**ground** 29:16
98:13
**grounds** 2:13
**group** 32:7 126:6
**growth** 30:19
**guarded** 220:19
**guess** 35:14 104:9
107:12 114:12
133:17 179:2
188:6 210:3
216:18 217:14
220:8
**guidance** 128:6
**Gun** 10:14,16
**Gurgo** 106:20
**Gurley** 80:1
**guy** 175:23 204:7
219:17
**guys** 115:8 163:1
165:12 168:11
209:6

**H**

**H** 4:6
**Halbert** 135:16
178:8
**half** 20:15 66:8
69:1 159:14 178:4
**half's** 195:3
**hallway** 175:11
**hand** 178:17
**handed** 34:12
**handful** 218:15
**handing** 38:2 41:5
44:1 46:22 48:16
51:3 54:17 56:17
110:11 116:23
120:17 126:17
135:6 137:12
139:4 141:10
144:7 145:9
146:22 149:1
158:18 170:5

176:10
**handle** 223:10
**hands** 152:8
**happen** 8:6 94:19
95:2 128:14
154:16 204:3
**happened** 50:6
57:15 78:21 84:3
89:1,14 90:15
91:12 100:23
104:23 105:8
106:9 107:7,8
113:2 127:5,14
134:11,17 137:3
172:17 181:2
187:15 193:12
202:8 205:22
206:2 208:23
**happens** 128:18
208:18
**happy** 149:8,10
**hard** 216:21 217:4
217:4
**hardware** 46:3
47:4 52:11
**head** 89:9 95:17
96:11 97:11,16,18
97:21 98:15 110:2
171:11 198:16
200:14 204:4,5,10
**Headquarters**
63:20
**heal** 121:19
**Health** 102:3 103:4
164:23 165:4
177:15
**hear** 71:12 185:8
199:3,8,23
**heard** 42:13 84:22
85:4 86:8 93:11
107:13 185:3
199:11,15
**hearing** 130:10,15
130:17 203:18
210:12 224:21
**heck** 122:6
**Heirs** 6:17

**held** 25:1,3
**helicopter** 18:9
   24:20 35:3 202:16
**helicopters** 22:18
**Hellfire** 36:20
**helmet** 27:10
**help** 57:17 63:5
   133:23 143:6
   152:17 163:17
   220:17
**helped** 141:4 143:9
**Henry** 17:19,21
**hereto** 37:23 41:3
   43:22 46:20 48:14
   51:1 54:15 56:15
   110:9 116:21
   120:15 126:15
   135:4 137:10
   139:2 141:8 145:7
   146:20 148:22
   158:1 170:3 176:8
   178:15
**herniated** 55:20
   212:17
**herniation** 51:7
**herniations** 218:13
**hey** 81:22 82:16
   93:16 196:20
   203:14 216:21
**hi** 175:11,12
**hide** 189:13
**high** 12:8,9,13,21
   25:19
**higher** 146:10
**highlighted** 170:13
**highly** 36:19
**hiking** 155:16
   156:17
**hip** 24:13 80:13
**hired** 183:2,6
**history** 13:18 16:5
   34:22 101:14
   196:16
**hit** 204:9
**hitting** 28:22
**hole** 126:11 161:22
   216:1

**home** 23:18 24:10
   48:7 59:17 63:3
   103:7,8,8 105:11
   105:12 106:3,6,13
   156:6 212:3
**honest** 44:12
**Hood** 16:12
**hope** 116:17
**Hopefully** 116:15
**hoping** 192:17
**horse** 190:13
**hospital** 17:1,5,9
   19:16,17,19 20:3
   20:5 55:2 89:18
   92:10 101:9,12,20
   102:1 105:6,12
**hot** 151:20,21
**hour** 92:2 159:21
   163:2,15 190:13
**hourly** 160:1,2
**hours** 22:17,22
   70:23 71:14,15
   123:9 125:13
   126:1,10 146:13
   147:20 160:11
   161:20,21 162:5
   163:14,16 214:3,5
   214:6,7,8 215:21
**house** 56:9 152:12
   152:17,19
**HPI** 145:12
**huge** 96:7 98:21
   156:16
**hundred** 73:3
**hundreds** 68:3
**Hungarian** 196:7
**hunt** 152:10,10
   156:23
**hunting** 156:8,10
   156:13
**Huntsville** 10:5
   30:9 32:6 55:5
   79:23 128:10
   194:8
**hurry** 35:8
**hurt** 35:3 89:13
   90:6 95:8 101:1

112:2,22 123:23
   123:23 127:16
   131:19 156:15
   158:8 185:22
   192:15 201:2
   209:13 212:13,14
**hurting** 161:9
**hurts** 101:1
**HVI** 121:5
**hydraulic** 75:19,23

**I**
**idea** 83:11 94:14
   154:3
**identification**
   37:22 41:2 43:21
   46:19 48:13 50:23
   54:14 56:14 110:8
   116:20 120:14
   126:14 135:3
   137:9 139:1 141:7
   144:5 145:6
   146:19 148:21
   157:23 169:6
   170:2 176:7
   178:14
**identify** 217:23
**immediate** 22:11
**immediately** 15:7
   21:8 30:13 31:18
   36:8 40:4 56:1
   89:19 112:19
   115:6 139:21
   140:23 141:22
   164:22 172:14
   221:5
**important** 127:23
   128:12 175:14
   206:10
**impression** 40:10
   57:2 193:5
**improve** 112:20
   173:10
**improvement**
   36:13
**incident** 60:3 65:8
   69:4 76:2,12 78:3

79:18 80:10 81:1
   84:11 86:11 87:18
   91:8 92:12 93:21
   98:23 99:13
   100:18 103:4,14
   103:17 104:6,14
   105:5,7 106:12,16
   107:6,13,20 108:8
   109:19 110:20
   111:20 112:19
   115:16 122:12
   123:1 124:4
   129:11 132:14
   136:20,21 152:18
   160:4 164:16,23
   165:8 170:18,22
   171:15 172:22
   174:1 177:6 181:1
   193:9 194:16
   197:7 207:9,10
   208:7 220:3,13
   222:20
**incidents** 87:9
**including** 163:4
**increase** 174:17
**increases** 160:1
**incurred** 132:6
   133:4 165:16
**Inc's** 175:17
**India** 62:8 99:4
   195:2
**indicate** 52:23
**indicated** 61:3
   149:6 189:11
**indicates** 47:3
   48:20 57:3 147:3
**indicating** 28:22
   45:20 78:16 111:5
   120:1 201:20,23
   203:2 204:6,9
   217:12 221:11
**indication** 39:15
   40:11 162:18
**indications** 41:12
**individual** 57:13
   113:14 176:20
**individuals** 83:14

**infection** 48:3 54:5
   56:4 58:15 60:9
**information** 108:8
   127:9 136:21,23
   145:16 149:9
**informed** 184:13
**initial** 5:7,8 40:21
   135:19 138:15
   141:12 176:11
   178:19 179:6
**initially** 20:9,18
   43:3,7,14 192:21
**injured** 89:2 91:3
   109:8 129:7
   172:12 185:19
**injuries** 165:7
**injury** 89:20,23
   92:7 104:17 105:1
   105:4 108:1 125:9
   165:17 167:3
   173:1,22 208:2
   209:1 211:11
   217:10 222:19
**inner** 39:11
**ins** 211:10
**inside** 200:8
**insinuating** 197:3
**inspect** 181:9,20
   182:7
**inspection** 186:9
   187:18
**installation** 181:11
**instance** 162:8
**instigating** 23:15
   54:8
**instructor** 13:1
**insurance** 127:4
   128:23 129:2
   163:19 166:5
**intent** 192:21
**intention** 157:9
**interactions** 175:9
**interested** 112:2
   222:22 225:1
**interior** 19:2
**internal** 15:9
**international** 15:11

36:18 63:6 64:9 65:3 107:3 174:4 175:6
**internationally** 124:14
**intervals** 43:11,14
**interviewed** 64:18
**involved** 21:18 60:4 69:4 76:2,12 80:11 84:11 108:4 118:22 138:7
**involvement** 223:10
**involves** 119:21
**IPs** 27:10
**issue** 31:14 32:18 82:20 84:10 94:10 127:2 201:2 215:11
**issued** 168:5
**issues** 24:18 26:20 27:17 28:12,15 29:11 30:6 32:17 34:20 35:20 37:17 77:22 84:8 85:6 85:12,17 86:6 88:19 102:19 153:21 156:2 222:18
**items** 222:15
**IV** 48:7

J

**Jacksonville** 178:8
**jams** 63:11
**January** 41:8 42:8
**jarring** 219:9
**Javelin** 64:21 65:14
**JEFFERSON** 224:13
**jerk** 94:15 95:5,15 188:9,15
**jerked** 94:16 95:8 95:14,19,23 96:9 97:9 98:9,15,19 100:23 171:7,11 201:9
**jerking** 94:17 95:2 100:18 170:21 201:15 203:23 208:8
**job** 30:9,23 36:16 37:3,5 65:9,11,12 92:3 109:8 124:4 124:11 129:8 131:20 149:23 162:3 172:13,17 193:3 214:21
**jobs** 216:10 218:7,8
**Joint** 17:15,23 19:18,23
**Jordan** 99:5 145:18 195:1
**judgment** 80:8 94:8 148:9 155:19
**judgments** 131:1
**July** 117:4 122:14 149:3 151:15
**June** 1:22 3:1 92:13 92:21 102:23 105:2 110:13,13 112:16 113:2,9,14 114:20 115:17 125:10 137:4 165:9 181:1 193:10,20,21 194:2 197:13 220:3
**Junior** 12:15,16

K

**Kean** 81:5,15 158:22
**keep** 11:11,13 29:15 60:22 88:15 122:3 125:18 127:20
**keeps** 82:2
**Kendrick** 4:5 6:16 17:17 22:6 33:6,9 33:13,17,21 81:13 164:9,13 166:18 185:10 190:2,6 222:5 223:8,16
**kept** 62:15 98:16
**Kevlar** 219:15
**kidding** 31:17
**kin** 224:23
**kind** 19:21 24:5 33:5 51:23 128:12 190:18 193:14,17 200:17 201:18 204:23 211:20 221:2
**kitchen** 152:23
**knee** 73:11 154:11
**knew** 27:4 62:14 98:3 112:1,2,22 114:17 175:2 190:23 193:4 212:12
**know** 8:1,12 11:17 11:19,20 13:21 17:4 18:23 19:7,8 19:15 21:7,8,13 21:17 27:9 28:22 29:5 31:5,8,19 34:22 35:2 40:4 40:16,20,22 43:1 44:10,15,22 45:1 45:2,10,12 50:5,7 53:21 54:2 58:17 58:19 59:16 60:16 60:18,21 66:22 67:20,20 68:7 69:10 71:21 72:9 72:11,16 73:17 75:18,21 76:1 77:9 78:21 79:1 81:22,23 82:1,4 83:8 84:5 85:8 87:19 88:22,23 90:13,17,23 91:3 91:5 92:6,15,18 92:20,23 94:16 95:8 96:4 100:9 101:8 102:5,10 103:12,20,21 104:11,15 105:11 107:15,22 109:9 109:23 110:13 113:15,17 115:4 115:13,19 116:11 117:17 118:7 119:7 120:20 122:10,13 123:20 123:22 128:17,20 129:9,14 132:2,4 133:1 134:6 135:7 135:10,22 136:14 137:15 138:6,14 140:7 142:5 144:15 146:5 148:5,8 149:11 150:13 151:10 153:6,7 154:11,14 154:14,15 155:17 157:12 160:15 163:1 164:16 165:20 166:4,18 167:17,23 168:15 169:2 170:8 172:6 172:16 175:18,21 176:13 177:9,10 177:23 178:1 179:5 180:11 181:14 183:20 184:10,10 186:20 187:5 188:2 189:2 190:8 191:5,9,16 192:3,4,6,12,14 194:1,4 195:19,22 196:12 197:4 199:7,18 201:17 201:21 202:16,23 204:1 205:22 206:1,11 207:19 208:20 209:9,15 209:19 210:19 211:2,9,10 214:11 215:23 216:2,23 218:17 219:9 220:20,20 221:2 221:19
**knowing** 36:11 90:5
**knowledge** 67:5 75:16 83:2 86:10 86:15 94:7 100:10 137:3 160:9 166:14,17 175:20 177:1 179:20 180:1,2,5,6,7 181:2,6 187:1
**known** 13:16 80:2
**knows** 137:4 196:16
**Kone** 1:10 190:7 191:13,16,19
**K-E-A-N** 81:15
**K-I-N-G** 81:14

L

**L** 1:15 6:4 225:2
**Labor** 128:9 130:5 131:9 134:18,20 162:14 168:18,20 169:16 177:21 210:16 211:16 223:1,2
**Labor's** 131:17
**laid** 24:11
**Lambert** 177:12
**large** 51:6 96:2 225:6
**Larry** 31:23 207:9
**late** 20:7 21:21 22:4 36:3 62:19 148:10
**latent** 187:20
**lateral** 63:9 174:15 174:16
**law** 1:20
**Lawing** 176:21 185:4,12,15 189:1
**laws** 2:5
**lawsuit** 14:2 60:4 69:4 76:3,13 80:11 84:12 88:8 160:14 165:22 166:16 170:7 177:2 178:20 188:21
**lawyer** 211:9
**lawyers** 221:20
**lawyer's** 193:3

**lay** 100:11 157:20
**lead** 16:16
**leading** 2:11 98:22 123:14 124:20 125:3
**leads** 109:6 179:19
**leaned** 89:6 96:22 198:15,18
**leaning** 89:8 95:7 96:11,15 97:6,16 199:1
**learned** 40:1
**leave** 57:7,22 94:4 123:11 125:11,20 131:23 159:17 160:21,23 161:2,3 161:3,7,11,12 162:14,19 163:6,7 174:3 214:3,4,7 215:11 216:22
**left** 30:8 46:3 66:5 96:22 99:7 105:10 105:11 106:2 198:18 202:20 211:22
**leg** 221:14
**legal** 179:16
**lesion** 121:7
**lessen** 149:15
**letter** 4:20 134:5,16 135:8,11,20 136:6 136:13,19,22 137:18 169:3
**letters** 73:18
**let's** 50:18,19 75:2 178:9 193:19 197:5 199:10 215:20 220:1
**level** 25:17 40:11 40:15,19 197:21 203:6
**levels** 146:11
**levied** 134:19
**lien** 166:15,19 216:20
**liens** 165:21
**life** 31:10 35:13 156:2 187:11
**light** 201:20
**lights** 200:10,11
**limit** 147:15 148:8
**limitations** 147:22 154:22 158:4
**limited** 153:6 223:4
**line** 59:18 172:16
**list** 189:10 223:12
**listed** 38:9 44:4,5 160:14 176:21 185:13
**listen** 199:7
**lit** 210:13
**litigation** 16:7 108:18 126:9 137:15 166:12
**little** 7:18 44:14 54:1 66:5 76:22 137:22 143:9 148:2,7 193:18 204:19 205:1 207:18 221:10,13
**live** 9:10 10:4 79:22
**lives** 80:1
**living** 188:17
**Lloyd** 1:20 6:11
**load** 35:7
**loads** 215:6
**loaned** 161:21
**located** 16:21 68:9 69:5,9 72:23 74:9
**long** 9:7,23 11:17 12:2 15:4 16:13 20:17,19 26:22 37:12 42:2 49:7 62:8,9 142:22 144:15,20 147:22 157:6 164:6 194:3 203:22 204:2 214:10 219:6 220:23
**longer** 150:9 152:1 194:16
**long-term** 147:16
**look** 35:3 39:6,8 40:8 53:15 57:1 88:9 117:19 144:21 146:3 153:6 167:19 170:11,15,16 176:2 186:4,18 187:15,16 198:19 223:14
**looked** 34:15 53:19 117:12 118:12 169:12,18 178:20 210:2
**looking** 119:10,11 126:23 182:13 203:12
**looks** 120:23 125:6 152:6
**Lortab** 146:4 195:15
**Lortabs** 146:13
**losing** 147:12
**loss** 200:12
**lost** 5:5 16:14 158:20 160:7,12 160:18 213:19,21 214:14
**lot** 29:7 36:23 37:1 47:14 69:15,18,21 174:17 176:18 193:2 214:15
**loud** 123:22
**love** 199:7
**lower** 163:2 221:15
**lucrative** 216:11
**lunch** 197:11
**lurch** 203:3
**lurched** 89:8,15 171:4 201:6
**lurching** 201:15 202:5 203:22 208:8
**lurching/jerking** 170:19
**lytic** 121:7
**L-A-W-I-N-G** 185:16

**M**

**machinery** 199:17 200:1
**Madison** 9:5 10:11 49:17 142:1
**main** 70:2
**maintain** 11:4 179:10,14,22 182:7,21
**maintained** 84:4
**maintaining** 192:1 193:7
**maintenance** 12:23 25:18 82:6 100:5 100:13 175:19 180:3,8 184:9 186:9 187:7,13,18 191:22 199:6
**major** 13:17 30:5 47:17
**making** 199:20
**male** 81:6
**man** 120:11
**manageable** 30:2 206:17
**management** 107:2 175:6
**manager** 77:7 85:15
**managing** 146:16
**Manatee** 12:15,16
**manifested** 20:12
**manifesting** 24:3
**manifests** 112:10
**manner** 208:1
**manufacturer** 215:1
**March** 54:19 55:8 55:23 56:10,11,19 58:23 59:2,9 62:21
**marked** 37:22 38:2 41:2,5 43:21 44:1 46:19,22 48:13,16 50:23 51:3 54:14 54:17 56:14,17 110:8 114:4 116:20,23 120:14 120:17 126:14,17 135:3,6 137:9 139:1,5 141:7,10 144:4,7 145:6,9 146:19,22 148:21 149:1 157:23 158:18 170:2,5 176:7,10 178:14 178:18
**marking** 137:12
**married** 9:23
**master** 155:15
**material** 212:21
**matter** 45:10 183:3 189:6 217:14
**mattered** 217:15
**McGhee** 6:17
**MDA** 66:5 67:14 67:15 73:5
**mean** 20:21 25:17 28:20 33:3 40:3 45:9 76:20 85:13 86:22 89:10 90:7 95:15 98:3 105:10 124:13 125:1 148:10 149:12 153:3,4 154:2 158:9 160:10,22 162:22 163:17 166:7 171:4,5,10 175:5 177:7 182:10 183:5 189:14 190:14 192:5 195:4 199:5 199:16 200:3,14 204:7 208:14 214:21 216:10 218:6
**means** 31:19 121:10
**meant** 93:19
**mechanics** 175:21 186:21 187:3
**Med** 30:14 32:4 50:8 167:18 169:5
**medical** 4:8 16:4,5 20:1 23:6 55:1

114:9 127:7,22
132:5,13,19 144:9
146:6 164:19
165:5,6,15,21
167:2,5 209:13
211:5
**medication** 60:23
61:23 133:1
149:20,22 150:3
206:18
**medications** 15:18
61:9,10 143:13
195:10
**medication-wise**
196:20
**Medicine** 50:2
196:6
**meet** 148:4 190:7
**meeting** 99:21
150:20
**meetings** 37:7
124:6,7 195:6
**memory** 15:19
202:13
**mention** 25:10
223:11
**mentioned** 167:5
176:20 193:11,12
194:22 196:2
200:18 213:20,22
223:13
**mentioning** 86:2
**Mentone** 157:12,13
**merge** 33:5
**met** 7:18 84:7
191:19
**metal** 45:21 200:4
200:4
**meters** 73:3
**mid** 36:4
**midday** 90:5
**middle** 87:12
**Middlemas** 6:4
26:13 87:3 94:11
100:6,14 108:20
118:4 130:19
131:11 132:11

133:21 134:2
136:2 138:10
146:7 147:9
166:20 167:23
168:3 173:18
179:15 180:19
181:17 183:1,12
187:8,22 188:5,10
210:18 223:7,15
**migraine** 221:3
**Mike** 79:12,13 80:3
80:16,18,19,20,21
80:21 81:1 87:18
89:12 90:16 91:3
92:1,6 100:18,21
100:22 101:4
104:9,9,16 105:4
106:17 107:16
172:3 189:7,11
204:18 205:8,15
205:20 206:3
209:11 212:20
220:13
**military** 13:15
34:16 36:21 129:1
129:6 164:1,10,11
**Miller** 1:19 2:21
7:2 225:2,3
**minds** 190:21
**minimal** 126:5
145:13 149:7
**minimum** 28:7
**minor** 9:19 13:19
**missed** 125:16,19
186:16 190:10
**missile** 36:20 63:12
66:6 67:9,23
72:14
**missiles** 14:23
63:13
**mistaken** 111:17
**MOA** 164:11
**Mobic** 61:12,14
143:16 195:17
213:9
**Mobic's** 195:19
**moderate** 117:22

**moderately** 57:4
**MOL** 164:1
**moment** 190:23
199:12
**Monday** 71:3,6
93:3
**money** 161:10
162:10,11 213:17
214:16,18 215:15
217:13
**monitor** 181:9,16
**Monroe** 1:21 6:11
**Monrovia** 11:2
**month** 18:20 20:13
20:23 21:2,4 22:9
23:22,23 24:11
43:13 151:5
161:23 167:21
195:3
**months** 20:15,15
27:2,4 48:7 59:17
60:15 99:12
167:22 168:1
**morning** 70:19
74:18 87:10 91:4
189:8 193:21
197:6,13
**mornings** 97:1
204:22
**mother** 56:9 57:20
**motion** 170:20,22
**Motrin** 25:5,6 28:5
29:13,15,17 30:18
30:19
**mountain** 158:16
**move** 42:6 65:19
95:17 162:5
174:15,16,19
218:3,5,6,7,8
**moved** 50:3,9,10
57:23 63:7 64:17
89:9 95:16 96:1
96:21 174:11
**movement** 200:17
**movements** 208:10
**moving** 154:5
184:13,15 202:1

**MRI** 4:15 56:18
58:5 115:4,8
116:10
**mud** 127:21
**multi** 40:11,15,19
**multiple** 18:14
111:9 130:13
**muscle** 28:17 45:17
46:2,15 61:12
143:4,8,15 149:23
195:13 206:20
**muscles** 24:19
26:20 27:6,18
28:13 29:11
119:23 140:6,22
143:11
**Mustang** 155:7
157:20
**myelogram** 17:13
17:13 18:6,7
38:19 53:17
115:10,11,11
116:5,8,15 117:2
117:6 119:8,9,17
122:18
**myelograms** 128:6
165:13
**Myleogram** 4:17

**N**

**N** 1:15 4:2
**name** 7:19 8:13
9:12 17:4,17 57:9
65:22 77:5 81:14
84:18 85:19,22
86:1 102:10
113:16 114:4
127:20 167:17
168:6 177:12
185:10,15 190:6
196:3,6,7
**named** 57:13
176:21
**names** 66:23 85:14
176:19 186:20
190:23 191:6,9
**Narcotic** 195:21

**narcotics** 206:23
**narrowing** 57:4
117:22
**nature** 37:3
**near** 74:9
**necessary** 2:9
18:16 173:11
223:3
**neck** 16:9,14 18:4
22:16,20 23:19
24:15,19 25:23
26:11,20 27:6,11
27:14,17,17 28:12
28:13 29:4,11
33:19 34:19 35:12
37:19 41:14 43:16
45:15,21 47:7,12
47:16 48:21 59:9
59:22,23 61:5,20
89:15 97:11 98:4
98:7 100:23 112:4
112:6,13 115:2
123:16,19 140:6
143:20 145:13
151:17 153:21
154:8,10 170:20
171:5 196:10
206:13 212:7
**need** 8:10 52:6
57:16,17 101:9
102:20 132:12
134:7 158:5
189:19 196:19
**needed** 25:7 121:22
134:5,17 146:14
149:13 150:7
**needs** 57:17 127:5
155:14
**negatively** 128:15
**negotiation** 124:8
**negotiations** 195:7
**neither** 224:22
**nerve** 118:8
**nerves** 28:23
143:11
**neural** 57:5
**neurologist** 35:15

**Neurontin** 62:1
 195:15
**never** 34:14 40:8
 44:12 71:15 77:1
 88:1 91:5 116:16
 118:17,17 123:20
 154:21 168:5
 169:14 171:8
 191:17 205:7
**new** 13:13,13 48:21
 65:12 97:23
 184:18 206:3
 215:6
**newer** 75:10
**newest** 16:13
**news** 71:13 122:19
**NF** 63:12
**nice** 63:10
**night** 143:15,20
 150:2 168:21
 193:20,20
**noise** 98:19,21
 199:10,11,14
**normal** 23:2,3
 203:21
**normally** 58:2
 155:18
**north** 10:8 69:12
 70:1,15
**northeast** 69:13
 73:21 74:2,10
 75:7 76:4,14 78:2
 84:13,22 86:8
 96:3 185:18
**NORTHEASTE...**
 1:3
**NORTHERN** 1:2
**note** 4:10,12,13,14
 4:18 5:2,3,4 44:2
 45:3 48:17 51:4
 120:22 145:10
 146:23 147:2
 149:2
**notes** 60:14 170:16
**notice** 2:17 60:14
 89:23 203:5
**noticed** 203:10

**notified** 76:16 88:1
 88:2 90:2 104:10
 168:21 188:23
**notify** 87:18 109:8
**notifying** 89:17
**November** 44:3
 45:3,6 48:18
 148:11,12
**number** 1:5 12:5
 22:22 37:21 39:20
 41:1 43:20 46:18
 48:12 50:22 54:13
 56:13 107:22
 110:7 116:19
 120:13 121:17,18
 126:13 135:2
 137:8 138:23
 141:6 145:5
 146:18 148:20
 153:1,19 157:22
 159:5,7,10,15
 170:1,12,17
 171:12 172:9
 173:8 176:6 178:2
 178:13 179:2,8
 186:5 209:12
 220:2
**numbers** 73:17
**numbness** 145:14
**nurse** 102:7,16
 103:5 173:21
 177:13

**O**

**O** 1:15
**Obamacare** 24:6
**object** 26:13 87:3
 94:11 100:6,14
 118:4 134:2
 138:10 147:9
 173:18 179:15
 180:19 181:17
 183:12 187:8,22
 188:10
**objection** 183:2
 188:5
**objections** 2:10,12

**observe** 199:3
**observed** 221:21
**observing** 75:9
**obviously** 197:18
 198:14 199:19
 201:1 223:13
**occasion** 76:19
 80:14 81:2 82:22
 86:12 93:4,23
 110:22 115:15
 150:13 196:18
**occasional** 84:10
**occasions** 79:7
 81:19 82:9,11
 87:6 111:9 118:19
 200:20 201:1
**occurred** 87:9
 131:20 222:20
**October** 8:17 39:2
 147:1 148:10
**offered** 2:14 213:23
 215:8
**office** 5:4 14:23
 63:6,8 67:21 68:9
 68:17,18 69:5,7
 71:21 72:1 74:23
 89:12,21 90:23
 91:10,17 92:8
 103:10 108:15
 109:20 110:12
 111:8 113:7
 115:18 126:19
 129:11 138:21
 145:11 149:3,5
 174:4 180:9
**Officer** 164:10
**officer's** 12:23
 164:2,12
**offices** 1:20
**off-the-record**
 166:23
**oh** 12:22 22:23 50:9
 74:8 80:22 127:13
 137:1 143:18
 169:1 202:11
 208:17 221:6
**okay** 7:10 33:17

 41:8 45:9,12
 47:10 52:3 62:3
 72:22 101:10
 104:4 118:9,21
 136:4 148:18
 152:7 164:13
 168:8 171:22
 172:17 182:14
 194:9 195:8,18
 205:8 206:7
 212:13 215:22
 218:10 219:7
 223:7
**old** 9:21 75:10,12
 152:4
**older** 75:13
**ombudsman**
 130:23
**once** 11:10 26:3,15
 28:7 39:22 59:11
 59:16,17 87:10
 97:2 111:11
 130:16 142:12
 185:23 209:11
 215:7
**ones** 35:6 53:7 67:2
 91:21 180:21
**ongoing** 140:19
 150:4
**onset** 97:23
**on-line** 13:14
**on-the-job** 173:1
 222:18
**oozy** 21:11
**op** 218:10
**open** 85:9 119:23
 198:10
**opened** 46:11 89:11
 95:10 198:14
**opening** 111:14
**openings** 118:11
**operate** 156:11
**operated** 33:1
**operation** 82:16,17
 186:14
**operations** 218:11
**operative** 4:9,11,14

 4:22 41:6,9 46:23
 54:18 139:6
**opinion** 34:18
 107:17 120:10
 151:14 167:11,12
 167:13
**opportunities**
 213:23 214:1
 217:22
**opportunity** 135:11
 136:6
**opposite** 73:1
**option** 29:17
**options** 72:6 132:1
**oral** 2:23 7:7
**order** 72:13 77:4
 84:17 85:13
 105:18 161:4
 176:1 180:16
 193:16 209:22
 210:3 212:4
**ordered** 90:14
**ordinary** 53:9
 199:23 218:22
**organization** 14:20
 49:21 165:12
 184:16
**organizations**
 10:11,19
**original** 2:23
**originally** 61:16
 174:23 197:6
 210:7
**orthopedic** 17:12
 23:7,8 26:2 35:15
 39:19 49:16 142:2
 142:13 164:17
 165:5
**outcome** 149:8
**outs** 211:10
**outside** 168:15
 197:12
**out-of-pocket**
 132:22
**overall** 149:6 177:8
**overseas** 99:3
 147:18 195:9

**over-the-counter**
206:18
**owe** 165:18
**owed** 214:6,9
215:17
**Owens** 80:2
**owns** 183:20
**Oxmoor** 6:5
**Ozark** 16:22,23

**P**

**P** 1:15
**PA** 57:8,9,12 58:10
111:5,6 113:3,7
113:13 116:3
145:18
**pace** 123:6
**page** 4:3,7 11:5
39:6 57:2 117:20
178:22
**pages** 210:21
**paid** 71:16 129:14
132:15,20 133:7
161:12,19 163:3,4
163:9,16 164:8
165:17,19 166:7
168:17 169:5
214:9 215:10,20
216:16
**pain** 16:10 20:8,19
20:20 21:8 22:16
23:14,16 24:17
27:11 28:11,17
30:1 37:14 41:14
41:16,19 42:4
45:7,15,17 47:16
48:21,22 54:6,9
57:15,17 59:23
61:15,20,21 89:11
89:16 95:11,12
97:22,23 98:1,1,5
101:13 111:20
112:4,5,12,18
123:16,18,19
139:19 143:7,13
145:3,13 146:1,11
146:14,15,15,16

149:14,19 158:12
173:10 195:10
196:19 205:16
220:21,22 221:6,7
**painful** 24:15 140:1
140:3,12
**Paint** 156:17
**pallets** 152:21
**panel** 198:21
**panels** 198:20
**papers** 221:1
**paperwork** 34:13
89:20,23 101:8
102:9 108:9 109:3
109:12 171:19
172:11 192:16
206:9
**paragraph** 39:9
117:21 133:14
136:18 170:11,17
171:12 172:9
173:8 179:2,8
182:13 186:5
210:22
**paraphrasing**
101:2
**Paris** 124:8
**Parker** 4:16,19,20
4:21 30:14,15
31:21,23 32:8
33:1 34:18 35:10
35:18 38:5,20,23
40:7 41:7 42:8
43:9 44:3,6,16
45:18 46:2 48:18
49:1,11,19 50:1
51:5,8,10 52:14
52:22 53:22 55:2
55:15 57:5 58:9
58:11,12 59:3
60:12 61:3,17
102:13,21,23
109:18 112:16
113:1,5,8,22
114:13,16 115:16
116:5,13 117:9
119:3,14 120:22

122:4,12 125:5
126:21 127:10
133:23 134:15,22
135:8 136:5,15,17
136:23 137:14,19
137:23 138:8,13
138:18 140:18
142:22 143:13
145:17 147:1,5
149:6 150:14
151:15 154:20
158:3 164:17
196:21 202:8
207:10 212:1
213:5,11
**Parker's** 57:12
103:10 110:12
111:8 113:20
121:9 126:19
129:11 138:20
145:11 149:3,5
150:5 167:15,16
212:3
**parking** 69:15,18
69:21 70:7,10
**part** 13:4 23:3
37:10 54:2 90:14
93:19 98:10,10
104:11 155:17
156:20 177:4
180:6 181:22
182:2 183:19
188:8 192:21
209:22 217:7
**partial** 30:12 31:16
33:12,14
**particular** 112:9
**parties** 1:17 2:12
224:23
**partner** 79:14
**parts** 27:12 124:3
**party** 127:15
133:19
**part-time** 147:19
148:1
**pass** 175:13
**passage** 118:7

**passages** 118:8
**patio** 152:19
**Patrick's** 56:10
58:21
**pay** 127:6,16 128:8
129:15 132:22,23
159:20,23 160:21
160:23 161:8,9,16
161:22 162:1,2,6
162:7,11 163:2,9
163:10,13 164:7
166:8,10 174:17
214:4,7,8,17,18
216:6,19
**paycheck** 161:4
**paying** 128:9 129:8
166:3
**pays** 127:21 162:23
164:3,5
**PA-C** 114:5
**PCS'd** 25:1
**Peachtree** 6:18
**PEO** 14:23 63:20
**people** 67:22 76:15
84:23 85:7 89:17
96:7 154:6 188:18
189:4 208:19
217:17
**percentages** 132:23
**Percocet** 145:1,2
195:15
**performance** 28:9
**performed** 19:12
19:13,15 21:2
31:13 38:19 42:8
42:16 47:3 55:3
55:11,16 59:4
117:9 139:10
140:18
**performing** 36:17
120:3
**period** 88:14 99:23
207:15 214:8
218:14
**periodic** 100:5
**permanent** 175:4
219:6

**permission** 29:18
71:13 123:6
**person** 77:12 81:4
82:6 87:15,17,21
91:7,14 92:16
100:11,19 105:3
130:12,13 135:17
141:17 142:19
**personal** 137:3
150:8 153:4
**personally** 84:20
109:11
**Petra** 196:7,8
**Phil** 65:21
**phone** 58:10
106:17 168:21
**phonetic** 202:23
**physical** 4:23 30:10
30:22 31:4,9,13
34:1,11,14 49:3,7
49:12 50:12,17
140:15,21 141:11
141:14,21 142:12
142:14,23 143:3,6
148:15 150:10
158:4 196:11,14
219:4
**physician** 16:10
17:9,21 22:19
27:18 31:8,13
32:9 34:1 102:5
105:15 150:8
154:18,20 168:17
196:2
**physicians** 120:9
**physician's** 19:20
114:6,9 167:17
**PICC** 59:18
**pick** 53:18,19
**picture** 33:20
**pictures** 118:12
**piece** 45:21 100:4
**pilot** 25:18 187:13
199:7 202:16
**pilot's** 13:1
**pitch** 202:16,20
**place** 1:21 6:12

20:7 36:2 53:18
55:8 56:19 85:21
124:10 130:4,18
157:11 177:6
183:2 193:14
197:2 211:11
**places** 99:6 166:1
**Plaintiff** 173:9
182:5
**Plaintiff's** 4:7
170:20
**Plaintiff(s)** 1:8 6:3
**plan** 120:23 127:1
146:3 147:2,3
**plans** 147:13
**plate** 37:18 45:19
51:22
**play** 162:5
**please** 3:3 8:14
14:21
**pleased** 45:5
145:20
**plus** 67:22
**POC** 50:4,10
**pocket** 132:16
163:13 166:7
**point** 8:11 26:18
27:3 28:15 29:2,9
30:2 39:18 51:20
52:15,21 55:19
59:14 61:11 62:23
65:5 69:5 86:3
88:17 93:6 109:2
112:17,20 116:14
116:14 119:20
121:15 127:2,7,13
145:14 149:12,21
150:22 199:12
203:19 212:16
213:22 215:19
217:14,16
**political** 11:16
**popped** 209:5
**portions** 181:10
**position** 65:16
79:15 81:8 106:23
174:3

**positive** 131:5
**possibility** 25:10
61:5 189:5
**possible** 32:12
120:6 128:13
188:3,7
**possibly** 129:20
157:17
**post** 11:12 89:18
218:10
**postal** 213:8
**posted** 86:17
**posterior** 119:21
120:3 121:2
139:11
**postpone** 45:2
**potential** 166:12
182:5,20 216:12
**pound** 156:18
**PowerPoint** 37:7
**practice** 20:1 49:19
50:3 114:15
**practitioner** 19:22
102:8 103:5
173:22 177:13
**preceding** 99:1,12
**precisely** 100:20
125:23
**prepare** 14:10
138:1
**prepared** 135:8,10
137:16 138:9,14
**prerequisite** 30:23
**Presbyterian** 11:3
**prescribe** 50:17
143:13
**prescribed** 29:13
30:18 61:16,19
62:6,16 143:16,23
149:22
**prescriptions** 213:2
**present** 222:21
**presentations** 37:7
**presents** 45:4
**presumably** 169:16
**pretty** 18:20 20:11
24:21 92:10 97:16

154:3 215:12
**prevent** 43:3
**previous** 38:6
76:11 114:1
118:19,21 187:11
212:15
**previously** 41:23
51:13 55:16 63:18
112:12 118:2
121:11 157:2
200:19
**primary** 127:4
128:22
**printed** 159:17
**prior** 2:15 8:18
14:3 15:8 22:14
23:13 32:18 35:10
46:4 51:17 52:19
53:11 76:2,12
78:2 80:10 81:1
84:11 86:11 93:20
98:6 117:23 121:7
136:13 153:10
155:1,9 157:10
194:3 211:3,19
223:9
**private** 19:22 20:1
**privileges** 20:4
**privy** 99:18
**probably** 11:19
16:7 45:16 47:19
68:4 96:4 99:22
103:6 105:14
110:16 183:23
193:3 196:14
203:13
**problem** 34:2
35:23 79:2 82:7
82:10,18,23 83:4
83:8,10 86:13,16
86:23 87:2 103:19
138:3 143:10
182:15 183:10,11
183:17 187:6,7,19
**problems** 18:9
20:11 21:6 22:20
25:23 26:11 27:5

29:20 34:9 35:12
47:17,22 53:1
61:6 76:14,19
77:13 78:2 81:18
82:3 84:13,21,23
85:4,20 86:7
87:13 88:2 93:5
93:12 94:2 98:23
99:14,17 118:2
181:3 186:3
218:13
**procedure** 2:20 7:4
18:23 21:13,14,15
37:18 41:13 42:7
42:20 46:9 47:3
47:11 52:23 55:10
55:15,22 117:8
120:2 139:8,10
140:3 164:6
192:17
**procedures** 24:12
52:8 55:3
**proceeded** 223:9
**proceedings** 7:8
134:1 159:3
160:20 162:13
**process** 26:4 31:3
84:17 101:11
128:14 130:8
137:21 190:9
192:19 205:22
207:19
**processes** 211:3
**procure** 131:23
**produced** 16:6
109:1 137:14
158:20 222:12
223:6
**product** 64:20
65:13 174:5
**production** 222:15
**profile** 219:3,6
**program** 15:1
64:20 65:2 66:3
67:10 70:22 175:5
**programming**
15:11

**programs** 13:8
36:18 64:9 65:3
66:4
**Program's** 174:4
**progress** 28:6
**project** 14:23 67:21
85:15
**promise** 132:18
190:13 216:21
**promotion** 63:8
**promptly** 198:6
**pronounce** 113:15
196:5
**proper** 176:3
192:16
**properly** 179:10,13
180:15 181:9
182:6 186:7
**property** 184:3
**propose** 120:6
**prove** 127:15
**proven** 212:7
**provide** 60:23
167:7 212:20
**provided** 7:3 28:5
63:13 108:11,16
126:7 133:14
167:10 173:4
184:9 187:3
**provider** 163:23
**providers** 165:6,21
167:2,5
**provides** 204:14
**proximity** 72:23
**pseudoarthosis**
118:14
**pseudoarthrosis**
122:6
**PT** 49:2
**Publix** 213:3,10
**pull** 157:20
**pulled** 59:18
**pulling** 124:15
**pumping** 48:8
**purge** 88:16
**purpose** 143:3
**purposes** 137:15

**push** 76:20,23 198:3 199:2
**pushed** 77:23 84:9 85:5 89:6,7 94:20 96:18,23 197:18 198:5,20 199:12
**pushing** 147:11
**push-ups** 219:8
**put** 19:3 53:6,6 82:13 84:18,19 108:9 127:16,17 152:19 173:15 186:13 209:21 210:2
**P.C** 6:11
**p.m** 223:19

**Q**

**QA** 187:18
**qualify** 31:7
**quality** 156:1
**question** 8:7 26:14 76:11 87:4 93:18 94:12 100:7,15 118:5 134:3,13 146:8 147:10 148:16 173:19 179:17 180:6,20 181:18 183:13 187:9 188:11 191:4 192:10 193:12
**questioning** 190:11 190:22 211:20
**questions** 2:10,11 8:2,4 15:23 101:14 136:3 167:11 189:20 190:4 193:11 207:23 221:18 222:8 224:17
**quick** 20:22 33:7 62:4 87:1 104:20 107:7 128:13 163:12 168:10 178:9 223:17
**quickest** 110:17
**quickly** 183:1
**quit** 62:2
**quite** 46:16 59:11 145:19,20 192:8

**R**

**R** 224:10
**race** 204:21
**radiate** 27:12
**radiates** 41:17
**radiating** 42:4 221:9
**radiation** 221:10
**radiculitis** 44:17
**Rainbow** 9:5 196:6
**randomly** 54:10
**range** 10:17 152:14
**rate** 159:20 163:2 214:8
**rates** 159:23
**rating** 128:15,16
**react** 170:21
**read** 35:23 42:2 118:11 122:18 169:17
**reading** 2:2 182:11
**readout** 31:16
**ready** 14:14 166:1 166:2 217:8,9
**real** 33:7 107:7 223:17
**realize** 204:2
**really** 20:22 44:12 60:17 86:1 97:15 99:2 168:10 195:23,23 199:16 216:21 217:13
**reason** 60:20 176:4 215:10
**reasons** 144:3 174:2
**rebuild** 140:22 143:3 153:19
**rebuilt** 73:11
**recall** 17:8 49:14 80:4,7 85:11 86:2 86:4 87:8 98:20 102:11 105:8 106:15 107:5 109:22 135:23 167:4 191:3,4 192:9 193:13,22
**receive** 131:7
**received** 130:2 132:14 149:5 160:17 162:17 165:4
**receiving** 150:4
**recognized** 63:10
**recollection** 47:20 141:15
**recommend** 28:3 29:13 51:11 114:20 119:19 140:19 142:23
**recommended** 46:2 49:2,12 57:8 115:3 116:9,10 120:3 125:6 148:15
**recommending** 52:14,15,22 121:3
**recommends** 116:14 121:1
**record** 4:8,15,19 8:14 38:16,18 54:23 56:18 126:18 130:21 149:4 150:17 166:20,22 211:5 222:9 223:11
**records** 16:6 40:5 82:2 125:18 169:18
**recover** 160:13 166:15
**recovered** 42:22
**recovering** 45:13 48:3 63:3 147:7 217:11
**recovery** 20:14 21:5 23:23 140:5 140:13,15 165:22 218:14
**recur** 26:1
**recurrence** 183:17
**red** 102:7
**redo** 54:3
**redoing** 221:1
**Redstone** 15:1,10 15:14 30:22 36:16 37:4 63:16 175:8 175:17 178:2,6 194:10
**Redstone's** 102:2
**reduced** 60:13 224:17
**reducing** 60:14
**reduction** 146:1
**refer** 27:22 31:4 38:13 40:6 101:15 102:20
**reference** 39:7,11 41:15 49:2 51:6 54:23 119:12 128:22 171:13
**referenced** 55:6 56:3 72:20 109:2 172:9 222:10,18
**referencing** 60:3 222:16
**referral** 30:13
**referred** 17:12,14 17:20 23:10 24:4 38:4,5,11,23 73:20 75:8 89:19 102:12 105:15
**referring** 38:7 47:5 102:14 140:13 171:17
**refill** 213:7
**reflect** 128:15
**regarding** 137:3 180:2,7 187:2
**Regent's** 13:16
**regimen** 142:17
**regular** 11:8 43:9 60:12 71:14 79:4 124:22 153:10,13 155:3,9
**regulated** 42:23
**reimbursed** 166:11
**reinstalling** 184:18
**related** 28:18 66:18 82:2 87:13 165:16 177:2
**relating** 2:6 75:16 88:11 94:7
**relation** 167:3
**relationship** 62:14
**relatively** 79:3
**relatives** 10:4,7 11:13
**relaxant** 61:13 143:15
**relaxants** 150:1 195:13 206:20
**release** 142:11
**released** 214:19
**relief** 20:8,19 22:11 36:8 37:13 45:7 47:12 50:15 55:23 59:8 139:19
**religious** 11:1
**remember** 20:22 42:5 99:9,11,13 100:20 104:7 126:4 141:3 142:20,21 146:5 171:18 193:15 203:14 205:19 221:8
**removal** 47:4 51:23 52:11
**remove** 45:19 53:5
**removed** 37:19 46:6 48:5 63:4
**removing** 46:3 184:18
**reopen** 223:4
**repair** 87:2 119:21 180:15,16 182:7 186:9
**repaired** 77:4 100:1 121:22
**repay** 133:16
**repeat** 8:5
**rephrase** 8:5

**replace** 184:12
**replaced** 48:6 184:4,21
**replacing** 184:17 185:1
**report** 4:9,11,22 33:9 41:6,9 46:23 54:18 77:18,21 80:15 81:1,18 83:4 107:20 139:6 168:4 169:19 171:14 172:8,21 172:23 173:5
**reported** 64:5 82:19,23 86:23 87:13 105:4 169:14,15 181:3 201:2,4
**Reporter** 3:4 7:9 106:19,22 185:14 185:17
**reporting** 65:6 77:13
**reports** 36:1 201:7
**represent** 37:1 183:3 190:6
**representing** 36:22
**represents** 224:19
**request** 135:20 184:11 222:14
**requests** 88:8
**required** 30:6 71:1 213:7
**requirement** 31:2 128:19 134:19 142:11 182:1
**requires** 100:5,13 181:15
**reserve** 223:3
**resolved** 145:15
**respective** 1:17
**respond** 101:4 211:23
**responding** 88:7
**respone** 55:13
**response** 9:3,18 13:6 15:23 17:3 19:14 21:23 22:13 23:12 31:22 32:15 37:11 39:1,13,17 40:13 43:5,18 46:7,10 47:9 48:23 49:13 52:20 54:20 55:9 56:5 59:1,5 63:2 65:7 65:20 66:19 67:17 68:23 69:8,16,19 72:18 74:17 75:1 77:2 78:8 81:12 90:22 91:16 105:23 108:3 111:1 114:7 117:7 119:1,15,18 120:4 125:17 126:20 127:8 140:4 141:20 143:5 144:13,22 148:14 159:22 160:5 163:22 165:2 178:7 185:7 189:19 191:15 194:21 197:14 198:23 200:21 204:17 205:18 210:9 213:13,16 219:23 220:5,10
**responsibilities** 191:23
**responsibility** 174:18 179:10 193:6
**responsible** 77:13 82:6 132:5 192:1
**responsive** 222:14
**rest** 97:13 106:12
**restriction** 23:21
**restrictions** 158:4
**restroom** 8:11
**result** 57:4 165:8 225:1
**results** 4:17 30:11 31:15 34:4,13 45:5 58:5,9 117:2 188:17
**retain** 88:13
**retained** 3:4 47:4
**retire** 25:7 79:17
**retired** 13:3 15:15 30:7 79:16 129:1 129:6 219:16,20 219:21
**retroactive** 132:3
**retrofit** 133:16
**return** 31:3 47:16 124:23 144:16 148:6
**review** 14:13 58:8 135:12,14 136:6
**reviewed** 135:19 167:9 170:8 176:13 179:4,5,7 181:10
**Rhonda** 177:12
**Richmond** 11:22
**ridden** 205:8
**ride** 62:8 101:22 203:20
**riding** 78:6
**rifle** 156:12
**right** 18:22 20:4,12 21:20 22:10 25:14 26:17 28:21 30:4 30:21 32:11,20 37:12 41:15,20 42:18,19 45:23 49:5 51:12 52:17 56:9,22 57:5 58:21 64:13,15,16 64:22,23 70:11,20 73:4,4 74:11 80:3 85:21 89:4 91:9 96:17,20 97:4 109:6 112:10,11 112:13 113:10 114:19 127:12 128:13 129:20 139:4 150:17 155:13 158:14 163:11 165:18 173:17 182:1 191:7 192:14,19 194:4,11 195:5 196:13 197:7,13 197:18 198:19,21 198:22 201:3 202:4,18,21 204:11,16 205:9 205:12 206:10,16 206:21 207:1 209:5,8 210:23 211:12 213:14 215:17 217:12 219:22 220:4,6,9 220:12 221:2,12 223:3
**rights** 19:20 55:4
**road** 6:5 21:3 154:12
**Rock** 156:17
**Rod** 10:13,16
**rode** 90:8 93:23 94:9 104:1 205:3 209:4
**rods** 119:22 153:21
**role** 175:17
**Ron** 57:10,13 113:15 114:19 116:4,9,11,11
**Ron's** 114:4
**room** 40:6 45:20 57:19 68:14 96:6 102:2 105:18 114:18 176:1 219:17
**rotary** 40:22
**rounds** 152:15
**routine** 8:1 97:1
**rubs** 143:19
**Rucker** 12:5 16:15 16:19 17:2,6,21 23:9 30:8
**Ruda** 85:15 90:5 104:1 177:7 189:1 189:9 212:20
**Ruda's** 176:23 185:5
**Rule** 2:19 7:3
**rules** 2:6,20 7:4
**run** 219:9,16
**running** 27:10

**S**

**S** 1:15 4:6 162:4
**Saint** 56:10 58:21
**sales** 36:22 63:12
**Sam** 214:6 216:19
**Sammons** 38:8,9 40:2,14
**Sandra** 158:22
**Sandy** 81:5
**sat** 24:10 89:12 90:23
**saved** 161:13
**saves** 213:17
**saw** 17:10,11 33:23 38:5 40:2 44:12 83:23 91:14 100:19 102:6,23 105:3 113:5,14 114:19 115:15 116:3,3,5 122:12 122:16 142:15 150:14,16 173:17 173:20,21 174:1 177:14 191:17 200:13 202:22 207:9 223:16
**saying** 138:4 153:15 156:1 172:7 175:11 208:18 212:11
**says** 38:17 40:11 41:13 45:4,12 53:23 105:15 114:4 117:20,21 121:1,6 127:1,1 145:12 147:3,13 159:21 170:18 171:13 173:8 176:3 210:19,19
**scan** 53:17 115:4 116:10
**scans** 17:14 128:6 165:13 169:11
**scar** 21:16 28:21

120:5
**scars** 169:12
**schedule** 103:2
124:22 150:21
**scheduled** 32:11,12
150:7,23 151:9
**scheduling** 173:15
174:2
**school** 12:8,9,13,21
12:23 106:8
**SCIC** 67:3,13
**scout** 155:15
**scouts** 10:22 152:3
157:12,13
**screams** 200:1,3
**screeches** 200:4
**screeching** 200:6
**screwed** 53:22
**screws** 46:12
119:22
**season** 156:9
**second** 10:15 18:15
18:21 20:10,10
21:1,6,12,18
22:11 23:13 24:10
24:16 25:9 26:9
26:19,22 29:10
30:16 34:7 39:6
57:1 59:10 66:7,8
68:16,22 69:1,1,9
72:2,19 73:7 74:1
95:10 117:20
120:10 122:17
124:21 125:1
153:17 166:21
172:19 180:5
183:15 204:1
208:15 214:13
**section** 121:5
126:23 145:12
147:2
**security** 68:1 107:2
128:16 176:3
**see** 16:10 27:18
28:6,21 43:12
44:14 57:16 58:3
58:11 60:20 88:10

88:22 103:6
108:22 109:18,19
110:1,17 112:16
112:18 113:1,7
114:13,15,16
115:7,17,19
119:12 120:9
122:14 146:11
150:6,19 170:13
173:9,21 176:19
200:13 201:17
204:21 206:1
211:23 220:1
**seeing** 34:17 35:9
43:9 50:1 60:12
173:14 196:4
**seeking** 160:13
162:14 164:16
**seemingly** 54:9
**seen** 57:9 60:15,16
87:21 89:18
108:23 113:19
122:15 167:2
176:15 179:7
196:11 207:20
**selected** 64:19
**selection** 174:8
**self** 16:16
**semi-automatic**
156:14
**send** 77:21 93:16
**senior** 155:22
**sensation** 94:17
**sense** 158:9 199:3
**sent** 88:10,15,18
99:22 103:8 136:9
136:11,12,13
140:21 168:5
172:15
**separate** 207:12
**separating** 73:3
**September** 47:1,11
**sequence** 193:13
**serious** 45:15 166:3
**served** 176:12
**service** 13:4 76:5
83:15 86:21,22

87:2 183:18 184:4
219:21
**services** 1:10 7:21
175:10,17,22
179:9,13,21 180:4
180:8,14 181:4,8
181:11,11,15
182:4,9,19,22
183:9 186:6,22
**set** 57:19 63:5 71:5
137:21 179:2
**setbacks** 151:16
**seven** 33:4
**seventh** 60:6
**severe** 39:15 47:16
57:4 59:22 196:19
**severity** 117:23
**sharply** 154:12
**sheet** 44:14
**shelters** 197:23
**Shepard** 8:15
**shoot** 152:14
**shooting** 152:11
**short** 13:23 104:21
133:13 178:11
**shortfall** 161:16
**shortly** 56:20
**shot** 219:16
**shoulder** 48:22
112:12 123:18
**shoulders** 112:7,8
**show** 120:5 125:23
**showed** 169:6
**showing** 222:21
**shown** 159:6,20
**shows** 121:6 131:9
195:6,6
**sic** 80:18,20
**sick** 106:1 125:10
161:3,3,5 163:1
214:7
**side** 69:10,12 70:1
70:1,6,9 72:8 73:2
73:4 96:16
**sides** 73:1 221:4
**siesta** 205:1
**sign** 82:13,14 84:19

**signature** 2:2 134:8
**signatures** 113:13
**signed** 186:12
**significant** 121:6
145:23
**signs** 172:3
**similar** 98:1,5
117:23 118:1
217:21
**simple** 140:7 152:7
**simulation** 67:3
214:23 215:4
**sir** 10:6,9 14:4,6,9
14:17 16:2 59:7
60:5 74:4 113:18
164:20 175:23
185:20 189:21
205:5 211:13
**sister** 11:11 188:22
**sit** 151:20,21
155:16 156:18
168:10 193:5
**site** 52:18 55:17
117:14,16
**sitting** 85:18 94:7
101:1 152:11
156:10 175:16
179:11,18 190:8
206:5,8,12
**situation** 129:17
**sit-ups** 219:8
**six** 27:4 46:11
60:15 146:13
210:21
**sixth** 60:7,11 61:1
61:11 62:18,22
153:17 156:5
**size** 209:14
**Skelton** 65:21
**ski** 152:13,14
153:12,14
**skiing** 157:5,10,14
158:15,16
**sleepy** 195:23
**slight** 78:5
**slowly** 54:11
**slows** 30:19

**small** 36:12 118:11
**smart** 206:11
**smell** 200:9
**smoothly** 46:13
**snap** 171:11
**snapped** 89:15
171:5 203:2
**snapping** 170:21
**snow** 152:13 157:5
157:10 158:16
**socially** 150:19
**soft** 115:13 212:18
**software** 215:6
**sole** 215:10
**solid** 36:11
**Soma** 144:23
195:13,17,22
213:3,10
**somebody** 77:20
80:15 86:2 90:3
90:10 123:21,21
180:17 186:16
209:20
**somewhat** 41:21
48:10
**son** 9:11,19 10:3
106:5,8 152:6
153:19 155:2,8,21
**son's** 152:2
**soon** 32:12 40:4
76:3 102:22 103:2
**sophomore** 155:23
**sore** 27:9
**soreness** 25:4 26:21
27:7
**sorry** 38:12 39:5
59:7 93:18 105:16
111:6 120:19
135:9 142:20
143:18 152:6
168:9 170:14
182:14,14 200:23
210:11 218:12
**sort** 25:11 28:13
114:5 121:22
123:22 131:7
140:20 199:11

208:21
**sound** 57:14 117:5
190:12
**sounded** 199:17
**sounds** 199:23
211:2
**Southern** 17:15,22
19:18,23
**Space** 14:23
**spasms** 45:17 46:2
47:8,12
**speak** 67:14 68:6
**specialist** 15:12
**specialized** 75:15
94:6 100:10
**specialties** 66:20
**specific** 17:9 23:15
85:14,22 99:9
103:12 114:12
142:14,17 158:13
**specifically** 221:22
222:16
**spell** 65:22 81:13
185:15
**spend** 106:12
**spent** 20:13 48:6
59:17
**spinal** 117:22
**spoke** 105:5 131:4
**Sports** 30:14 32:4
49:16 50:1,8
167:18 169:5
**spot** 70:19
**squeeze** 109:20
110:23
**SSMD** 107:1
**stabilized** 149:16
**stairs** 73:8,12 75:4
76:8,10,17 90:19
220:9,15
**stairwell** 68:12
72:3,21 74:9
**stand** 145:1
**start** 16:3 26:16
30:5 43:9 44:13
101:8 147:3,14
193:19 206:9,9

**started** 15:8 16:8,9
16:14 20:20 21:5
23:14,23 24:2,2
24:22 25:4 26:4
26:18,19 27:1,16
28:11 29:10 34:17
35:9 36:15 37:14
45:14 46:1 49:23
59:22 63:14 64:3
65:1 68:8 70:21
75:6 88:6 89:17
89:19 95:3 97:22
99:8 101:10,10
142:12 147:20
148:1,1 155:12
172:4 205:22
206:2 218:16
**starting** 29:3
190:18
**startles** 123:23
**starts** 39:9 178:22
202:3,6
**state** 8:13 224:12
225:6
**stated** 127:6 149:7
205:2
**statement** 86:5
192:9 212:4
**statements** 167:16
210:5
**states** 14:19 145:12
145:13 181:12
183:22
**State's** 8:23
**status** 18:19 151:3
177:10 219:19
**stay** 44:11 79:20
204:7 207:16
**stayed** 29:22 175:3
**stenotype** 224:16
**step** 85:9,10 153:22
**stepped** 199:13
203:14
**Steve** 89:22 104:16
106:17,23 109:4
109:12,14 171:23
**stiff** 27:9 62:9

**stiffness** 27:17 29:4
**STIPULATED**
1:16 2:1,8,16
**stipulation** 7:5
**stipulations** 7:10
**stone** 152:21
**stop** 62:3 171:9
**stopped** 104:3
**stopping** 85:8,12
85:20
**stops** 202:3,6
**store** 153:2
**story** 190:16
**straight** 25:17
31:18 97:16
**Street** 6:18
**strength** 143:4,9
**stress** 53:7 208:3
**stride** 124:13,18
153:16
**strike** 97:19 98:10
212:6
**stuck** 218:8
**student** 8:23
**students** 24:23 25:3
**Studies** 67:3
**study** 118:1 121:6
**stuff** 40:21 53:16
62:17 101:16
113:22 126:5
150:12 153:3
172:19 176:3
218:23
**subject** 223:5
**submit** 107:23
134:17
**submitted** 129:12
133:6 135:15
**substantial** 162:10
**successfully** 147:7
**succinct** 133:20
**sucks** 152:5
**sudden** 128:7
170:19,19,21
**suddenly** 95:16
**sued** 14:5
**sufficient** 137:20

**sugar** 19:3 196:15
**Suite** 1:21 6:13,19
**summarizes** 48:9
**summarizing** 117:2
**summary** 62:4
**supervise** 186:7
**supervision** 224:18
**supervisor** 64:5,10
64:11,14 65:8,18
**supplement** 132:19
163:21 164:3
**supplemental**
121:1 132:17
133:8
**support** 175:18
181:11
**supported** 167:15
**supposed** 25:1 71:6
149:23 152:22
172:18
**sure** 22:8 24:20
36:6 45:22 50:13
64:22 83:5 87:20
101:5,6 104:16
110:3,4 115:3
116:2 132:8 151:3
151:12 152:16
161:1 165:11,14
181:23 193:2,4
199:21 205:23
208:4 214:12
217:5
**surgeon** 17:11,12
23:8 27:23 28:7
35:15 39:20 89:19
101:16 102:13
103:6 164:5
173:14,21
**surgeons** 26:2
**surgeries** 16:17
25:10 28:16,19
33:4 46:4 51:17
52:7,19 53:11
98:7 110:18
112:13 113:23
114:2 118:20,21
146:6 211:20

212:15 219:1
**surgery** 18:19,22
19:9,12 20:6,10
20:11,16,17 21:1
21:6,12,18,20
22:12,14 23:13,18
23:18 24:15,16
26:9,9,19,22
29:10 30:6 32:11
32:12,14,18,22
34:7,8 35:10 36:2
36:7,9 37:13 39:4
41:10,19 42:3
43:8 45:6,8 46:1
47:5,13,23 48:2,4
51:11,14,20 52:10
52:13 55:6,8 56:1
56:7,21 58:13,14
58:20 59:2,3,9
60:6,8,11 61:1,11
62:18,22 63:4
64:16 115:13
121:3,14,16
122:20 123:14
124:21 125:2,3
139:15,18,22
140:1,10,14,18
141:1,19 142:8
143:12 144:12
145:16 146:1
147:8 149:9
153:10,17 155:1
155:10 156:5
157:10 164:19
**surgical** 42:20 46:8
47:10 55:22 139:7
**surprised** 30:11
**sustained** 165:8
167:4
**sutures** 113:22
**Swift** 6:17
**sworn** 7:14 15:22
**symptoms** 123:15
**synopsis** 134:10
**System** 36:20
**systems** 14:22 15:5
15:10 63:1,15,23

64:4 65:1,11 66:3
66:18 67:2,8
107:2
**S-K-E-L-T-O-N**
65:23
**s/Allison** 225:2
**S3** 67:2,13

**T**
**T** 1:15,15 4:6
224:10,10
**tabbed** 34:12
**tactical** 22:18
**tag** 176:3
**take** 15:17 16:3
18:4 35:2,4 53:4
58:1 60:20 61:12
62:9 73:8,9,10,13
74:22 75:4 76:8
87:1 104:19
105:18 126:11
128:10 130:18
143:14,14,15,15
143:16 144:2,2,23
144:23 149:23
150:1 162:3,9
170:15 174:21
178:9 183:18
195:12,14 208:3
218:4 223:13
**taken** 1:19 2:23
25:2 30:17 32:19
34:8 86:18 91:4
125:11 184:4
224:16
**takes** 152:8 184:16
197:22 210:20
**talk** 44:16,20 77:3
81:4 85:1,7,14
104:5 113:17
199:10
**talked** 14:12 24:4
43:1 52:8 56:21
61:7 62:19 86:7
91:7 116:11,13
138:12 163:18
177:5 178:3 189:4

195:10 205:15
208:6 211:4 222:2
222:20
**talking** 58:23 85:11
86:10 104:23
106:15 199:22
209:10,16 213:19
219:2,22
**tax** 163:10 216:20
**taxable** 163:5
**taxes** 163:4
**teaching** 16:13
**team** 90:2 210:1
**technicians** 191:1,6
191:10
**techs** 209:16,23
**Telecon** 130:22
**telephonic** 130:14
130:17
**tell** 15:23 16:8
22:19 24:19 25:21
26:3,15 29:15
31:10 34:3 35:11
35:16,18,21 36:5
40:9,14,18 66:22
75:9 81:21 85:19
89:1 92:22 101:2
106:9 113:2,4
118:1 128:2 134:6
151:1 158:14,15
174:11 179:12
180:17 184:14,23
187:10 194:6
203:2 204:4
210:20,21
**telling** 134:5
**tells** 33:11
**temptation** 207:7
**ten** 49:10,10 50:12
125:13
**term** 42:14 122:3,4
201:5
**terms** 44:8 196:10
211:1 216:11
**test** 25:18 187:13
199:6
**testified** 7:14 49:23

115:17 122:22
164:18,22 201:8
**testify** 15:19
130:20 189:12
**testifying** 189:5
**testimony** 2:23
171:2,23 190:16
212:21 222:11
**tests** 169:10
**Texas** 16:13
**thank** 33:22 102:4
106:22 163:18
185:17 190:1
223:17
**Thanks** 164:14
189:23 190:17
**therapist** 141:14
142:14
**therapy** 4:23 49:3,8
49:12,15 50:12,17
140:16,21 141:11
141:21 142:12,23
143:3,6 148:16
150:10
**thereto** 2:15 224:17
**thing** 8:3 35:17
37:8 44:23 45:19
100:2 105:15
122:20,21 140:7
147:13 172:20
175:5 187:15
196:15 208:1
216:1,3 218:3
221:3 222:8
**things** 11:12 13:14
40:18 105:20
118:10 127:12,19
133:3 143:19
144:3 153:1,4,8
153:18,20 155:12
155:18 157:7,16
172:15 177:11
186:18 187:17
190:10,20 199:8
202:17 211:3
213:9 218:20
219:7

**think** 13:16 18:16
19:4,11 21:19,21
22:4,6 33:3,21
37:15,17 38:21
40:3 43:13 45:17
47:19 48:1 49:9
56:3,11 58:12
62:5 85:14,23
86:9 87:10 88:4
88:19 90:14 92:13
95:19 101:1
102:20 103:11
106:17 107:11
108:19,23 110:16
111:17 112:21
114:5 115:9,21
116:4,13 118:13
124:6 131:3,15
133:14 136:16
138:12 143:1
151:8 159:4,9
168:2 176:16,17
178:5 185:3
189:19 194:7,18
196:7 201:8 203:9
203:11,17 205:15
205:23 207:11
208:23 212:10,14
220:13 221:18,19
222:5,12
**third** 32:14 36:2,7
37:13 39:4,8
41:10,18 42:19
43:8 45:7 46:1
66:7,9 72:7,20
73:22 127:15
133:19 136:18
**Thomas** 177:16,19
**thought** 22:20
28:14,17 34:19
35:11 53:1 61:4
72:19 157:17
168:9 192:6 205:7
**thousand** 68:5
163:3
**thread** 146:15
**three** 13:23 34:4

43:13 51:17 52:7
52:19 60:15 73:3
80:12,23 82:9
87:6 92:14,14
99:6,12 124:6,6,7
131:1 143:20
144:18 156:17
166:1 169:22
177:10 181:7
200:16,19 204:13
204:13
**threw** 207:6
**throw** 152:4 155:20
**throwing** 155:8
**Thursday** 71:3,6
**tighter** 29:7
**till** 111:12
**time** 2:13,14 8:11
14:1 17:18 18:16
23:8,20 24:10
25:5,8 26:8,10
28:10,15 29:2,20
29:23 30:2,14
32:3,18 33:23
34:6 39:18 41:14
41:18 45:14 48:22
49:11 51:20 52:15
52:21 53:16,20,23
55:11,19 57:6
59:14,21 60:7
61:11 62:4,23
63:22 64:1,11
65:5 69:3,5 71:5
71:17,17,22 76:16
79:5,21 84:15
86:3,11 87:8
88:14,18 90:5
91:1,19 92:3,5
93:6,10,15,20
99:11,15,23
100:13,13 103:12
105:18 107:1
111:10,16,20
112:17 114:21
119:20 121:15
122:11 123:16
125:9,10,11,20

126:21 127:2 128:10 131:2 138:8 141:3 142:15,16 145:15 146:11 147:22 148:7,12 149:15 150:16,22 154:13 155:14,20 156:4,5 156:7 157:4,6 158:15 160:4,6 161:3,13,17 164:15 167:13 175:7 179:17,20 180:11 183:15,15 191:23 192:12,20 195:3,8 196:5 197:12 199:13 203:8 207:8,9,16 211:21 213:6 215:18,19 216:4,6 221:4
**timecards** 125:21 125:22 126:7 144:21 159:18 222:21
**timely** 207:23
**times** 12:5 80:9,12 80:23 84:15 87:11 151:18 160:11,11 162:6 214:8 215:21
**tingling** 36:12 145:14 199:21 206:7
**tinnitus** 149:17
**tired** 96:12
**tissue** 115:13 212:18
**title** 65:2,12
**TOC** 142:1
**today** 8:2 14:11 15:20 16:1 45:4 45:11 85:18 94:8 106:1 154:14,15 167:6 175:16 176:18 179:11,18 184:20 188:19 189:2,15,20 193:5 195:11 206:12 222:10
**told** 23:1 25:7,15 31:14 32:9 34:1 40:1 42:5 44:23 83:7 85:19 94:1,5 100:20 101:12,14 102:18,19 103:5 105:3 107:16 111:11,14 113:3 116:6 117:11 118:12 119:3,14 119:16 122:19 137:5 153:8 154:18,21 158:5,7 158:11 171:18 174:14 184:23 185:2 186:19 189:7,9,15 196:16 198:15 199:6 205:17,21 208:21 209:10,11,11 210:14
**top** 38:10 55:1 95:9 110:2 117:4
**topic** 196:1
**total** 15:13 33:4 67:19 68:2 72:9 125:11,16 147:18 160:7
**touch** 79:20 190:20 216:23
**town** 194:2
**track** 11:11
**tracked** 28:5
**tracking** 15:10
**traction** 75:19,23
**trade** 195:6
**train** 186:7
**training** 13:1,4 23:6 24:23 75:15 94:6 100:10 114:10 186:18 187:2,12,18 219:4
**transcript** 2:23 224:19
**trauma** 22:16 54:8 207:12,12
**travel** 59:15 60:18 62:10 99:8 124:5 147:16,16,23 175:3 195:16,17 217:8,9
**traveled** 36:23 37:1 62:16 71:17
**traveling** 37:3 43:4 59:19 71:4,19 124:14 126:4 153:18 194:4,5 195:9
**treat** 61:14 167:2
**treated** 27:21 28:1 149:20 165:7
**treating** 28:11
**treatment** 16:11 17:2 28:2 29:12 29:14 49:4 114:21 119:20 120:7 132:13 140:19 150:4 164:16 165:3
**tree** 156:18
**trial** 2:13 189:6
**Tricare** 127:4 128:23 129:12,14 129:16,21 133:6,8 163:19 164:3,6,7 166:8,9,14 213:8 213:14
**tried** 25:18 62:1,1 151:19 157:19
**trip** 115:21 124:8,9
**trips** 43:2 99:6 124:6,9,18 194:15 194:23
**true** 180:12 224:19
**truth** 15:23
**truthful** 189:16
**truthfully** 15:19
**try** 44:10 45:1,2 50:18,19 111:9 155:17 179:20 190:3,10 193:14 193:18 201:11 202:11 206:15 207:21
**trying** 18:17 95:13 104:7 106:18 127:19,20 157:15 158:17 171:6 172:6 190:12,14 192:19 206:6 207:20 208:3 211:23
**tub** 151:21,21
**tube** 152:13
**Tucker** 177:16,20
**turn** 119:22 214:21 215:9
**turned** 96:22 99:4 108:21 195:5 198:17 215:7
**twice** 68:19 185:23
**Twitter** 11:7
**two** 16:16 20:21 35:4 38:6 45:21 48:7 59:17 62:6 69:23 72:6,11,16 72:22 73:16 79:18 80:12,22 82:9 87:6,11 96:16 101:18 103:16 110:19 111:3 112:15 114:14 119:22 124:7 125:12 127:12,18 127:19 131:15 143:20 144:18 146:13 147:20 148:2 149:23 152:21 161:23 162:1 167:22 168:1 172:15 178:3 180:13 194:19,20 195:3 200:19 219:1
**type** 8:21 11:1,4 13:19 16:9 18:23 22:15,15 82:2 98:18 100:2 102:16 130:14 150:4,10 160:18 196:15 208:8 215:23
**types** 13:8 169:10
**typewriting** 224:18
**typical** 34:16 97:1 196:12 203:20
**typically** 43:11,16 73:8,9 74:3,19 82:5 83:9,15 88:13 90:17 91:17 91:18 92:1 156:12
**T1** 42:18 47:4

U

**U** 1:15 162:4
**UAE** 195:1
**uh-huh** 9:3,18 13:6 17:3 19:14 21:23 22:13 23:12 31:22 32:15 37:11 39:1 39:13,17 40:13 43:5,18 46:7,10 47:9 48:23 49:13 52:20 54:20 55:9 55:13 56:5 59:1,5 63:2 65:7,20 66:19 67:17 68:23 69:8,16,19 72:18 74:17 76:6 77:8 82:8 97:5 105:23 106:14 108:3 111:1 114:7 117:7 119:1,15,18 120:4 121:13 125:17 127:8 135:9 139:13 140:4 141:20 143:5 144:13,22 148:14 159:22 160:5 163:22 165:2 177:16 178:7 185:7 191:15 194:21 197:14 198:23 200:21 204:17 205:10,18

210:9 213:13,16 219:23 220:5,10
**Uh-huh(affirmat...** 75:1 77:2 78:8 81:12 90:22 91:16 126:20
**unable** 162:2,3
**Uncle** 214:6 216:19
**understand** 8:4 15:22 33:18 51:23 52:2,5 84:4 101:19 105:2 114:11 124:13 127:22 128:20 133:13 171:2 184:2,6 190:15 191:13 192:15 202:14 211:6 212:10,16 216:3 217:6
**understanding** 26:10 34:7 39:23 42:12 55:7,14 61:2 83:13,16 100:12 104:13 114:8 119:2 121:8 121:20 125:15 131:16 133:10 139:12 144:10 156:22 168:17 171:22 175:15 177:19 184:21 191:22 202:12
**understood** 8:8 122:1 202:9 214:3
**unique** 66:20
**unit** 75:11
**United** 14:19 181:12 183:22
**unscrewed** 46:11
**untrackable** 41:14
**unusual** 199:9,11 199:14 222:1
**updated** 11:13
**upper** 41:15
**upset** 184:15
**upwards** 95:5,20
**use** 11:7,8 42:13 71:18 74:3 76:17 76:17 82:14 90:18 92:16 150:12 152:22,22,23 153:2 156:12,12 160:23 161:6,15 163:6 186:14 206:20,23 220:9
**uses** 73:22
**usual** 7:9
**usually** 50:16,17 66:21 70:15 82:12 82:15 90:23 91:22 93:16 94:3 112:10 204:21
**U.S** 1:1 12:1 37:2 77:10 84:5 215:5

**V**

**VA** 30:10,10,22 31:4 32:9 33:10 33:23 34:10 39:20 40:1
**validate** 215:6
**validated** 39:19 169:13
**Valley** 156:17
**vegetable** 24:2
**vehicle** 192:5
**Venus** 12:9,11,18
**version** 16:14
**versus** 175:6
**vertebrae** 116:7 117:16 118:13,16 118:18 119:4,6,13
**vertebras** 118:23
**veterans** 129:5
**VFW** 10:21
**vibration** 25:19
**Virginia** 9:13,16,17 11:22
**visit** 48:22 60:21 115:22 116:12 173:11
**visited** 151:15
**visitors** 70:11
**visits** 61:3 129:10
**vs** 1:9

**W**

**wage** 5:5 160:1,2
**wages** 158:20 160:7 160:13,18 213:20 213:21
**wait** 34:4 156:21 174:9
**waiting** 173:13
**waive** 214:20
**waived** 2:3,18
**wake** 21:10
**walk** 70:19 81:22 156:19 186:14 218:16,17
**walked** 57:19 89:5 89:6,11 101:11,12 115:23 169:6 198:15,17 201:16 208:14,18 212:7,8 220:13
**walking** 201:18
**wall** 73:5,5 89:7,9 95:8 96:12,14,15 96:17,20,22,23 97:3,7,17 198:18 198:18,19 199:2 204:8
**walls** 96:16 204:7
**want** 9:13 14:20 16:3 38:13 64:22 81:3 85:22 87:20 124:13 128:19 130:19 131:3 150:15,21 152:9 163:7 165:10 168:10 176:16 178:23 182:16 190:20 193:3,9,14 201:11 208:20 216:9 217:1,5,18 222:9 223:13
**wanted** 71:21 101:5 107:15,16,19 108:8 114:16 122:20,21 144:19 147:5 165:14 174:19,21,22,23
**war** 63:13
**warn** 182:5,19 183:9
**warned** 182:9,22
**wasn't** 27:14 53:7,8 62:5 71:3 83:1 90:4 93:2 101:6,7 103:23 104:7,8 114:13 115:3 124:11,15 126:4,5 134:11,14 140:1 156:6 192:8 196:4 199:21 202:3 203:10 209:17 212:12 217:7
**watch** 168:11
**water** 152:13 153:12,14 158:15 201:17,18
**way** 16:7 29:5,6 35:3 53:3 75:21 92:15 113:6 134:13,14 144:20 184:11 204:6 208:16 210:12 213:18
**ways** 201:14
**Weapons** 14:22 15:5 63:1,6,15,23 64:4 65:1,10 66:3 66:18 67:8 70:22 77:11
**wear** 219:15
**wearing** 27:9
**weather** 153:23 154:4
**web** 11:4
**week** 58:22 71:1,2 71:15 92:20 111:19 131:14 151:11 163:16 194:14,14,18,20 207:17
**weeks** 20:21 34:4 48:5 49:10,10 50:12 98:22 99:1 110:19 111:3 112:15 114:14 124:4,23 125:8 126:3,3 131:15 141:2 143:1 144:17,18 147:4 147:14,17,18,20 147:23 148:2 173:23 218:15
**went** 18:2,19 19:3 20:13 23:18 24:3 24:6,8,9,9,10 30:9 30:10 31:18,21 32:8 34:10 36:13 36:20 37:16,18 42:22 45:18 46:11 46:15,16 47:23 48:1,2 50:4 54:4 57:18,21,21 60:14 83:7 89:5,10,10 89:17 90:1,6 92:9 95:4,18 97:11 99:3,4,5 103:3,8 105:6,11,12 106:2 112:17 113:1 115:18 116:4 124:10 128:5 129:16 134:15 138:2 139:17 148:2 156:7,9 157:4 161:22 164:23 166:4 171:4 200:14 203:19 204:5 205:14,23 207:17 209:19 211:21 213:17,18 214:14 218:14
**weren't** 34:9 109:19 128:9 166:3 201:2 211:17 217:9
**we'll** 62:3 115:10
**we're** 45:1 58:23 133:18 184:13,15

193:4 196:1 222:22
**we've** 52:7 86:6,9 87:20,21 101:8 130:2,13 149:4 176:16,18 188:18 190:5,7 195:10 206:8,12 221:17 222:4
**whatsoever** 124:17 191:10
**wheels** 157:20
**When's** 45:14
**whining** 131:3,4
**white** 198:18
**Whitehead** 1:20 6:11
**wife** 9:11 10:1,3 40:5 106:5,7 143:19 152:18 168:15
**wife's** 9:12
**willing** 60:18 189:12 212:2
**win** 134:12
**wing** 40:22
**wise** 225:1
**witness** 2:3 7:6 9:1 22:8 33:11,15,18 106:21 133:20 136:4 164:11 167:21 172:4 185:12,16 189:23 224:20
**witnesses** 176:17
**woke** 21:7
**Wood** 80:18,20
**woods** 156:19
**words** 132:3 137:2 163:3
**work** 14:18 42:21 42:23 66:17,17 67:19 68:3 70:18 71:1,7,15 74:19 75:2 77:4 79:14 84:3,17 85:13 88:14 89:4 90:12 91:18,22 99:19 103:7,13 105:21 106:7 108:14 109:7 122:23 123:2,3,6,7,8 124:21,22,23 125:16 127:5 144:16 145:3 147:4,12,14,19 148:2 152:2 157:3 159:6 172:18 176:1 177:23 180:21 181:20 186:15 189:5 190:19 193:21 197:7 199:8 207:17,21,21 215:3 217:12,17 220:2 222:22
**workday** 93:22
**worked** 15:4 17:16 17:22 63:18,23 71:2,2,10 79:15 90:3 93:8 94:9 105:7 113:21 123:4,8 125:12,13 125:23 126:1,3 148:3 175:7 191:1 192:23 194:7 207:18 209:2
**worker's** 84:1 109:3,12 134:1 159:2 160:20 162:12 167:8 172:10
**working** 13:9 15:9 15:14 32:3 36:15 37:6 62:23 63:14 67:6,7,9 68:8 70:21 71:23 73:6 75:6 81:16 83:11 90:10,16 109:15 123:4,9 127:18 155:2 167:8 174:10 175:5,13 189:3 212:5 214:22,22 215:2
**workmen's** 83:22 89:23 101:17 104:17 107:21 113:12 115:23 127:3,6,13,17,17 128:8 131:22 134:12 135:17 137:17 161:5,7 162:23 167:12 169:20 171:20 172:20 177:17 207:22
**workplace** 89:20 107:23
**works** 35:16 48:19 66:10 67:7 81:5,9 132:8 164:17 167:18 168:13 178:1 186:15 208:15
**world** 1:10 7:21 36:21 59:20 175:10,16,22 179:9,13,21 180:3 180:8,14 181:4,8 181:11,15 182:4,8 182:19,22 183:9 186:6,21 214:15 215:4
**worse** 29:21 42:2 54:3 101:7 111:21 114:17
**wouldn't** 76:15,21 145:2 175:2 197:1
**wounded** 131:18
**wrestle** 152:5
**write** 35:1 134:10 134:16 196:21 212:1,2
**written** 131:8 137:19 171:14 172:5,8 210:15 212:21
**wrong** 90:4,8 98:4 102:17 103:23 104:2 111:5 112:3 115:1 118:14 170:14 180:18 207:20 209:3 210:8
**wrote** 137:22
**W4** 219:20

**X**

**X** 4:2,6 158:13
**X-ray** 18:4 43:16 60:20 115:7 119:8 167:9 169:7,8,9
**X-rays** 17:13 30:15 34:15 128:7 151:3
**x-y** 203:1

**Y**

**Y** 158:13
**yank** 217:18
**yeah** 9:15 11:10,15 12:22 19:20,21 22:8 26:15 28:20 32:23 33:21 34:10 36:10,13,14 38:11 39:5,10 40:3 41:17 42:11 47:14 48:19 50:13 58:10 59:12 61:21 62:21 76:20 80:1,19 82:12 83:6 85:1 95:4 98:3 99:16 106:10 120:19 126:2 130:22 136:12 137:1 139:23 149:12 150:18 155:7 156:14 165:13 170:13 173:6 174:21 176:22 179:18 183:4 198:17 201:10 202:7,14 208:17 217:4 220:16
**year** 18:18 28:7,8 37:16 64:15 79:18 132:20 150:8 151:1,14 152:4 155:23,23 156:3,4 174:8 175:1 178:4 215:8 216:15,17
**years** 9:9 10:2 11:20 12:4,6,7 15:13 92:14 154:16 162:1,1 169:22 177:10 178:4 206:5
**York** 13:13,14
**young** 8:22 219:17
**y'all** 156:11 220:14

**Z**

**Z** 158:13
**zones** 92:5

**$**

**$1,600** 128:3
**$40,000** 216:14
**$46.49** 159:21
**$5,000** 163:12 215:16
**$740** 163:4

**#**

**#210** 6:6
**#57** 225:4

**1**

**1** 4:8 37:21 38:3,10 44:3 209:12
**1st** 45:3
**1.6** 63:12
**10** 4:17 79:19 116:19 117:1 143:1 160:11 163:15,16 211:22 212:5,5
**10s** 71:3
**10th** 120:23 125:6
**10,000** 215:21 216:16
**109** 4:16
**11** 4:18 20:15,15 120:13,18
**11th** 39:3 48:18
**11:00** 1:23

**116** 4:17
**12** 4:19 126:13,18 143:1 149:3 174:13
**12th** 1:22 3:1 151:15
**120** 4:18
**126** 4:19
**13** 4:20 12:4 135:2 135:7
**134** 4:20
**1355** 6:18
**136** 4:21
**138** 4:22
**14** 4:21 137:8,13
**14th** 147:1
**140** 4:23
**143** 5:1
**144** 5:2
**146** 5:3
**148** 5:4
**15** 2:21 4:22 138:23 139:5 208:19
**157** 5:5
**16** 4:23 9:22 141:6 141:11 152:4
**16th** 56:19
**169** 5:6
**17** 5:1 144:4,8
**17th** 51:5 56:10
**1740** 6:5
**175** 5:7
**178** 5:8
**18** 5:2 145:5,10
**189** 4:5
**19** 5:3 146:18,23
**190** 156:18 215:21
**1963** 8:17
**1988** 2:21

**2**

**2** 4:1,9 41:1,6 54:19 89:7 198:20 199:2
**2nd** 55:8
**2,000** 22:17
**20** 5:4 148:20 149:2 179:8
**20th** 1:21 6:12
**200,000** 63:11
**2000** 45:16
**2003** 16:12 19:11 20:7 21:21 22:4,7 33:4
**2004** 22:4,5 27:3
**2005** 9:9 15:15 32:16 33:2 36:3,3 36:16 39:3
**2006** 42:8 44:3 45:4 45:6
**2007** 47:1,11 48:10
**2008** 15:6 48:18
**2009** 51:5 52:15 54:7,19 55:8,23 56:19 58:23 59:3 59:9 62:18,19,22
**2010** 92:13 105:2 110:13,14 117:4 120:23 125:7 126:19 139:6 141:13 144:10 145:11 147:1 148:13 160:2 165:9 181:1 193:10 220:3
**2011** 65:17 174:12
**2012** 149:3 151:16
**2013** 1:22 3:1
**21** 5:5 157:22 158:19
**211** 67:21
**22** 5:6 170:1,6
**220** 215:18
**227s** 16:13
**23** 5:7 139:6 176:6 176:11
**23rd** 117:4 139:7
**24** 5:8 47:1 141:13 178:13,18
**24th** 110:13,14 112:17 113:2,9,15 114:20 115:18 141:15
**240** 126:10 161:20 162:5 214:6,8
**25** 144:10
**2501** 1:21 6:12
**253** 9:5
**28** 10:2

**3**

**3** 4:10 43:20 44:2
**30** 7:3 23:19 206:5
**30x40** 153:1
**300** 1:21 6:13,19
**30309** 6:20
**31st** 145:11,22
**34** 182:13
**35209** 6:7
**35223** 6:14
**35758** 9:6
**37** 4:8
**38** 186:5

**4**

**4** 4:11 46:18,23 47:22,23 48:1 57:3
**4-5** 54:22
**4:15** 223:19
**4:30** 71:8
**40** 71:14,15
**40,000** 216:17
**40-hour** 71:2 124:23
**400** 161:20
**41** 4:9
**43** 4:10
**45.5** 125:11,16 159:6,11 160:11
**450** 163:13
**4505** 63:17 64:1 66:1 67:6,19 68:9 69:14 71:23 73:7 183:21
**46** 4:11 162:6
**4649** 160:11
**48** 4:12

**5**

**5** 4:12 21:19 22:2 27:1 33:14,15 38:17 39:20 47:22 47:23 48:1,12,17 51:12 55:12 117:14 152:14
**5th** 126:19
**5(d)** 2:19
**5-6** 19:7
**5:12-CV-02119** 1:5
**5:30** 70:18 89:5 168:21 197:16
**50** 4:13 161:21 215:21
**52** 170:12,17
**53** 171:12 172:9
**54** 4:14 173:8
**5550** 63:21
**56** 4:15

**6**

**6** 4:13 8:17 19:4 21:19 22:2 30:12 30:20 31:16 33:12 33:14,15,15 38:17 39:20,21 50:22 51:4 121:17,18 178:22
**6th** 41:8 42:8
**6-7** 19:7
**6:00** 71:8 197:15
**600** 152:15

**7**

**7** 4:4,14 19:4 21:22 30:13,20 31:17 33:12,15 39:21 40:17 54:13,18 64:16
**73** 155:7
**75** 161:8

**8**

**8** 4:15 48:10 56:13 56:18
**8th** 193:20 194:2

**9**

**9** 4:16 110:7,11
**9th** 92:13,21 102:23 105:2 125:10 137:4 181:1 193:10,21
**9/30/13** 225:7
**9/30/2013** 225:4
**90-day** 151:7